**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

RHONDA RASCHE, DANIEL CHASTEEN,    )
HOWARD ROBERT ANDERSON, EDWARD    )
WASTAG, MICHAEL CHESNIAK, ALBERT    )
CUNDARI, BYRON HERRERA, GEORGE    )
INNISS, JOSEPH JOOST, IKEM MIKHAIL,    )
LUIS IVAN MORALES, JESUS NAVARRO,    )
VINCENT ORTEGA, ROBERT PITTS, DOEL    )
POLANCO, JOSEPH RADDI, JOSEPH SPAIN,    )
BRIAN THOMPSON, RICARDO VELEZ,    )
REMICK WARE, MORGAN SHASTAL,    )
individually, and on behalf of    )
all others similarly situated,    )
    )
        Plaintiffs,    )
    )
        v.    )  No. 15 cv 7918
    )
B.R. LANE, Acting Director of the Illinois    )  Chief Judge Ruben Castillo
Department of the Lottery;    )
ILLINOIS DEPARTMENT OF THE LOTTERY;    )
LESLIE GEISSLER MUNGER, Illinois    )
Comptroller;    )
MICHAEL W. FRERICH, Illinois State Treasurer;  )
ARIZONA STATE LOTTERY COMMISSION;    )
TONY BOUIE, Executive Director of the Arizona    )
State Lottery Commission;    )
OFFICE OF THE ARKANSAS LOTTERY;    )
BISHOP WOOSLEY, Director of the Office of the  )
Arkansas Lottery;    )
CALIFORNIA LOTTERY COMMISSION;    )
NATHANIEL KIRTMAN, III, Chair of the    )
California Lottery Commission;    )
COLORADO LOTTERY COMMISSION;    )
LAURA SOLANO, Director of the Colorado    )
Lottery Commission;    )
CONNECTICUT LOTTERY CORPORATION;    )
ANNIE M. NOBLE, President and CEO of the    )
Connecticut Lottery Corporation;    )
DELAWARE LOTTERY;    )
VERNON KIRK, Director of the Delaware Lottery; )
FLORIDA LOTTERY;    )
TOM DELACENSERIE, Director of the Florida    )
Lottery;    )

GEORGIA LOTTERY CORPORATION;                     )
DEBBIE D. ALFORD, Acting President and CEO        )
of the Georgia Lottery Corporation;               )
IDAHO LOTTERY COMMISSION;                        )
JEFFREY R. ANDERSON, Executive Director          )
of the Idaho Lottery Commission;                 )
STATE LOTTERY COMMISSION OF INDIANA;)
SARAH M. TAYLOR, Executive Director of the       )
State Lottery Commission of Indiana;             )
IOWA LOTTERY BOARD;                              )
TERRY RICH, CEO of the Iowa Lottery Board;       )
KANSAS LOTTERY COMMISSION;                       )
TERRY PRESTA, Executive Director of the          )
Kansas Lottery Commission;                       )
KENTUCKY LOTTERY CORPORATION;                    )
ARTHUR L. GLEASOR, JR., President and CEO        )
of the Kentucky Lottery Corporation;             )
LOUISIANA LOTTERY CORPORATION;                   )
ROSE HUDSON, President of the Louisiana          )
Lottery Corporation;                             )
MAINE STATE LIQUOR & LOTTERY                     )
COMMISSION;                                      )
GREGG MINEO, Director of the Maine State         )
Liquor & Lottery Commission;                     )
MARYLAND LOTTERY AND GAMING                      )
CONTROL COMMISION;                               )
GORDON MEDENICA, Director of the Maryland        )
Lottery and Gaming Control Commission;           )
MASSACHUSETTS STATE LOTTERY;                     )
MICHAEL R. SWEENEY, Executive Director of        )
the Massachusetts State Lottery;                 )
MICHIGAN BUREAU OF STATE LOTTERY;                )
M. SCOTT BOWEN, Commissioner of the              )
Michigan Bureau of State Lottery;                )
MINNESOTA STATE LOTTERY;                         )
ED VAN PETTEN, Executive Director of the         )
Minnesota State Lottery;                         )
MISSOURI LOTTERY COMMISSION;                     )
MAY SCHEVE REARDON, Executive Director           )
of the Missouri Lottery Commission;              )
MONTANA LOTTERY COMMISSION;                      )
ANGELA WONG, Director of the Montana             )
Lottery Commission;                             )
NEBRASKA LOTTERY;                               )
JILL MARSHALL, Acting Director of the            )
Nebraska Lottery;                               )

NEW HAMPSHIRE LOTTERY COMMISSION;  )
CHARLES McINTYRE, Executive Director of  )
the New Hampshire Lottery Commission;  )
NEW JERSEY LOTTERY COMMISSION;  )
CAROLE HEDINGER, Executive Director of the  )
New Jersey Lottery Commission;  )
NEW MEXICO LOTTERY AUTHORITY;  )
DAVID BARDEN, CEO of the New Mexico  )
Lottery Authority;  )
NEW YORK LOTTERY AND GAMING  )
COMMISSION;  )
GARDNER GURNEY, Director of the New York  )
Lottery and Gaming Commission;  )
NORTH CAROLINA LOTTERY COMMISSION;  )
ALICE GARLAND, Executive Director of the  )
North Carolina Lottery Commission;  )
NORTH DAKOTA LOTTERY;  )
RANDY MILLER, Director of the North Dakota  )
Lottery;  )
OHIO LOTTERY COMMISSION;  )
DENNIS BERG, Director of the Ohio Lottery  )
Commission;  )
OKLAHOMA LOTTERY COMMISSION;  )
ROLLO REDBURN, Executive Director of the  )
Oklahoma Lottery Commission;  )
OREGON LOTTERY COMMISSION;  )
JACK ROBERTS, Director of the Oregon Lottery  )
Commission;  )
PENNSYLVANIA LOTTERY;  )
DREW SVITKO, Executive Director of the  )
Pennsylvania Lottery;  )
RHODE ISLAND LOTTERY;  )
GERALD AUBIN, Director of the Rhode Island  )
Lottery;  )
SOUTH CAROLINA LOTTERY COMMISSION;  )
PAULA HARPER BETHEA, Executive Director  )
of the South Carolina Lottery Commission;  )
SOUTH DAKOTA LOTTERY COMMISSION;  )
NORM LINGLE, Executive Director of the South  )
Dakota Lottery Commission;  )
TENNESSEE EDUCATION LOTTERY  )
CORPORATION;  )
REBECCA HARGROVE, President and CEO of  )
the Tennessee Education Lottery Corporation;  )
TEXAS LOTTERY COMMISSION;  )
GARY GRIEF, Executive Director of the Texas  )

3

Lottery Commission; )
VERMONT LOTTERY COMMISSION; )
GREGORY SMITH, Executive Director of the )
Vermont Lottery Commission; )
VIRGINIA LOTTERY BOARD; )
PAULA I. OTTO, Executive Director of the )
Virginia Lottery Board; )
WASHINGTON LOTTERY COMMISSION; )
BILL HANSON, Director of the Washington )
Lottery Commission; )
WEST VIRGINIA LOTTERY COMMISSION; )
JOHN C. MUSGRAVE, Director of the West )
Virginia Lottery Commission; )
WISCONSIN LOTTERY; )
MICHAEL EDMONDS, Director of the Wisconsin )
Lottery; )
WYOMING LOTTERY CORPORATION; )
JON CLONTZ, CEO of the Wyoming Lottery )
Corporation; )
WASHINGTON, D.C. LOTTERY AND )
CHARITABLE GAMES CONTROL BOARD; )
TRACY COHEN, Executive Director of the )
Washington, D.C. Lottery and Charitable Games )
Control Board; )
US VIRGIN ISLANDS LOTTERY )
COMMISSION; )
JUAN FIGUEROA, SR., Executive Director of )
the US Virgin Islands Lottery Commission; )
LOTERIA ELECTRONICA DE PUERTO RICO; )
ANTONIO PEREZ LOPEZ, Secretario Auxiliar of )
the Lotería Electronica de Puerto Rico; )
MULTI-STATE LOTTERY ASSOCIATION; )
MEGA MILLIONS CONSORTIUM, )
 )
   Defendants. ) Jury Trial Demanded

# **FIRST AMENDED CLASS ACTION COMPLAINT**

All Plaintiffs (collectively, "Illinois Lottery Winners"), individually, and on behalf of all

others similarly situated, by and through counsel at ZIMMERMAN LAW OFFICES, P.C., bring

this action against all Defendants (collectively, the "Defendants"), and state as follows:

4

## TABLE OF CONTENTS

Nature of the Case ............................................................................................6

The Structure of the Lottery ..........................................................................7

Illinois Adopted a Policy to Cease Paying Illinois Lottery Winners ......................12

The Illinois Lottery Continues to Sell Lottery Tickets ..........................................16

Defendants Have the Ability to Pay Illinois Lottery Winners ...............................17

Plaintiffs and Class Members Have a Vested Property Right in Their Winnings................18

Parties ...............................................................................................................19

Jurisdiction and Venue ....................................................................................37

Class Allegations ..............................................................................................38

Issues Concerning the Eleventh Amendment ...............................................41

Plaintiffs' and Class Members' Request for Preliminary Injunctive Relief ......................43

Count I (Declaratory Judgment) ....................................................................51

Count II (42 U.S.C. § 1983) .............................................................................53

Count III (42 U.S.C. § 1983) ...........................................................................62

Count IV (18 U.S.C. § 1961) ............................................................................68

Count V (Civil Conspiracy) .............................................................................73

Count VI (Conversion) .....................................................................................77

Count VII (Conversion) ....................................................................................82

Count VIII (Unjust Enrichment) .....................................................................84

Count IX (Unjust Enrichment) ........................................................................89

Count X (42 U.S.C. § 1983) ..............................................................................91

Count XI (42 U.S.C. § 1983) ............................................................................98

Count XII (Mandatory Injunction) ...............................................................105

Count XIII (Mandatory Injunction) ..............................................................112

## NATURE OF THE CASE

1.　　　The Illinois State Lottery offers over fifty (50) different games of chance to the general public.  Many of those games are offered exclusively within the state of Illinois, such as instant "scratch-off" games and daily in-state number drawing games.

2.　　　In addition to those in-state games, the Illinois State Lottery also participates in the interstate Powerball and Mega Millions lottery games.  The jackpots for the Powerball and Mega Millions games are comprised by aggregating proportional contributions from each participating jurisdiction's department of the lottery.

3.　　　On July 1, 2015, the Illinois Department of the Lottery and B.R. Lane adopted an official policy to cease making payments to individuals who win in excess of $25,000 from any game offered by the Illinois State Lottery, including the interstate Powerball and Mega Millions games.

4.　　　On or about August 28, 2015, almost two months after the Illinois Department of the Lottery stopped making disbursements to the Illinois Lottery Winners whose winnings exceed $25,000, Steven Rossi, Communication Director of the Illinois Department of the Lottery, made the following public announcement:[1]

> Due to the ongoing budget situation in Springfield, some lottery winner payments have been delayed.  All winners will be paid in full as soon as the Lottery and the Illinois Comptroller have the legislative authority to do so. Currently, winners may claim prizes under $600 at any of our 8,000 retail locations, and prizes under $25,000 may be claimed at any Lottery claims center, found at illinoislottery.com."

---

[1] Gaynor Hall, *Illinois Lottery Delays Payouts of $25,000 or More*, WGNTV.COM, Aug. 28, 2015, http://wgntv.com/2015/08/28/illinois-lottery-gives-i-o-u-for-payouts-of-25000-or-more.

5.      As a result of the official policy adopted by the Illinois Department of the Lottery and B.R. Lane, Illinois Lottery Winners who won in excess of $25,000 after July 1, 2015, have been unable to collect their winnings, and are indefinitely barred from obtaining their winnings.

6.      Illinois Lottery Winners of the Powerball and Mega Millions games have been unable to collect any winnings, including amounts that have been contributed by Defendants in addition to the Illinois Department of the Lottery.

7.      On October 15, 2015, the Illinois Department of the Lottery and B.R. Lane amended their official policy and ceased making payments to Illinois Lottery Winners who won in excess of $600 from any game offered by the Illinois State Lottery.[2]  According to the Illinois Department of the Lottery, the Illinois Department of the Lottery has insufficient funds in its lottery fund to pay Illinois Lottery Winners who won in excess of $600.

8.      As a result of the amended official policy adopted by the Illinois Department of the Lottery and B.R. Lane, Illinois Lottery Winners who won in excess of $600 after October 15, 2015 have also been unable to collect their winnings, and are indefinitely barred from obtaining their winnings.

9.      Accordingly, Plaintiffs bring this action for Defendants' ongoing failure to make payouts due and owing to the Illinois Lottery Winners.

## THE STRUCTURE OF THE LOTTERY

10.      Lotteries have long been a tool used by governments to raise revenue, dating back to early colonial period in America.[3]

---

[2] Erik Runge, *Illinois Lottery: Payment Delays for All Winners Over $600*, WGNTV.COM, Oct. 14, 2015, http://www.nbcchicago.com/blogs/ward-room/Lottery-Officials-Players-Who-Win-More-Than-600-Will-be-Delayed-Payment-332909841.html

[3] Roger Dunstan, *Gambling in California*, CALIFORNIA RESEARCH BUREAU, CALIFORNIA STATE LIBRARY, Jan. 1997, http://www.library.ca.gov/crb/97/03/97003a.pdf

11.     A lottery generates revenue by selling lottery tickets to create a "pool" of money, awarding a portion of that "pool" to the winner, and remitting the remainder of the "pool" to the government.[4]  As such, lotteries necessarily have a positive cash-flow.  For example, in 2010, American lotteries generated $58 billion in consumer spending, resulting in a $17 billion profit for the States.[5]

12.     Since lotteries involve gambling, jurisdictions often outlaw all lotteries except those specifically authorized by the government. For example, although Illinois prohibits gambling, those who participate in lotteries authorized by the Illinois Lottery Law—20 ILCS 1605/1, *et seq.*—fall within an exception to that prohibition.  720 ILCS 5/28-1.

13.     To oversee their officially sanctioned lottery games, jurisdictions create autonomous, independently funded and managed entities ("Lottery Departments").  These Lottery Departments have the sole authority to establish, conduct, and administer the lottery games that are offered in their respective jurisdictions.

14.     For example, the Illinois Lottery Law establishes the Illinois Department of the Lottery as an independent entity tasked with implementing and regulating the lottery games offered within Illinois.  20 ILCS 1605/4.

15.     The Illinois Department of the Lottery has the independent authority to "promulgate such rules and regulations governing the establishment and operation of a State lottery as it deems necessary" to manage the lottery games offered within the state of Illinois, which includes the ability to "issue written game rules, play instructions, directives, operations

---

[4]  Alicia Hansen, *How Much Implicit Tax Revenue Did Lotteries Raise in FY2010?*, THE TAX FOUNDATION, Dec. 28, 2010, http://taxfoundation.org/blog/how-much-implicit-tax-revenue-did-lotteries-raise-fy2010
[5]  Alicia Hansen, *How Much Implicit Tax Revenue Did Lotteries Raise in FY2010?*, THE TAX FOUNDATION, Dec. 28, 2010, http://taxfoundation.org/blog/how-much-implicit-tax-revenue-did-lotteries-raise-fy2010

manuals, brochures, or any other publications necessary to conduct specific games." 20 ILCS 1605/7.1.

16. The Illinois Department of the Lottery is the sole entity permitted to offer lottery games within the state of Illinois. *See*, 720 ILCS 5/28-1.

17. B.R. Lane, as Director of the Illinois Department of the Lottery, has the independent authority to maintain an account of money separate and apart from all public moneys of the State ("Illinois Director's Account"), and pay winners of lottery prizes up to $25,000 from the Illinois Director's Account. 20 ILCS 1605/20.1.

18. The Illinois Lottery Law also establishes a special fund called the "State Lottery Fund." 20 ILCS 1605/20(a).

19. The State Lottery Fund is a separate and independent fund from the general funds of the state of Illinois. 30 ILCS 105/5.52.

20. The State Lottery Fund consists of all revenues received from (1) the sale of lottery tickets or shares, (2) application fees from licensed retailers of Illinois Lottery tickets, and (3) all other monies from any other fund or source that are credited or transferred thereto. 20 ILCS 1605/20(a). In short, all proceeds from the Illinois lottery are deposited in the State Lottery Fund. 20 ILCS 1605/9.1(d)(7).

21. Funds from the State Lottery Fund are disbursed by the Illinois Department of the Lottery, pursuant to the following order of priority: First, the funds are used to pay prizes to Illinois Lottery Winners (and to pay retailer bonuses to sellers of winning Illinois Lottery tickets). Second, the funds are used to pay costs incurred in the operation and administration of the Illinois Lottery. Finally, any residual funds are transferred to be retained by the state of

Illinois. 20 ILCS 1605/9.1(o). This order of priority is an official codification of the general structure of lotteries described in Paragraph 11.

22.     When necessary, the Illinois Director's Account is replenished with, and only replenished with, funds held in the State Lottery Fund. 20 ILCS 1605/20.1. This procedure is consistent with the priority articulated by 20 ILCS 1605/9.1(o), as the Illinois Director's Account is used solely to pay Illinois Lottery Winners. 20 ILCS 1605/20.1.

23.     Put simply, the Illinois Department of the Lottery is financially and legally autonomous from the state of Illinois. Financially, the Illinois Department of the Lottery raises and maintains funds independently, and is not reliant on funding or tax revenues from the state of Illinois—in fact, the state of Illinois imposes taxes on the prizes paid out by the Illinois Department of the Lottery. The liabilities of the Illinois Department of the Lottery are satisfied in full *before* any funds are remitted to the state of Illinois, and its operating budget is segregated from the general funds of the state of Illinois. Legally, the Illinois Department of the Lottery has full discretion to manage its own affairs.

24.     Based upon information and belief, all other Defendant jurisdictions that offer lottery games have independent Lottery Departments that are legally and financially autonomous in the same ways as the Illinois Department of the Lottery. These Lottery Departments have substantially similar systems of administration and accounting, and are solely responsible for managing the lottery games offered in their respective jurisdictions. For clarity, this means that all other Lottery Departments segregate lottery revenues and operational expenses from the general treasuries of their jurisdictions, and only the net profits (*i.e.*, residual funds remaining after lottery winners and ongoing expenses are paid) are transferred to be retained by their respective jurisdictions' general treasuries.

25.     Lottery games can be either intrastate or interstate in nature.  However, regardless of whether a particular lottery game is intrastate or interstate in nature, the participating jurisdictions' Lottery Departments are responsible for managing the games.

26.      In regard to intrastate lottery games, many Lottery Departments, like the Illinois Department of the Lottery, offer, administer, and manage daily numbers drawing games and "scratch-off" ticket games exclusively to in-state purchasers.

27.     In addition to intrastate games, many Lottery Departments offer interstate lottery games—such as the Powerball and Mega Millions games—that are offered across multiple jurisdictions, and are administered by the offering jurisdictions' Lottery Departments collectively.

28.     The Lottery Departments participating in interstate lottery games have entered into various agreements ("Lottery Agreements") to create associations and enact rules that facilitate the collective administration of various interstate lottery games.  There are two (2) such associations—the Multi-State Lottery Association (MUSL) and the Mega Millions Consortium—and the Lottery Departments Defendants are members of at least one of those two (2) associations.

29.     Specifically, the Powerball game is administered by the MUSL, while the Mega Millions game is administered by the Mega Millions Consortium.  However, the MUSL and the Mega Millions Consortium have entered into a "Cross-Selling Agreement" that allows members of the MUSL to sell lottery tickets for the Mega Millions game, and members of the Mega Millions Consortium to sell lottery tickets for the Powerball game.

30.     These interstate lottery games use the same accounting procedures and order of priority of payment as articulated above: first, lottery winners are paid; second, the ongoing

expenses of the interstate lottery games are paid; finally, any residual funds are divided between the participating jurisdictions' Lottery Departments.

31.     Pursuant to the Lottery Agreements, the participating Lottery Departments use a three-step process to pay winners of interstate lottery games.  First, the participating Lottery Departments each remit their proportional share of the prize money to one aggregating Lottery Department (Illinois is not one of them).  Then, the aggregating Lottery Department transfers the winning funds to the Lottery Departments of the jurisdictions with the lottery winners.  Finally, each Lottery Department of the jurisdiction with a lottery winner transfers the winning funds to its respective lottery winners.

32.     The Lottery Agreements also provide that a Lottery Department can be held liable for any expenses and costs associated with a shortfall in prize money that the Lottery Department causes by failing to contribute its proportional share of the prize money won in an interstate lottery game.

## ILLINOIS ADOPTED A POLICY TO CEASE PAYING
## ILLINOIS LOTTERY WINNERS

33.     On June 30, 2015, the Illinois State Budget for the 2015 Fiscal Year expired. Illinois has yet to adopt a budget for the 2016 Fiscal Year, which runs from July 1, 2015 through June 30, 2016.

34.     On July 1, 2015, since Illinois had not (and still has not) adopted a budget for the 2016 Fiscal Year, the Illinois Department of the Lottery and B.R. Lane adopted their official policy to cease making payments to winners of the Illinois State Lottery (*i.e.*, Illinois Lottery Winners) who won in excess of $25,000.

35.     However, the Illinois Department of the Lottery and B.R. Lane did not inform the public about this official policy until August 28, 2015, almost two months after the Illinois

Department of the Lottery stopped making disbursements to the Illinois Lottery Winners whose winnings exceed $25,000. As set forth above, on August 28, 2015, Steven Rossi, Communication Director of the Illinois Department of the Lottery, publicly announced the official policy.

36. As a result of the official policy adopted by the Illinois Department of the Lottery and B.R. Lane, Illinois Lottery Winners who won in excess of $25,000, have been unable to collect their winnings after July 1, 2015, and are indefinitely barred from obtaining their winnings relative to both intrastate and interstate lottery games offered by the Illinois Department of the Lottery.

37. Relative to interstate lottery games, such as the Powerball and Mega Millions games, Illinois Lottery Winners have been unable to collect any winnings, including amounts that have been contributed by the other participating Defendant Lottery Departments in addition to the Illinois Department of the Lottery.

38. On October 15, 2015, the Illinois Department of the Lottery and B.R. Lane amended their official policy and ceased making payments to Illinois Lottery Winners who won in excess of $600.[6]

39. As a result of the amended official policy adopted by the Illinois Department of the Lottery and B.R. Lane, Illinois Lottery Winners—in addition to those affected by the original Illinois Lottery policy—who won in excess of $600 have also been unable to collect their winnings after October 15, 2015, and all Illinois Lottery Winners who won in excess of $600 are

---

[6] Erik Runge, *Illinois Lottery: Payment Delays for All Winners Over $600*, WGNTV.COM, Oct. 14, 2015, http://www.nbcchicago.com/blogs/ward-room/Lottery-Officials-Players-Who-Win-More-Than-600-Will-be-Delayed-Payment-332909841.html

indefinitely barred from obtaining their winnings relative to both intrastate and interstate lottery games offered by the Illinois Department of the Lottery.

40. The Illinois Department of the Lottery's and B.R. Lane's attempts to render contingent the distribution of the Lottery winnings upon the passage of a state budget in Illinois means that it is quite realistic that the winners may never receive their money, as the budget is not close to being passed and the state of Illinois is operating under a "new normal" without a budget.[7]

41. As a result of the official policy adopted by the Illinois Department of the Lottery and B.R. Lane, many Illinois Lottery Winners have been placed in financial limbo, with no date or deadline by which the payments to which they are entitled will be disbursed. The Illinois Lottery's website highlights twenty-nine (29) prizes that have occurred since July 1, 2015, ranging from $50,000 to a $262 million Mega Millions jackpot split by two winners. That jackpot happens to be the second largest prize in the history of the Illinois lottery.[8]

42. Based on the information set forth on the website of the Illinois Lottery, the following constitutes the breakdown of the amounts due and owing to the winners, the grand total of which is $288,425,000:[9]

| Date of Press Release | Prize Amount | Names of Winners |
|---|---|---|
| August 17, 2015 | $1,050,000 | John Groth |
| August 14, 2015 | $250,000 | Doris Buchanan |

---

[7] Kim Geiger & Monique Garcia, *Illinois' new normal: No budget, by money still flowing*, CHICAGO TRIBUNE, Aug. 10, 2015, http://www.chicagotribune.com/news/local/politics/ct-illinois-budget-new-normal-met-20150809-story.html.

[8] Aaron Smith, *Illinois lottery winners are in limbo*, CNN MONEY, Aug. 31, 2015, http://money.cnn.com/2015/08/31/news/illinois-lottery/index.html?iid=surge-stack-dom.

[9] *Anything's Possible Press Releases*, ILLINOIS LOTTERY, http://www.illinoislottery.com/en-us/press-releases.html (last accessed September 8, 2015).

| August 13, 2015 | $50,000 | Rhonda Rasche |
|---|---|---|
| August 12, 2015 | $400,000 | Tatasha Trotter |
| August 7, 2015 | $850,000 | Andrew Burke |
| August 6, 2015 | $400,000 | Lance Whitfield |
| August 5, 2015 | $15,000,000 | Michelle Baymon |
| August 4, 2015 | $450,000 | Eddie Mae Mason |
| August 3, 2015 | $1,000,000 | Carlos Herrera |
| July 31, 2015 | $50,000 | David Davis |
| July 30, 2015 | $250,000 | Leon Pawlykowycz |
| July 29, 2015 | $500,000 | Jermaine Roby |
| July 28,2015 | $200,000 | Narayan Dhungel |
| July 27, 2015 | $250,000 | Danny Chasteen |
| July 2015 | $262,000,000 | John Williams and Neal Logue |
| July 24, 2015 | $1,000,000 | Paul Veselack |
| July 23, 2015 | $175,000 | John Howard |
| July 21, 2015 | $150,000 | Michael Gioppo |
| July 22, 2015 | $550,000 | Patti Schaake |
| July 17, 2015 | $50,000 | Christine Kulman |
| July 16, 2015 | $1,000,000 | Melynda Refkin |
| July 15, 2015 | $100,000 | Jaime Prazma |
| July 14, 2015 | $200,000 | Vivian Wilson |
| July 13, 2015 | $100,000 | Bill King |
| July 9, 2015 | $300,000 | Jeff Hendrix |

| July 8, 2015 | $600,000 | Glenn Gliedt and Jeffrey Darr |
| July 7, 2015 | $250,000 | Francisco Hernandez |
| July 6, 2015 | $250,000 | Charles McLaughlin |
| July 1, 2015 | $1,000,000 | Edward Casper |
| **Total:** | **$288,425,000** | |

43.     Since August 17, 2015, the website of the Illinois Lottery inexplicably ceased publishing the Press Releases relating to the Illinois Lottery Winners, who won in excess of $25,000.[10]

### **THE ILLINOIS LOTTERY CONTINUES TO SELL LOTTERY TICKETS**

44.     Despite adopting an official policy to withhold payments to Illinois Lottery Winners, the Illinois Department of the Lottery continues to sell both interstate and intrastate lottery tickets, and continues to pay the costs incurred in the operation and administration of the Illinois Lottery.   Upon information and belief, this includes, without limitation, B.R. Lane's annual salary of $142,000.

45.     The Illinois Department of the Lottery's choice to continue to sell lottery tickets, despite adopting its official policy of non-payment of prize winnings, amounts to a fraud committed upon the public.   Indeed, State Representative Jack Franks (D-Marengo) cited the Illinois government for committing fraud in this instance:

> "Our government is committing a fraud on the taxpayers, because we're holding ourselves out as selling a good, and we're not—we're not selling anything."[11]

---

[10]  *Id.*

[11]  Matthew Walberg, *Illinois lottery winners have to wait for payout due to budget impasse*, CHICAGO TRIBUNE,  Aug.  28,  2015,  http://www.chicagotribune.com/news/local/breaking/ct-lottery-payments-delayed-met-0828-20150828-story.html

46.     In furtherance of the Illinois Department of the Lottery's fraudulent practices, the Illinois Department of the Lottery and B.R. Lane have established another official policy—coextensive with their official policy of non-payment—to contravene the priority of payments set forth by 20 ILCS 1605/9.1(o), as the costs incurred in the operation and administration of the Illinois Lottery are paid from the State Lottery Fund before Illinois Lottery Winners are paid their prize money.

47.     The Illinois Department of the Lottery's and B.R. Lane's adoption of an official policy ignoring the priority of payments set forth by 20 ILCS 1605/9.1(o) has a deleterious effect upon existing Illinois Lottery Winners because the funds that are supposed to be used by the Illinois Department of the Lottery to pay Illinois Lottery Winners are instead being used to pay costs incurred in the operation and administration of the Illinois Lottery.

### DEFENDANTS HAVE THE ABILITY TO PAY ILLINOIS LOTTERY WINNERS

48.     Despite the Illinois Department of the Lottery's claims to the contrary, the Illinois Department of the Lottery necessarily has the funds to pay Illinois Lottery Winners, as the finances and accounts of the Illinois Department of the Lottery are self-sustaining, independently funded and maintained, and are not combined with any other state of Illinois funds until *after* all Illinois Lottery Winners are paid their winnings.

49.     According to a letter dated July 6, 2015 from B.R. Lane to the Illinois State Treasurer, as of June 30, 2015 the cash balance in the State Lottery Fund was $244.4 million.

50.     In regard to interstate lottery games, all other participating Lottery Departments are responsible for their proportional share of the prize money won by an Illinois Lottery Winner.  Therefore, the majority of the funds due to Illinois Lottery Winners of interstate lottery

17

games are entirely unrelated to any monetary contribution from the Illinois Department of the Lottery.

51.     Despite the fact that the participating non-Illinois Lottery Departments have the segregated money to pay Illinois Lottery Winners of interstate lottery games, the non-Illinois Lottery Directors, non-Illinois Lottery Departments, MUSL, and Mega Millions Consortium have adopted official policies of either (a) transferring to the Illinois Department of the Lottery their proportional share of the interstate lottery prize money won by Illinois Lottery Winners, knowing that the Illinois Department of the Lottery and B.R. Lane will not pay out that prize money to the Illinois Lottery Winners, or (b) retaining their segregated proportional share of the interstate lottery prize money won by Illinois Lottery Winners without paying it to the Illinois Lottery Winners, knowing that the Illinois Lottery Winners have immediate and vested possessory and property rights to the money.

52.     The non-Illinois Lottery Directors, non-Illinois Lottery Departments, MUSL, and Mega Millions Consortium have also adopted official policies of allowing the Illinois Department of the Lottery and B.R. Lane to continue to market, advertise and sell Powerball and Mega Millions lottery tickets, and participating in joint marketing, advertising and sales efforts in furtherance thereof, knowing that the Illinois Lottery Winners will not be paid their prize winnings.

## PLAINTIFFS AND CLASS MEMBERS HAVE A VESTED PROPERTY RIGHT IN THEIR WINNINGS

53.     When an individual wins a prize of more than $600 from any intrastate or interstate lottery game offered by the Illinois Department of the Lottery, that individual must redeem the winning ticket, within the established claim period, pursuant to the procedures

prescribed by the Illinois Department of the Lottery. *See, e.g.*, 20 ILCS 1605/7.1; 11 Ill.Admin.Code 1770.190.[12]

54. After a winning lottery ticket is redeemed, the Illinois Department of the Lottery validates the winning ticket, and once a lottery ticket is verified as a winning ticket, the claimant is entitled to the prize money. 11 Ill.Admin.Code 1770.190.

55. Plaintiffs and Class members have complied will all requirements and procedures prescribed by the Illinois Department of the Lottery—and, by extension, the Lottery Agreements established by all other Lottery Departments—to be entitled to their prize money.

56. Therefore, Plaintiffs and Class members have a vested right in their winnings, as they have complied with all prerequisites necessary to obtain ownership of their winnings. Indeed, the Illinois Department of the Lottery does not contest that Plaintiffs and Class members are entitled to their lottery winnings.

57. Plaintiffs and Class members have not given the Illinois Department of the Lottery, or any other Lottery Department, consent to possess, control, reappropriate, or otherwise use their winnings (*i.e.*, their property) for any other purpose than is necessary to effectuate a transfer of the money to Plaintiffs' and Class members' possession and control.

## PARTIES

### *Illinois Intrastate Lottery Plaintiffs*

58. At all relevant times, Plaintiff Rhonda Rasche ("Rasche") was an Illinois citizen. Rasche purchased a winning Illinois Lottery ticket on or about July 28, 2015, and won $50,000. Rasche made a valid and undisputed claim with the Illinois Department of the Lottery on or about July 30, 2015. The Illinois Department of the Lottery refused to pay Rasche's claim.

---

[12] Additional information is also on the Illinois Department of the Lottery website, available at: http://www.illinoislottery.com/en-us/When_You_Win.html

59.     At all relevant times, Plaintiff Danny Chasteen ("Chasteen") was an Illinois citizen. On or about July 20, 2015, Chasteen purchased a winning Illinois Lottery ticket and won $250,000.   Cashteen made a valid and undisputed claim with the Illinois Department of the Lottery after July 1, 2015.   The Illinois Department of the Lottery refused to pay Chasteen's claim.

60.     At all relevant times, Plaintiff Howard Robert Anderson ("Anderson") was an Illinois citizen.   On or about October 20, 2015, Anderson purchased a winning Illinois Lottery ticket and won $1,000.   Anderson made a valid and undisputed claim with the Illinois Department of the Lottery after July 1, 2015.   The Illinois Department of the Lottery refused to pay Anderson's claim.

61.     At all relevant times, Plaintiff Edward Wastag ("Wastag") was an Illinois citizen. Wastag purchased a winning Illinois Lottery ticket after July 1, 2015, and won $250,000. Wastag made a valid and undisputed claim with the Illinois Department of the Lottery after July 1, 2015.   The Illinois Department of the Lottery refused to pay Wastag's claim.

62.     At all relevant times, Plaintiff Morgan Shastal ("Shastal") was an Illinois citizen. On or about October 17, 2015, Shastal purchased a winning Illinois Lottery ticket and won $100,000.   Shastal made a valid and undisputed claim with the Illinois Department of the Lottery after July 1, 2015.   The Illinois Department of the Lottery refused to pay Shastal's claim.

63.     Plaintiffs Rasche, Chasteen Anderson, Wastag, and Shastal are hereinafter collectively known as the "Intrastate Plaintiffs."

### *Interstate Lottery Plaintiffs*

64.     At all relevant times, Plaintiff Michael Chesniak ("Chesniak") was an Illinois citizen.

65.     At all relevant times, Plaintiff Albert Cundari ("Cundari") was an Illinois citizen.

66.     At all relevant times, Plaintiff Byron Herrera ("Herrera") was an Illinois citizen.

67.     At all relevant times, Plaintiff George Inniss ("Inniss") was an Illinois citizen.

68.     At all relevant times, Plaintiff Joseph Joost ("Joost") was an Illinois citizen.

69.     At all relevant times, Plaintiff Ikem Mikhail ("Mikhail") was an Illinois citizen.

70.     At all relevant times, Plaintiff Luis Ivan Morales ("Morales") was an Illinois citizen.

71.     At all relevant times, Plaintiff Jesus Navarro ("Navarro") was an Illinois citizen.

72.     At all relevant times, Plaintiff Vincent Ortega ("Ortega") was an Illinois citizen.

73.     At all relevant times, Plaintiff Robert Pitts ("Pitts") was an Illinois citizen.

74.     At all relevant times, Plaintiff Doel Polanco ("Polanco") was an Illinois citizen.

75.     At all relevant times, Plaintiff Joseph Raddi ("Raddi") was an Illinois citizen.

76.     At all relevant times, Plaintiff Joseph Spain ("Spain") was an Illinois citizen.

77.     At all relevant times, Plaintiff Brian Thompson ("Thompson") was an Illinois citizen.

78.     At all relevant times, Plaintiff Ricardo Velez ("Velez") was an Illinois citizen.

79.     At all relevant times, Plaintiff Remick Ware ("Ware") was an Illinois citizen.

80.     At all relevant times, Plaintiff Robert Clark ("Clark") was an Illinois citizen.

81.     At all relevant times, Plaintiff Richard D. Herman ("Herman") was an Illinois citizen.

82.     On or about September 8, 2015, Chesniak, Cundari, Herrera, Inniss, Joost, Mikhail, Morales, Navarro, Ortega, Pitts, Polanco, Raddi, Spain, Thompson, Velez, and Ware, together, purchased a winning Mega Millions lottery ticket and won $1,000,000. On or about

21

September 10, 2015, they made a valid and undisputed claim with the Illinois Department of the Lottery. The Illinois Department of the Lottery refused to pay their claim.

83.     On or about September 19, 2015, Clark and Herman, together, purchased a winning Powerball lottery ticket and won $2,000,000. Clark and Herman made a valid and undisputed claim with the Illinois Department of the Lottery after July 1, 2015. The Illinois Department of the Lottery refused to pay their claim.

84.     Plaintiffs Chesniak, Cundari, Herrera, Inniss, Joost, Mikhail, Morales, Navarro, Ortega, Pitts, Polanco, Raddi, Spain, Thompson, Velez, Ware, Clark, and Herman are hereinafter collectively known as the "Interstate Plaintiffs."

*Illinois Defendants*

85.     At all relevant times, Defendant B.R. Lane was the Acting Director of the Illinois Department of the Lottery. Defendant Lane is being sued individually and in his official capacity.

86.     At all relevant times, Defendant Illinois Department of the Lottery was an autonomous, independently funded and managed entity in the state of Illinois responsible for administering the Illinois Lottery, and is headquartered at 122 S. Michigan Ave., 19th Floor, Chicago, IL 60603.

87.     At all relevant times, Defendant Leslie Geissler Munger was the Illinois Comptroller. Defendant Geissler Munger is being sued individually and in her official capacity.

88.     At all relevant times, Defendant Michael W. Frerich was the Illinois State Treasurer. Defendant Frerich is being sued individually and in his official capacity.

*Non-Illinois Defendants*

89.     At all relevant times, Defendant Arizona State Lottery Commission was an autonomous, independently funded and managed entity in the state of Arizona responsible for administering the Arizona State Lottery, and is headquartered at 4740 E. University Dr., Phoenix, AZ 85034.

90.     At all relevant times, Defendant Tony Bouie was the Executive Director of the Arizona State Lottery Commission. Defendant Bouie is being sued individually and in his official capacity.

91.     At all relevant times, Defendant Office of the Arkansas Lottery was an autonomous, independently funded and managed entity in the state of Arkansas responsible for administering the Arkansas Scholarship Lottery, and is headquartered at 124 W. Capitol Ave., #1400, Little Rock, AR 72203.

92.     At all relevant times, Defendant Bishop Woosley was the Director of the Office of the Arkansas Lottery. Defendant Woosley is being sued individually and in his official capacity.

93.     At all relevant times, Defendant California Lottery Commission was an autonomous, independently funded and managed entity in the state of California responsible for administering the California Lottery, and is headquartered at 700 N. 10th Street, Sacramento, CA 95811.

94.     At all relevant times, Defendant Nathaniel Kirtman, III was the Chair of the California Lottery Commission. Defendant Kirtman is being sued individually and in his official capacity.

95.     At all relevant times, Defendant Colorado Lottery Commission was an autonomous, independently funded and managed entity in the state of Colorado responsible for

administering the Colorado Lottery, and is headquartered at 225 N. Main Street, Pueblo, CO 81003.

96.     At all relevant times, Defendant Laura Solano was the Director of the Colorado Lottery Commission. Defendant Solano is being sued individually and in her official capacity.

97.     At all relevant times, Defendant Connecticut Lottery Corporation was an autonomous, independently funded and managed entity in the state of Connecticut responsible for administering the Connecticut Lottery, and is headquartered at 777 Brook Street, Rocky Hill, CT 06067.

98.     At all relevant times, Defendant Annie M. Noble was the President and CEO of the Connecticut Lottery Corporation. Defendant Noble is being sued individually and in her official capacity.

99.     At all relevant times, Defendant Delaware Lottery was an autonomous, independently funded and managed entity in the state of Delaware responsible for administering the Delaware Lottery, and is headquartered at 1575 McKee Road, Suite 102, Dover, DE 19904.

100.     At all relevant times, Defendant Vernon Kirk was the Director of the Delaware Lottery. Defendant Kirk is being sued individually and in his official capacity.

101.     At all relevant times, Defendant Florida Lottery was an autonomous, independently funded and managed entity in the state of Florida responsible for administering the Florida Lottery, and is headquartered at 250 Marriott Drive, Tallahassee, FL 32301.

102.     At all relevant times, Defendant Tom Delacenserie was the Director of the Florida Lottery. Defendant Delacenserie is being sued individually and in his official capacity.

103.     At all relevant times, Defendant Georgia Lottery Corporation was an autonomous, independently funded and managed entity in the state of Georgia responsible for administering

24

the Georgia Lottery, and is headquartered at 250 Williams Street, Suite 3000, Atlanta, GA 30303.

104. At all relevant times, Defendant Debbie D. Alford was the Acting President and CEO of the Georgia Lottery Corporation. Defendant Alford is being sued individually and in her official capacity.

105. At all relevant times, Defendant Idaho Lottery Commission was an autonomous, independently funded and managed entity in the state of Idaho responsible for administering the Idaho Lottery, and is headquartered at 1199 Shoreline Lane, Suite 100, Boise, ID 83702.

106. At all relevant times, Defendant Jeffrey R. Anderson was the Executive Director of the Idaho Lottery Commission. Defendant Anderson is being sued individually and in his official capacity.

107. At all relevant times, Defendant State Lottery Commission of Indiana was an autonomous, independently funded and managed entity in the state of Indiana responsible for administering the Hoosier Lottery, and is headquartered at 1302 N. Meridian Street, Indianapolis, IN 46202.

108. At all relevant times, Defendant Sarah M. Taylor was the Executive Director of the State Lottery Commission of Indiana. Defendant Taylor is being sued individually and in her official capacity.

109. At all relevant times, Defendant Iowa Lottery Board was an autonomous, independently funded and managed entity in the state of Iowa responsible for administering the Iowa Lottery, and is headquartered at 13001 University Ave., Clive, IA 50325.

110. At all relevant times, Defendant Terry Rich was the CEO of the Iowa Lottery Board. Defendant Rich is being sued individually and in his official capacity.

111. At all relevant times, Defendant Kansas Lottery Commission was an autonomous, independently funded and managed entity in the state of Kansas responsible for administering the Kansas Lottery, and is headquartered at 128 N. Kansas Ave., Topeka, KS 66603.

112. At all relevant times, Defendant Terry Presta was the Executive Director of the Kansas Lottery Commission. Defendant Presta is being sued individually and in his official capacity.

113. At all relevant times, Defendant Kentucky Lottery Corporation was an autonomous, independently funded and managed entity in the commonwealth of Kentucky responsible for administering the Kentucky Lottery, and is headquartered at 1011 W. Main Street, Louisville, KY 40202.

114. At all relevant times, Defendant Arthur L. Gleasor, Jr. was the President and CEO of the Kentucky Lottery Corporation. Defendant Gleasor is being sued individually and in his official capacity.

115. At all relevant times, Defendant Louisiana Lottery Corporation was an autonomous, independently funded and managed entity in the state of Louisiana responsible for administering the Louisiana Lottery, and is headquartered at 555 Laurel Street, Baton Rouge, LA 70801.

116. At all relevant times, Defendant Rose Hudson was the President of the Louisiana Lottery Corporation. Defendant Hudson is being sued individually and in her official capacity.

117. At all relevant times, Defendant Maine State Liquor & Lottery Commission was an autonomous, independently funded and managed entity in the state of Maine responsible for administering the Maine State Lottery, and is headquartered at 10 Water Street, Hollowell, ME 04347.

26

118. At all relevant times, Defendant Gregg Mineo was the Director of the Maine State Liquor & Lottery Commission. Defendant Mineo is being sued individually and in his official capacity.

119. At all relevant times, Defendant Maryland Lottery and Gaming Control Commission was an autonomous, independently funded and managed entity in the state of Maryland responsible for administering the Maryland Lottery, and is headquartered at 1800 Washington Blvd., Suite 330, Baltimore, MD 21230.

120. At all relevant times, Defendant Gordon Medenica was the Director of the Maryland Lottery and Gaming Control Commission. Defendant Medenica is being sued individually and in his official capacity.

121. At all relevant times, Defendant Massachusetts State Lottery was an autonomous, independently funded and managed entity in the commonwealth of Massachusetts responsible for administering the Massachusetts Lottery, and is headquartered at 60 Columbian Street, Braintree, MA 02184.

122. At all relevant times, Defendant Michael R. Sweeney was the Executive Director of the Massachusetts State Lottery. Defendant Sweeney is being sued individually and in his official capacity.

123. At all relevant times, Defendant Michigan Bureau of State Lottery was an autonomous, independently funded and managed entity in the state of Michigan responsible for administering the Michigan Lottery, and is headquartered at 101 E. Hillsdale Street, Lansing, MI 48909.

124.    At all relevant times, Defendant M. Scott Bowen was the Commissioner of the Michigan Bureau of State Lottery. Defendant Bowen is being sued individually and in his official capacity.

125.    At all relevant times, Defendant Minnesota State Lottery was an autonomous, independently funded and managed entity in the state of Minnesota responsible for administering the Minnesota Lottery, and is headquartered at 2645 Long Lake Road, Roseville, MN 55113.

126.    At all relevant times, Defendant Ed Van Petten was the Executive Director of the Minnesota State Lottery. Defendant Van Petten is being sued individually and in his official capacity.

127.    At all relevant times, Defendant Missouri Lottery Commission was an autonomous, independently funded and managed entity in the state of Missouri responsible for administering the Missouri Lottery, and is headquartered at 1823 Southridge Dr., Jefferson City, MO 65109.

128.    At all relevant times, Defendant May Scheve Reardon was the Executive Director of the Missouri Lottery Commission. Defendant Scheve Reardon is being sued individually and in her official capacity.

129.    At all relevant times, Defendant Montana Lottery Commission was an autonomous, independently funded and managed entity in the state of Montana responsible for administering the Montana Lottery, and is headquartered at 2525 N. Montana Ave., Helena, MT 59601.

130.    At all relevant times, Defendant Angela Wong was the Director of the Montana Lottery Commission. Defendant Wong is being sued individually and in her official capacity.

28

131.    At all relevant times, Defendant Nebraska Lottery was an autonomous, independently funded and managed entity in the state of Nebraska responsible for administering the Nebraska Lottery, and is headquartered at 1800 O Street, Suite 101, Lincoln, NE 68509.

132.    At all relevant times, Defendant Jill Marshall was the Acting Director of the Nebraska Lottery. Defendant Marshall is being sued individually and in her official capacity.

133.    At all relevant times, Defendant New Hampshire Lottery Commission was an autonomous, independently funded and managed entity in the state of New Hampshire responsible for administering the New Hampshire Lottery, and is headquartered at 14 Integra Dr., Concord, NH 03301.

134.    At all relevant times, Defendant Charles McIntyre was the Executive Director of the New Hampshire Lottery Commission. Defendant McIntyre is being sued individually and in his official capacity.

135.    At all relevant times, Defendant New Jersey Lottery Commission was an autonomous, independently funded and managed entity in the state of New Jersey responsible for administering the New Jersey Lottery, and is headquartered at 1333 Brunswick Avenue Cir., Trenton, NJ 08648.

136.    At all relevant times, Defendant Carole Hedinger was the Executive Director of the New Jersey Lottery Commission. Defendant Hedinger is being sued individually and in her official capacity.

137.    At all relevant times, Defendant New Mexico Lottery Authority was an autonomous, independently funded and managed entity in the state of New Mexico responsible for administering the New Mexico Lottery, and is headquartered at 4511 Osuna Road NE, Albuquerque, NM 87109.

138.    At all relevant times, Defendant David Barden was the CEO of the New Mexico Lottery Authority. Defendant Barden is being sued individually and in his official capacity.

139.    At all relevant times, Defendant New York Lottery and Gaming Commission was an autonomous, independently funded and managed entity in the state of New York responsible for administering the New York Lottery, and is headquartered at One Broadway Center, Schenectady, NY 12305.

140.    At all relevant times, Defendant Gardner Gurney was the Director of the New York Lottery and Gaming Commission. Defendant Gurney is being sued individually and in his official capacity.

141.    At all relevant times, Defendant North Carolina Lottery Commission was an autonomous, independently funded and managed entity in the state of North Carolina responsible for administering the North Carolina Education Lottery, and is headquartered at 2100 Yonkers Road, Raleigh, NC 27604.

142.    At all relevant times, Defendant Alice Garland was the Executive Director of the North Carolina Lottery Commission. Defendant Garland is being sued individually and in her official capacity.

143.    At all relevant times, Defendant North Dakota Lottery was an autonomous, independently funded and managed entity in the state of North Dakota responsible for administering the North Dakota Lottery, and is headquartered at 1050 E. Interstate Ave., Suite 200, Bismarck, ND 58503.

144.    At all relevant times, Defendant Randy Miller was the Director of the North Dakota Lottery. Defendant Miller is being sued individually and in his official capacity.

30

145.    At all relevant times, Defendant Ohio Lottery Commission was an autonomous, independently funded and managed entity in the state of Ohio responsible for administering the Ohio Lottery, and is headquartered at 1100 Resource Dr., Suite 5, Brooklyn Heights, OH 44131.

146.    At all relevant times, Defendant Dennis Berg was the Director of the Ohio Lottery Commission. Defendant Berg is being sued individually and in his official capacity.

147.    At all relevant times, Defendant Oklahoma Lottery Commission was an autonomous, independently funded and managed entity in the state of Oklahoma responsible for administering the Oklahoma Lottery, and is headquartered at 3817 N. Santa Fe, Oklahoma City, OK 73118.

148.    At all relevant times, Defendant Rollo Redburn was the Executive Director of the Oklahoma Lottery Commission. Defendant Redburn is being sued individually and in his official capacity.

149.    At all relevant times, Defendant Oregon Lottery Commission was an autonomous, independently funded and managed entity in the state of Oregon responsible for administering the Oregon Lottery, and is headquartered at 500 Airport Road SE, Salem, OR 97301.

150.    At all relevant times, Defendant Jack Roberts was the Director of the Oregon Lottery Commission. Defendant Roberts is being sued individually and in his official capacity.

151.    At all relevant times, Defendant Pennsylvania Lottery was an autonomous, independently funded and managed entity in the commonwealth of Pennsylvania responsible for administering the Pennsylvania Lottery, and is headquartered at 1200 Fulling Mill Road, Middleton, PA 17057.

152.    At all relevant times, Defendant Drew Svitko was the Executive Director of the Pennsylvania Lottery. Defendant Svitko is being sued individually and in his official capacity.

153.    At all relevant times, Defendant Rhode Island Lottery was an autonomous, independently funded and managed entity in the state of Rhode Island responsible for administering the Rhode Island Lottery, and is headquartered at 1425 Pontiac Ave., Cranston, RI 02920.

154.    At all relevant times, Defendant Gerald Aubin was the Director of the Rhode Island Lottery. Defendant Aubin is being sued individually and in his official capacity.

155.    At all relevant times, Defendant South Carolina Lottery Commission was an autonomous, independently funded and managed entity in the state of South Carolina responsible for administering the South Carolina Education Lottery, and is headquartered at 1333 Main Street, 4th Floor, Columbia, SC 29201.

156.    At all relevant times, Defendant Paula Harper Bethea was the Executive Director of the South Carolina Lottery Commission. Defendant Harper Bethea is being sued individually and in her official capacity.

157.    At all relevant times, Defendant South Dakota Lottery Commission was an autonomous, independently funded and managed entity in the state of South Dakota responsible for administering the South Dakota Lottery, and is headquartered at 711 E. Wells Ave., Pierre, SD 57501.

158.    At all relevant times, Defendant Norm Lingle was the Executive Director of the South Dakota Lottery Commission. Defendant Lingle is being sued individually and in his official capacity.

159.    At all relevant times, Defendant Tennessee Education Lottery Corporation was an autonomous, independently funded and managed entity in the state of Tennessee responsible for

administering the Tennessee Education Lottery, and is headquartered at 26 Century Blvd., Suite 200, Nashville, TN 37214.

160.    At all relevant times, Defendant Rebecca Hargrove was the President and CEO of the Tennessee Education Lottery Corporation. Defendant Hargrove is being sued individually and in her official capacity.

161.    At all relevant times, Defendant Texas Lottery Commission was an autonomous, independently funded and managed entity in the state of Texas responsible for administering the Texas Lottery, and is headquartered at 611 E. 6th Street, Austin, TX 78701.

162.    At all relevant times, Defendant Gary Grief was the Executive Director of the Texas Lottery Commission. Defendant Grief is being sued individually and in his official capacity.

163.    At all relevant times, Defendant Vermont Lottery Commission was an autonomous, independently funded and managed entity in the state of Vermont responsible for administering the Vermont Lottery, and is headquartered at 1311 US Route 302, Suite 100, Barre, VT 05641.

164.    At all relevant times, Defendant Gregory Smith was the Executive Director of the Vermont Lottery Commission. Defendant Smith is being sued individually and in his official capacity.

165.    At all relevant times, Defendant Virginia Lottery Board was an autonomous, independently funded and managed entity in the commonwealth of Virginia responsible for administering the Virginia Lottery, and is headquartered at 900 E. Main Street, Richmond, VA 23219.

166.    At all relevant times, Defendant Paula I. Otto was the Executive Director of the Virginia Lottery Board. Defendant Otto is being sued individually and in her official capacity.

167.    At all relevant times, Defendant Washington Lottery Commission was an autonomous, independently funded and managed entity in the state of Washington responsible for administering the Washington Lottery, and is headquartered at 814 4th Ave. E., Olympia, WA 98506.

168.    At all relevant times, Defendant Bill Hanson was the Director of the Washington Lottery Commission. Defendant Hanson is being sued individually and in his official capacity.

169.    At all relevant times, Defendant West Virginia Lottery Commission was an autonomous, independently funded and managed entity in the state of West Virginia responsible for administering the West Virginia Lottery, and is headquartered at 900 Pennsylvania Ave., Charleston, WV 25302.

170.    At all relevant times, Defendant John C. Musgrave was the Director of the West Virginia Lottery Commission. Defendant Musgrave is being sued individually and in his official capacity.

171.    At all relevant times, Defendant Wisconsin Lottery was an autonomous, independently funded and managed entity in the state of Wisconsin responsible for administering the Wisconsin Lottery, and is headquartered at 2135 Rimrock Road, Suite 231, Madison, WI 53708.

172.    At all relevant times, Defendant Michael Edmonds was the Director of the Wisconsin Lottery. Defendant Edmonds is being sued individually and in his official capacity.

173.    At all relevant times, Defendant Wyoming Lottery Corporation was an autonomous, independently funded and managed entity in the state of Wyoming responsible for

administering the Wyoming Lottery, and is headquartered at 1620 Central Ave., Suite 100, Cheyenne, WY 82001.

174.    At all relevant times, Defendant Jon Clontz was the CEO of the Wyoming Lottery Corporation. Defendant Clontz is being sued individually and in his official capacity.

175.    At all relevant times, Defendant Washington D.C. Lottery and Charitable Games Control Board was an autonomous, independently funded and managed entity in the District of Columbia responsible for administering the Washington D.C. Lottery, and is headquartered at 2235 Shannon Place, S.E., Washington, D.C. 20020.

176.    At all relevant times, Defendant Tracy Cohen was the Executive Director of the Washington, D.C. Lottery and Charitable Games Control Board. Defendant Cohen is being sued individually and in her official capacity.

177.    At all relevant times, Defendant US Virgin Islands Lottery Commission was an autonomous, independently funded and managed entity in the territory of the US Virgin Islands responsible for administering the Virgin Islands Lottery, and is headquartered at 5800 Krondprindsens Gade, St. Thomas, VI 00802.

178.    At all relevant times, Defendant Juan Figueroa, Sr. was the Executive Director of the US Virgin Islands Lottery Commission. Defendant Figueroa is being sued individually and in his official capacity.

179.    At all relevant times, Defendant Lotería Electronica de Puerto Rico was an autonomous, independently funded and managed entity in the territory of Puerto Rico responsible for administering the Puerto Rico Lottery, and is headquartered at 383 Ave. F.D. Roosevelt, Suite 110, San Juan, PR 00918.

180.    At all relevant times, Defendant Antonio Perez Lopez was the Secretario Auxiliar of the Lotería Electronica de Puerto Rico. Defendant Perez Lopez is being sued individually and in his official capacity.

181.    Defendants Lane, Bouie, Woosley, Kirtman, III, Solano, Noble, Kirk, Delacenserie, Alford, Anderson, Taylor, Rich, Presta, Gleasor, Jr., Hudson, Mineo, Medenica, Sweeney, Bowen, Petten, Reardon, Wong, Marshall, McIntyre, Hedinger, Barden, Gurney, Garland, Miller, Berg, Redburn, Roberts, Svitko, Aubin, Bethea, Lingle, Hargrove, Grief, Smith, Otto, Hanson, Musgrave, Edmonds, Clontz, Cohen, Figueroa, Sr., and Perez Lopez are hereinafter collectively known as the "Lottery Directors."

182.    Defendants Illinois Department of the Lottery, Arizona State Lottery Commission, Office of the Arkansas Lottery, California Lottery Commission, Colorado Lottery Commission, Connecticut Lottery Corporation, Delaware Lottery, Florida Lottery, Georgia Lottery Corporation, Idaho Lottery Commission, State Lottery Commission of Indiana, Iowa Lottery Board, Kansas Lottery Commission, Kentucky Lottery Corporation, Louisiana Lottery Corporation, Maine State Liquor & Lottery Commission, Maryland Lottery and Gaming Control Commission, Massachusetts State Lottery, Michigan Bureau of State Lottery, Minnesota State Lottery, Missouri Lottery Commission, Montana Lottery Commission, Nebraska Lottery, New Hampshire Lottery Commission, New Jersey Lottery Commission, New Mexico Lottery Authority, New York Lottery and Gaming Commission, North Carolina Lottery Commission, North Dakota Lottery, Ohio Lottery Commission, Oklahoma Lottery Commission, Oregon Lottery Commission, Pennsylvania Lottery, Rhode Island Lottery, South Carolina Lottery Commission, South Dakota Lottery Commission, Tennessee Education Lottery Corporation, Texas Lottery Commission, Vermont Lottery Commission, Virginia Lottery Board, Washington

36

Lottery Commission, West Virginia Lottery Commission, Wisconsin Lottery, Wyoming Lottery Corporation, Washington, D.C. Lottery and Charitable Games Control Board, US Virgin Islands Lottery Commission, and Lotería Electronica de Puerto Rico are hereinafter collectively known as the "Lottery Departments."

183.   All of the Lottery Departments (except for the Lotería Electronica de Puerto Rico) entered into an agreement to create an entity named the Mega Millions Consortium.   At all relevant times, Defendant Mega Millions Consortium is an unincorporated association.

184.   All of the Lottery Departments created a non-profit association named the Multi-State Lottery Association for Powerball.   At all relevant times, Defendant Multi-State Lottery Association is an Iowa non-profit association, with its principal place of business located at 4400 NW Urbandale Drive, Urbandale, IA 50322.

## JURISDICTION AND VENUE

185.   This Court has jurisdiction over Plaintiffs' and Class members' constitutional and property rights claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, in that their claims arise under 42 U.S.C. § 1983, which is an Act of Congress providing for the protection of constitutional and property rights.

186.   This Court has supplemental jurisdiction over Plaintiffs' and Class members' state law claims pursuant to 28 U.S.C. § 1367, as Plaintiffs' and Class members' state law claims arise out of the same case or controversy as Plaintiffs' and Class members' constitutional and property rights claims.

187.   Venue is proper the Northern District of Illinois, pursuant to 28 U.S.C. § 1391.

## CLASS ALLEGATIONS

188.   **Class Definition**: Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and a Class of all others similarly situated, defined as follows:

> All winners of lottery games offered by the Illinois Department of the Lottery whose claim to prizes in excess of $600 existed on or after July 1, 2015, and who have not been paid.

Excluded from the Class are: (1) Defendants, and Defendants' agents; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

189.   The Class is composed of two distinct Subclasses, as set forth in the following Paragraphs.

190.   **Subclass I Definition**: The Intrastate Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and a Subclass of all others similarly situated, defined as follows:

> All winners of intrastate lottery games offered by the Illinois Department of the Lottery whose claim to prizes existed on or after July 1, 2015, and who have not been paid.

191.   Subclass I shall be hereinafter referred to as the "Intrastate Lottery Class."

192.   **Subclass II Definition**: The Interstate Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and a Subclass of all others similarly situated, defined as follows:

> All winners of interstate lottery games offered by the Illinois Department of the Lottery whose claim to prizes existed on or after July 1, 2015, and who have not been paid.

193.   Subclass II shall be hereinafter referred to as the "Interstate Lottery Class."

194.     **Numerosity**: The Classes are so numerous that joinder of all individual members in one action would be impracticable.  Since August 17, 2015, the website of the Illinois Lottery stopped publishing the Press Releases identifying the Illinois Lottery Winners who won prizes in excess of $25,000. As of August 17, 2015, there were twenty-nine (29) lottery winnings that have occurred since July 1, 2015, with prizes ranging from $50,000 to a $262 million Mega Millions jackpot. Since then, the size of the Classes has only grown, as the Illinois Department of the Lottery and B.R. Lane adopted their amended official policy to cease payment on all winning tickets for more than $600.  Additionally, the Illinois Department of the Lottery continues to sell lottery tickets with potential winnings in excess of $600. Thus, the number of individuals with winning tickets worth in excess of $600 has increased, encompassing members of all Classes, which is likely comprised of thousands of individuals.

195.     **Commonality and Predominance**: There are common questions of fact and law affecting members of the Classes, which common questions predominate over questions which may affect individual members.  These include the following:

a.      Whether Plaintiffs and Class members have a vested property right in their lottery winnings, and the interest accrued thereon;

b.      Whether Plaintiffs and Class members have full and exclusive property rights (*i.e.*, ownership) in their winnings, and the interest accrued thereon;

c.      Whether Plaintiffs and Class members have been wrongfully deprived of their winnings in contravention of their constitutional rights;

d.      Whether Plaintiffs and Class members are entitled to equitable relief (*e.g.*, imposition of a constructive trust, and/or injunctive relief) to obtain their winnings;

e.      Whether the Defendants violated Plaintiffs' and Class members' constitutional and property rights by refusing to disburse their winnings;

f.      Whether Plaintiffs and Class members have a right to immediate possession of their winnings;

g.      Whether Defendants converted Plaintiffs' and Class members' property (*i.e.*, their lottery winnings);

h.      Whether Defendants' actions, taken pursuant to the Lottery Agreements, constitutes actions prohibited by the Racketeer Influenced and Corrupt Organizations Act;

i.      Whether Defendants' actions constitute violations of federal law;

j.      Whether Defendants were unjustly enriched due to their conduct;

k.      Whether Defendants committed fraud;

l.      Whether the Illinois Department of the Lottery is required to inform purchasers of its lottery games that they would not be paid if their winnings exceed $600.

196.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class members that they represent.  All are based on the same legal theories and arise from the same unlawful conduct.  Plaintiffs and the Class have been similarly or identically harmed by the same unlawful conduct of Defendants. Defendants have all refused to issue any winnings to the Plaintiffs and Class.

197.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent their respective Class members. Plaintiffs have no interests that conflict with the interests of the Class members that they represent, and there is no conflict between the interests of any Subclasses with one another. Furthermore, Plaintiffs have retained counsel experienced and competent in the prosecution of complex class action litigation.

198.    **Superiority**: A class action is superior to other available means for the fair and efficient adjudication of the claims of the Class members.  Besides the predominance of questions common to all Class members, individual Class members lack resources to undertake the burden and expense of individual prosecution of these claims against Defendants.

Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. In contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.

199.    Furthermore, Defendants have acted and refused to act on grounds that apply generally to the Class, so that final injunctive relief and declaratory relief would apply to the Class as a whole.

200.    **Ascertainability**: The members of the Class can be easily ascertained, as they necessarily have winning lottery tickets. Discerning members of the Class from members of the general public would involve the exact same process used by all Lottery Departments to ascertain winners of the lottery games that they offer.

## ISSUES CONCERNING THE ELEVENTH AMENDMENT

201.    Plaintiffs and Class members acknowledge that the Eleventh Amendment to the United States Constitution may be implicated by some of the causes of action set forth herein. *See*, U.S. Const. Amend. XI.

202.    Due to the separation between the Lottery Departments and the governments of their respective jurisdictions, the Eleventh Amendment is not implicated in this case. Indeed, in *Burrus v. State Lottery Com'n of Ind.*, 546 F.3d 417 (7th Cir. 2008), the United States Court of Appeals for the Seventh Circuit held that such was the case with respect to Indiana's Lottery Department.

203.    Nevertheless, Plaintiffs and Class members realize the Eleventh Amendment is applicable if a Lottery Department is found to be an "arm of the state," and such a determination

will affect the appropriate parties, causes of action, and types of relief that can be pled in connection with a particular claim.

204.    Plaintiffs' and Class members' requests for relief can be divided into three (3) distinct categories.   The first such category is Plaintiffs' and Class members' prayer for declaratory judgment, as it is applicable irrespective of whether or not the Eleventh Amendment applies.   The other two categories are plead in the alternative to one another, based upon a determination of whether or not the Eleventh Amendment applies to a Defendant in this case.

205.    To the extent that a prayer for relief against a Defendant who is deemed to *not* be an arm of the state would implicate the impermissible expenditure of general treasury funds, and would therefore implicate the Eleventh Amendment, Plaintiffs and Class members expressly limit such prayers for relief.   For example, if Plaintiffs' and Class members' winnings have accrued interest prior to the filing of this action, and some of that accrued interest has already been transferred to the general treasury of a particular state, Plaintiffs' and Class members' prayer for accrued interest should be limited to accrued interest that has not already been transferred to the general treasury of a particular state.

206.    Based upon the foregoing self-imposed limitation on Plaintiffs' and Class members' prayers for relief, Plaintiffs' and the Class members' request for preliminary injunctive relief—as set forth below—is necessary, as it will prevent accrued interest on their lottery winnings from being prematurely transferred to the general treasuries of Defendants' jurisdictions.   In the event that Plaintiffs and Class members do not obtain a favorable judgment on the merits of this case, any accrued interest on funds held by the Court, pursuant to Plaintiffs' and Class members' sought-after preliminary injunctive relief, may be transferred to Defendants' jurisdictions' general treasuries without any harm to Defendants' jurisdictions.

## PLAINTIFFS' AND CLASS MEMBERS' REQUEST
## FOR PRELIMINARY INJUNCTIVE RELIEF

### Legal Basis for Preliminary Injunctive Relief

207. "The purpose of a preliminary injunction is not to conclude the merits of the controversy, but merely to preserve the status quo until a more considered decision on the merits is possible." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 264 (7th Cir. 1981).

208. When seeking injunctive relief under the common law, the party seeking a preliminary injunction or TRO must establish facts demonstrating the traditional equitable elements that (1) it has a protected right; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) its remedy at law is inadequate; and (4) there is a likelihood of success on the merits. *Houseknecht v. Zagel*, 112 Ill.App.3d 284, 291-92 (1st Dist. 1983). In either case, the party seeking relief is not required to make out its entire case that would entitle it to relief on the merits; rather, it need show only that it raises a "fair question" about the existence of its right and that the court should preserve the status quo until the case can be decided on the merits. *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill.2d 373, 382 (1985).

209. In the instant matter, Plaintiffs and Class members will be seeking preliminary injunctive relief to maintain the status quo prior to a determination on the merits relative to the causes of action pled below.

210. Plaintiffs' and Class members' requests for preliminary injunctive relief may be considered prior to a determination of any Eleventh Amendment issues.

211. Depending upon the Court's determination of the subsequent issues presented by this litigation, the various forms of preliminary injunctive relief requested by Plaintiffs and Class members may ripen into prayers for permanent injunctive relief.

212. In the case at hand, all of the elements for injunctive relief are met.

## The Preliminary Injunctive Relief Requested

213.     Plaintiffs and Class members are seeking preliminary injunctive relief to prevent the Illinois Department of the Lottery from (1) selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, and (2) making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid.

214.     To the extent that the Illinois Department of the Lottery continues to sell lottery tickets with potential winnings in excess of $600, for both interstate and intrastate games, Plaintiffs and Class members seek preliminary injunctive relief to explicitly inform individuals presently purchasing said lottery tickets, at the point of sale, that they are not able to collect their winnings if their winnings exceed $600.

215.     Plaintiffs and Class members are also seeking preliminary injunctive relief to require Defendants to transfer all lottery winnings, and accrued interest thereon, that are due to Plaintiffs and Class members to the custody of the Court.  The Court shall hold said monies, plus additional accrued interest, in trust until this case can be fully adjudicated on the merits.

## Clearly Ascertainable Right

216.     In order for injunctive relief to be obtained, a plaintiff must clearly establish a protectable property right. *Ording v. Springer*, 88 Ill.App.3d 243, 245 (1st Dist. 1980).

217.     The Plaintiffs' and Class members' rights to their winnings have vested, and Plaintiffs and Class members have acquired full and exclusive property rights in their winnings (*i.e.*, ownership).  Therefore, Plaintiffs and Class members have clearly ascertainable rights to their winnings, and the interest accrued thereon.

218.     Furthermore, the individuals playing lottery games offered by the Illinois Department of the Lottery are entitled to be apprised that they will not be able to obtain winnings in excess of $600, before making their decision to purchase lottery tickets.  It is a certainty that

some of these individuals will win, and those individuals will be subjected to the Illinois Department of the Lottery's and B.R. Lane's official policy to not pay winning tickets. Every person who wins an interstate lottery game, or an intrastate lottery game with a prize greater than $600, will automatically become a Class member. Since that policy violates the constitutional and property rights of Illinois Lottery winners—as it is doing to Plaintiffs and Class members— clearly ascertainable rights are implicated.

**Irreparable Harm**

219. The necessity of the temporary injunction should be made apparent by appropriate allegations showing that a change in the status quo would cause irreparable injury. *O'Brien v. Matual*, 14 Ill.App.2d 173, 187 (2nd Dist. 1957).

220. Plaintiffs and the Class members are subject to irreparable injury because each time Defendants refuse to distribute their winnings in favor of paying the ongoing expenses of interstate and intrastate lottery games, Plaintiffs' and Class members' property is being misappropriated. This misappropriation violates Plaintiffs' and Class members' full and exclusive property rights in their winnings because Plaintiffs and Class members have not given their consent to Defendants to use their property in this manner.

221. In addition, so long as Plaintiffs' and Class members' property remains in Defendants' possession, Defendants are able to use Plaintiffs' and Class members' property, against Plaintiffs' and Class members' will, to obtain accrued interest. Depending on the resolution of the Eleventh Amendment issue in this case, Plaintiffs and Class members may be unable to recover this accrued interest unless an injunction is issued relative to their improperly withheld prize winnings.

222.     To the extent that Defendants are acting under color of law, their official policies violate Illinois Lottery Winners' constitutional rights, as Defendants are taking private property (*i.e.*, the Illinois Lottery Winners' winnings) for public use without *any* compensation.

223.     In addition, to the extent that the Illinois Department of the Lottery and B.R. Lane are acting under the color of law, their official policy to contravene the priority of payments set forth by 20 ILCS 1605/9.1(o) repeatedly violates Plaintiffs' and Class members' statutory rights.

224.     Further, the individuals who are buying tickets for lottery games offered by the Illinois Department of the Lottery without knowing about the Illinois Department of the Lottery's and B.R. Lane's official policy to not pay winning tickets are harmed because they are paying for a chance to win a prize which is not offered, and are therefore subjected to fraud.  In addition, these new lottery winners will be subjected to the same harm as Plaintiffs and Class members, which can only be prevented by an injunction.

**Inadequate Remedy at Law**

225.     There is no adequate remedy at law when the injury is continuing in nature. An injunction is proper in such a circumstance. *Fink v. Board of Trustees of Southern Ill. Univ.*, 71 Ill.App.2d 276, 281 (5th Dist. 1966).

226.     In the case at hand, there is no adequate remedy at law for Defendants' misconduct, because the wrongs complained of are continuous, ongoing, and repeatedly occurring.  In addition, Defendants' official policies are in contravention of established constitutional principles.

227.     It is also possible that Plaintiffs and Class members will have no legal recourse to acquire any accrued interest on Plaintiffs' and Class members' property without an injunction being issued.

228.    At the present time, future winners of lottery games offered by the Illinois Department of the Lottery have no ability to prevent themselves from being subjected to the Illinois Department of the Lottery's and B.R. Lane's official policy.

## Likelihood of Success on the Merits

229.    "The party seeking a preliminary injunction or temporary restraining order is not required to make out a case which would entitle him to relief on the merits; rather, he need only show that he raises a 'fair question' about the existence of his right and that the court should preserve the status quo until the case can be decided on the merits." *Buzz Barton & Assoc., Inc. v. Giannone*, 108 Ill.2d 373, 382 (1985).

230.    Plaintiffs and Class members are likely to be successful on the merits because Defendants' repeated failures to make payments to the Plaintiffs and Class members constitute a host of legal wrongs—as set forth by the causes of action below—regardless of any determination of whether Defendants are arms of their respective states.

231.    Moreover, there is no serious dispute as to the facts and liabilities in this case. Indeed, the Illinois Department of the Lottery admits that Plaintiffs and Class members are entitled to their prize winnings. Thus, the "fair question" prong is met here.

## Enforcement Is Feasible

232.    Enforcement is feasible because Plaintiffs' and Class members' requested relief is easily implemented, observed, and are interrelated to one another.  For example, if the Court suspends the sales of tickets for all lottery games offered by the Illinois Department of the Lottery with a potential payout of more than $600, the ongoing expenses incurred by the Illinois Department of the Lottery will drop precipitously.  If the Illinois Department of the Lottery continues to sell tickets, Plaintiffs' and Class members' requested relief is similarly enforceable.

47

Therefore, the Court can easily ascertain whether the Illinois Department of the Lottery is in compliance with its order.

233.    The Court will also supervise the deposit of the disputed funds with the Clerk of the Court, so the Court will be immediately apprised of which parties are in compliance with its order.

### Balancing of Hardships

234.    The hardship to the Illinois Department of the Lottery is slight compared to the hardship continuously and repeatedly experienced by winners and potential winners of lottery games offered by the Illinois Department of the Lottery. The proposed relief imposes little to no financial burden on Defendants, as the requested funds are already in Defendants' possession. In contrast, the financial burden that Plaintiffs and the Class will suffer from having their winnings frozen indefinitely, and having to apply for loans to pay their bills—as Plaintiff Chasteen has done—is great.  Moreover, the financial aspects of such an injunction would be easily tolerated by all Defendants given the presence of funds in the State Lottery Fund and the similar segregated lottery funds of all other Defendants.

235.    Relative to all Defendants, there is no dispute as to whether or not Plaintiffs and Class members are entitled to their winnings, and all Defendants intend to pay (or have already divested themselves of) said winnings.  Therefore, there will be no burden upon Defendants.

236.    In addition, the requested injunctive relief will require Defendants to deposit Plaintiffs' and Class members' winning funds with the Court. This will allow Plaintiffs' and Class members' accrued interest to be segregated from any other monies not at issue in this action. If Plaintiffs and Class members do not prevail, Defendants will receive the entirety of that money (principal and interest), placing Defendants in the identical financial position that they

48

would have been without the requested injunction. In contrast, if Plaintiffs and Class members prevail, and the requested injunction was not ordered, Plaintiffs and Class members may be unable to acquire said interest due to the Eleventh Amendment. Therefore, the risk of hardship is borne only by Plaintiffs and Class members.

237. Furthermore, given Defendants' knowing, intentional, and willful adoption of their official policies to deprive Plaintiffs and Class members of their property, the balance of hardships inquiry is unnecessary. *See*, *Nonnenmann v. Lucky Stores, Inc.,* 53 Ill.App.3d 509, 515 (3rd Dist. 1977) (noting that a court should not apply the relative hardship test where conduct by a defendant was intentional). This is especially true for the Illinois Department of the Lottery because it continued to sell lottery tickets for the potential prizes that it will not pay, while simultaneously failing to inform the public of that policy.

**The Court Should Dispose of the Bond Requirements Before Entering the Injunction**

238. Federal Rule of Civil Procedure 65(c) provides:

> The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

Fed.R.Civ.P. 65(c).

239. In this instance, there is a good cause for this Court to issue injunctive relief in the absence of a bond. Here, Defendants do not dispute that Plaintiffs and Class members are entitled to their winnings. Plaintiffs seek to forestall Defendants from committing continuing constitutional violations. Moreover, as described above, there is no potential harm to Defendants, as the requested injunction will require them to do something that they have already expressed the intention to do in the future.

240.    In addition, the Illinois Department of the Lottery is continuing to pay its operating expenses using Plaintiffs' and the Class members' property. Given the priority granted to the prize winners under the Illinois Lottery Law, it is improper to pay the secondary operational expense of the Illinois Lottery, while leaving the actual and potential winners of the lottery without payments and without redress.  *See*, 20 ILCS 1605/9.1(o).  The aforementioned statutory and constitutional violations contravene public policy, and therefore, the requested injunction would be for good cause.

241.    Moreover, to the extent that the Illinois Department of the Lottery continues to sell tickets to interstate and intrastate lottery games, it is perpetrating a fraud on the public, and subjecting future winners to the misappropriation of their winnings.  As such, permitting the Illinois Department of the Lottery to continue to sell tickets, without informing the public of the true nature of that transaction, would allow the Illinois Department of the Lottery to continue to perpetrate the illegal acts complained of in this case upon the public (which include future Class members).

242.    Finally, the facts of this case are not seriously in dispute, and there is little to no risk that a subsequent factual determination will render any injunctive relief inappropriate after it is duly granted.

243.    Therefore, in light of the foregoing, Plaintiffs and Class members have demonstrated good cause for the Court to issue preliminary injunctive relief consistent with the requests herein.

**COUNT I**
**Declaratory Judgment**
**On Behalf of All Plaintiffs Against All Defendants**
**(Regardless of Whether Defendants are Arms of the State Under the 11th Amendment)**

244.  Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

245.  Count I is asserted irrespective of whether or not the Lottery Departments are determined to be arms of the state.

246.  At all relevant times, there was in effect the Declaratory Judgment Act ("DJA"), 28 U.S.C. §2201(a), which states, in relevant part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a)

247.  Plaintiffs and Class members seek an order declaring that:

a.  Plaintiffs and Class members have full and exclusive property rights in (*i.e.*, ownership of) their lottery winnings;

b.  Plaintiffs and Class members have a vested property right in their lottery winnings; and

c.  Plaintiffs and Class members have a property interest in the accrued interest on their lottery winnings for any length of time that their lottery winnings remain due and owing.

248.  The controversy presented in this case is definite and concrete, and affects the adverse legal interests of the parties. Plaintiffs' and Class members' legal rights in their lottery winnings, and interest accrued thereon, directly affects their ability to pursue appropriate remedies to acquire possession and control of said winnings plus interest. Defendants have an opposing tangible legal interest in the claims set forth herein, as this case will determine the legal

and constitutional scope of Defendants' obligations to Plaintiffs and Class members relative to their lottery winnings.

249.    There is an actual controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment because Defendants deprived, and continue to deprive, Plaintiffs and the Class members of their constitutional and property rights vis-à-vis the winnings and interest accrued thereon. Plaintiffs and the Class have suffered an "injury in fact" as a result of Defendants' wrongful retention, use and enjoyment, and misappropriation of their winnings.

250.    Consequently, Plaintiffs and Class members have been, and will continue to be, caused significant harm in that they have been unlawfully deprived and denied possession of their property—and by extension their constitutional rights—by Defendants.  Plaintiffs and Class members will continue to suffer financial harm, in addition to the deprivation of their constitutional due process rights, if the Court were to deny their request for declaratory relief.

251.    If the Court were to deny Plaintiffs' and Class members' request for declaratory relief, this controversy will continue to exist, as Plaintiffs' and Class members' ability to pursue their legal remedies is contingent upon the declaration requested herein, and because Defendants refuse to fulfill their legal, constitutional, and ethical obligations to Plaintiffs and Class members.

252.    Since Plaintiffs and Class members indisputably satisfied all requirements set forth by the Illinois Lottery Law and other applicable laws, and those laws do not allow for any exceptions or discretion in disbursement of properly filed claims to lottery winnings, there are no disputed legal and factual issues that the Court would have to resolve in granting Plaintiffs' and Class members' request for declaratory relief.

253. Based on the foregoing facts, the Court should declare the rights and other legal remedies of Plaintiffs and Class members vis-à-vis the winnings and interest accrued thereon.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class defined herein;

B. Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiffs and the Class and against Defendants;

D. Issuing an order declaring the Plaintiffs' and Class members' full and exclusive property rights (*i.e.*, ownership) in their winnings and accrued interest thereon, and that said property rights have vested;

E. Awarding Plaintiffs reasonable attorney's fees and costs; and

F. Granting all such further and other relief as the Court deems just and appropriate.

## COUNT II
### 42 U.S.C. § 1983
**On Behalf of Interstate Lottery Plaintiffs and the
Interstate Lottery Class Against the MUSL, the Mega Millions Consortium, All Lottery Departments, and All Lottery Directors, in Their Official Capacity and as Individuals
(Assuming Defendants are <u>Not</u> Arms of the State Under the 11th Amendment)**

254. Interstate Lottery Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

255. The Lottery Departments and their Lottery Directors are not arms of the state for purposes of the Eleventh Amendment because the Lottery Departments are legally and financially autonomous from their jurisdictions' governments, raise and maintain funds

independently, are not reliant on funding or tax revenues from their jurisdictions, and segregate their operating expenses from the general treasuries of their jurisdictions' governments. Any judgment against the Lottery Departments and their Lottery Directors would not be paid from the general treasuries of their respective jurisdictions' governments, as lottery funds and operating budgets are held in a separate, special account.

256. The governments of the Lottery Departments' respective jurisdictions have delegated the historic and exclusive state function of running their lotteries to their Lottery Directors vis-à-vis their Lottery Departments. Although the Lottery Departments and their Lottery Directors are not state entities or actors for the purposes of the Eleventh Amendment, the Lottery Departments' and Lottery Directors' exclusive authority to administer lotteries at the behest of their respective jurisdictions' governments means that they act under the color of state law for purposes of 42 U.S.C. § 1983.

257. At all relevant times, there was in effect 42 U.S.C. § 1983, which states, in relevant part:

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

258. As stated above, the Lottery Departments have adopted official policies of non-payment as to Interstate Lottery Plaintiffs and Interstate Lottery Class members. Those official policies have been authorized and adopted by all Lottery Directors, respectively.

259. Each Lottery Department and Lottery Director is a member of the MUSL, the Mega Millions Consortium, or both.

260.    As members of the MUSL and the Mega Millions Consortium, each Lottery Department and Lottery Director administrates and manages the Powerball and Mega Millions interstate lottery games, and each Lottery Department and Lottery Director is responsible for advertising and selling lottery tickets for those games, pursuant to the Lottery Agreements and Cross-Selling Agreement.

261.    As such, the actions of each Lottery Department and Lottery Director relative to the Powerball and Mega Millions interstate lottery games were also taken on behalf of the MUSL the Mega Millions Consortium.

262.    In light of the foregoing, the MUSL, the Mega Millions Consortium, each Lottery Department, and each Lottery Director is a "person" as interpreted in 42 U.S.C. § 1983.

263.    The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee that no State shall "deprive any person of life, liberty or property, without due process of law." This principle is known as "Due Process."

264.    Due Process consists of two components, Substantive Due Process and Procedural Due Process. Substantive Due Process requires that state action does not impermissibly deprive a person of their fundamental rights to life, liberty, or property. Procedural Due Process requires that adequate procedures are in place before a state actor permissibly deprives (*i.e.*, Substantive Due Process is not implicated) a person of life, liberty, or property.

265.    The Fifth Amendment's "Takings Clause" of the U.S. Constitution states that "nor shall private property be taken for public use without just compensation." The Takings Clause is made applicable to the States by way of the Fourteenth Amendment to the U.S. Constitution.

266. A "taking" is effectuated when a property owner is denied the right to use his property for all economically beneficial uses. When a taking is without just compensation, a state actor deprives a citizen of his Substantive Due Process rights.

267. When a taking is certain to occur, and a state actor does not give a citizen the opportunity to a predeprivation hearing to assert his legal interests relative to the property being subjected to a taking, a state actor deprives that citizen of his Procedural Due Process Rights.

268. In this case, Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights have been violated by the Lottery Departments' and the Lottery Directors' official policies.

269. The Lottery Departments' and the Lottery Directors' official policies deprived, and continue to deprive, Interstate Lottery Plaintiffs and Interstate Lottery Class members of all beneficial uses of their property (*i.e.*, their lottery winnings).

270. The Lottery Departments' and the Lottery Directors' official policies do not provide Interstate Lottery Plaintiffs and Interstate Lottery Class members with any compensation whatsoever. Even if Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property is eventually returned, the Lottery Departments and the Lottery Directors have not indicated that they will compensate Interstate Lottery Plaintiffs and Interstate Lottery Class members with the accrued interest on their lottery winnings, and therefore, that property—the accrued interest— will have been taken without just compensation.

271. Since the Lottery Departments' and the Lottery Directors' official policies constitute a taking, without just compensation, Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process rights (*i.e.*, constitutional rights) have been violated.

Therefore, the Lottery Departments' and the Lottery Directors' official policies are unconstitutional as applied to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

272.   Additionally, there is no set of circumstances in which the Lottery Departments' and the Lottery Directors' official policies of depriving Interstate Lottery Plaintiffs and Interstate Lottery Class members of the use of their property and accrued interest thereon would *not* violate the Substantive Due Process rights of any citizen subjected to those policies.   Those official policies are therefore facially invalid.

273.   Even if the Lottery Departments' and the Lottery Directors' deprivation of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property did not violate their Substantive Due Process rights, the Lottery Departments' and the Lottery Directors' official policies also deprived, and continue to deprive, Interstate Lottery Plaintiffs and Interstate Lottery Class members of a fair opportunity to be heard prior to being deprived of their property (*i.e.*, their lottery winnings).

274.   The Lottery Departments and the Lottery Directors were under an obligation to provide Interstate Lottery Plaintiffs and Interstate Lottery Class members with a predeprivation hearing because the Lottery Departments and the Lottery Directors knew that their official policies would effectuate a taking.

275.   Therefore, the Lottery Departments' and the Lottery Directors' official policies, as applied to Interstate Lottery Plaintiffs and Interstate Lottery Class members, violate Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Procedural Due Process rights (*i.e.*, their constitutional rights).

276.   Additionally, there is no set of circumstances in which the Lottery Departments' and the Lottery Directors' official policies of depriving Interstate Lottery Plaintiffs and Interstate

Lottery Class members of a predeprivation hearing would *not* violate the Procedural Due Process rights of any citizen subjected to those policies. Those official policies are therefore facially invalid.

277. At all relevant times, the Lottery Departments and the Lottery Directors were, and continue to be, acting under color of law when carrying out their governmentally delegated functions in connection with operating lottery games.

278. As such, the Lottery Departments and the Lottery Directors had, and continue to have, a duty and obligation to comply with the U.S. Constitution when carrying out their governmentally delegated functions in connection with operating lottery games.

279. However, the Lottery Departments and the Lottery Directors, acting under the color of State law, denied Interstate Lottery Plaintiffs and Interstate Lottery Class members of their Substantive Due Process and Procedural Due Process rights by adopting, and continuing to enforce, their official policies to deprive Interstate Lottery Plaintiffs and Interstate Lottery Class members of their property (*i.e.*, their lottery winnings) and a predeprivation hearing.

280. The actions of the Lottery Departments and the Lottery Directors, pursuant to their official policies, constitute violations of rights guaranteed to Interstate Lottery Plaintiffs and Interstate Lottery Class members by the Fifth and Fourteenth Amendments to the U.S. Constitution.

281. The Lottery Departments and the Lottery Directors committed these acts intentionally, knowing that violations of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights would be violated by their official policies.

282.     To the extent that the Lottery Departments and the Lottery Directors for jurisdictions other than Illinois have already transferred Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property to the Illinois Department of the Lottery and B.R. Lane, these actions still constitute violations of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights because the Lottery Departments and the Lottery Directors from jurisdictions other than Illinois knew, prior to doing so, that such actions would effectuate a taking without just compensation in light of the Illinois Department of the Lottery's and B.R. Lane's official policy to not pay out these winnings.

283.     Moreover, Interstate Lottery Plaintiffs and Interstate Lottery Class members do not have any adequate state remedies because the MUSL and Mega Millions Consortium do not provide any forum for Interstate Lottery Plaintiffs and Interstate Lottery Class members to seek redress, as there is no common tribunal to adjudicate their claims against all responsible Lottery Departments and Lottery Directors.

284.     Even if Interstate Lottery Plaintiffs and Interstate Lottery Class members attempted to seek redress through alternative forums, those forums would be inadequate for the following reasons.  First, Interstate Lottery Plaintiffs and Interstate Lottery Class members would be required to file separate actions in each jurisdiction against each Lottery Department and Lottery Director in order to try to recover that jurisdiction's proportional share of the winnings. Second, Interstate Lottery Plaintiffs and Interstate Lottery Class members cannot possibly know which Lottery Department and Lottery Director is in possession of their lottery winnings, and how much of those winnings each Lottery Department and Lottery Director is in possession of. Third, even if Interstate Lottery Plaintiffs and Interstate Lottery Class members did have such

information, each Lottery Department and Lottery Director could subsequently transfer Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to another Lottery Department and Lottery Director. Finally, any postdeprivation remedy offered by the Lottery Departments and Lottery Directors would be inadequate, as Interstate Lottery Plaintiffs and Interstate Lottery Class members may be precluded from recovering the accrued interest on their winnings, despite the fact that the accrued interest has also become Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property, if Eleventh Amendment prohibitions were applicable. These reasons apply even if some or all of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings were in possession of the Illinois Department of the Lottery and B.R. Lane.

285. In addition, any postdeprivation remedy offered by the Lottery Departments and Lottery Directors would be futile, as the Lottery Departments and Lottery Directors are *already* knowingly violating constitutional and statutory law. Despite knowing of their legal violations, the Lottery Departments and Lottery Directors continue to enforce their illegal official policies. Any postdeprivation remedy would also be futile, as the Lottery Departments and Lottery Directors would ignore it, just as they have ignored their obligations under existing statutory and constitutional law.

286. Based upon the foregoing, the MUSL, the Mega Millions Consortium, the Lottery Departments, and the Lottery Directors have acted, and continue to act, under color of law in enacting, and continuing to enforce, their official policies, which deprive Interstate Lottery Plaintiffs and Interstate Lottery Class members of their Substantive Due Process and Procedural Due Process rights.

287.     As a direct and proximate result of the MUSL's, the Mega Millions Consortium's, the Lottery Departments', and the Lottery Directors' deprivation of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights, Interstate Lottery Plaintiffs and Interstate Lottery Class members have suffered financial damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Interstate Lottery Plaintiffs, individually, and on behalf of the Interstate Lottery Class, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Interstate Lottery Class defined herein;

B.    Designating Interstate Lottery Plaintiffs as representatives of the Interstate Lottery Class and their undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Interstate Lottery Plaintiffs and the Interstate Lottery Class and against the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors;

D.    Issuing an order enjoining the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors from implementing their official policies;

E.    Awarding Interstate Lottery Plaintiffs and the Interstate Lottery Class members their lottery winnings and all accrued interest thereon;

F.    Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.    Awarding Interstate Lottery Plaintiffs reasonable attorney's fees and costs; and

H.    Granting all such further and other relief as the Court deems just and appropriate.

## COUNT III
## 42 U.S.C. § 1983
**On Behalf of all Plaintiffs and the Class Against the Illinois Department of the Lottery, and B.R. Lane, in His Official Capacity and as an Individual**
**(Assuming These Defendants are <u>Not</u> Arms of the State Under the 11th Amendment)**

288.    Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

289.    The Illinois Department of the Lottery and B.R. Lane are not arms of the state of Illinois for purposes of the Eleventh Amendment because they are legally and financially autonomous from the Illinois government, raise and maintain funds independently, are not reliant on funding or tax revenues from the state of Illinois, and segregate their operating expenses from the general treasuries of the state of Illinois. Any judgment against the Illinois Department of the Lottery and B.R. Lane would not be paid from the general treasury of the state of Illinois, as lottery funds and operating budgets are held in a separate, special account.

290.    The state of Illinois delegated the historic and exclusive state function of running its lottery games to the Illinois Department of the Lottery and B.R. Lane. Although the Illinois Department of the Lottery and B.R. Lane are not state entities or actors for the purposes of the Eleventh Amendment, Illinois Department of the Lottery's and B.R. Lane's exclusive authority to administer lotteries at the behest of the Illinois government means that they act under the color of state law for purposes of 42 U.S.C. § 1983.

291.    At all relevant times, there was in effect 42 U.S.C. § 1983, which states, in relevant part:

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

292. As stated above, the Illinois Department of the Lottery and B.R. Lane have adopted an official policy of non-payment as to Plaintiffs and Class members. That official policy has been authorized and adopted by B.R. Lane.

293. In light of the foregoing, the Illinois Department of the Lottery and B.R. Lane are each a "person" as interpreted in 42 U.S.C. § 1983.

294. The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee that no State shall "deprive any person of life, liberty or property, without due process of law." This principle is known as "Due Process."

295. Due Process consists of two components, Substantive Due Process and Procedural Due Process. Substantive Due Process requires that state action does not impermissibly deprive a person of their fundamental rights to life, liberty, or property. Procedural Due Process requires that adequate procedures are in place before a state actor permissibly deprives (*i.e.*, Substantive Due Process is not implicated) a person of life, liberty, or property.

296. The Fifth Amendment's "Takings Clause" of the U.S. Constitution states that "nor shall private property be taken for public use without just compensation." The Takings Clause is made applicable to the States by way of the Fourteenth Amendment to the U.S. Constitution.

297. A "taking" is effectuated when a property owner is denied the right to use his property for all economically beneficial uses. When a taking is without just compensation, a state actor deprives a citizen of his Substantive Due Process rights.

298. When a taking is certain to occur, and a state actor does not give a citizen the opportunity to predeprivation hearing to assert his legal interests relative to the property being subjected to a taking, a state actor deprives that citizen of his Procedural Due Process Rights.

299. In this case, Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights have been violated by the Illinois Department of the Lottery's and B.R. Lane's official policy.

300. The Illinois Department of the Lottery's and B.R. Lane's official policy deprived, and continues to deprive, Plaintiffs and Class members of all beneficial uses of their property (*i.e.*, their lottery winnings).

301. The Illinois Department of the Lottery's and B.R. Lane's official policy does not provide Plaintiffs and Class members with any compensation whatsoever. Even if Plaintiffs' and Class members' property is eventually returned, the Illinois Department of the Lottery and B.R. Lane have not indicated that they will compensate Plaintiffs and Class members with the accrued interest on their lottery winnings, and therefore, that property—the accrued interest—will have been taken without just compensation.

302. Since the Illinois Department of the Lottery's and B.R. Lane's official policy constitutes a taking, without just compensation, Plaintiffs' and Class members' Substantive Due Process rights (*i.e.*, constitutional rights) have been violated. Therefore, the Illinois Department of the Lottery's and B.R. Lane's official policy is unconstitutional as applied to Plaintiffs and Class members.

303. Additionally, there is no set of circumstances in which the Illinois Department of the Lottery's and B.R. Lane's official policy of depriving Plaintiffs and Class members of the

use of their property and accrued interest thereon would *not* violate the Substantive Due Process rights of any citizen subjected to it. That official policy is therefore facially invalid.

304.     Even if the Illinois Department of the Lottery's and B.R. Lane's deprivation of Plaintiffs' and Class members' property did not violate their Substantive Due Process rights, the Illinois Department of the Lottery's and B.R. Lane's official policy also deprived, and continues to deprive, Plaintiffs and Class members of a fair opportunity to be heard prior to being deprived of their property (*i.e.*, their lottery winnings).

305.     The Illinois Department of the Lottery and B.R. Lane were under an obligation to provide Plaintiffs and Class members with a predeprivation hearing because the Illinois Department of the Lottery and B.R. Lane knew that their official policy would effectuate a taking.

306.     Therefore, the Illinois Department of the Lottery's and B.R. Lane's official policy, as applied to Plaintiffs and Class members, violates Plaintiffs' and Class members' Procedural Due Process rights (*i.e.*, their constitutional rights).

307.     Additionally, there is no set of circumstances in which the Illinois Department of the Lottery's and B.R. Lane's official policy of depriving Plaintiffs and Class members of a predeprivation hearing would *not* violate the Procedural Due Process rights of any citizen subjected to it. That official policy is therefore facially invalid.

308.     At all relevant times, The Illinois Department of the Lottery and B.R. Lane were, and continue to be, acting under color of law when carrying out their governmentally delegated functions in connection with operating lottery games offered in Illinois.

309.     As such, the Illinois Department of the Lottery and B.R. Lane had, and continue to have, a duty and obligation to comply with the U.S. Constitution when carrying out their

governmentally delegated functions in connection with operating lottery games offered in Illinois.

310.    However, the Illinois Department of the Lottery and B.R. Lane, acting under the color of State law, denied Plaintiffs and Class members of their Substantive Due Process and Procedural Due Process rights by adopting, and continuing to enforce, their official policy to deprive Plaintiffs and Class members of their property (*i.e.*, their lottery winnings) and a predeprivation hearing.

311.    The actions of the Illinois Department of the Lottery and B.R. Lane, pursuant to their official policy, constitute violations of rights guaranteed to Plaintiffs and Class members by the Fifth and Fourteenth Amendments to the U.S. Constitution.

312.    The Illinois Department of the Lottery and B.R. Lane committed these acts intentionally, knowing that violations of Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights would be violated by their official policy.

313.    Any postdeprivation remedy offered by the Illinois Department of the Lottery and B.R. Lane would be futile, as the Illinois Department of the Lottery and B.R. Lane are *already* knowingly violating constitutional and statutory law. Despite knowing of their legal violations, the Illinois Department of the Lottery and B.R. Lane continue to enforce their illegal official policy.  Any postdeprivation remedy would also be futile, as the Illinois Department of the Lottery and B.R. Lane would ignore it, just as they have ignored their obligations under existing statutory and constitutional law.

314.    Any postdeprivation remedy offered by the Illinois Department of the Lottery and B.R. Lane would be inadequate as Plaintiffs and Class members may be precluded from

recovering the accrued interest on their winnings, despite the fact that the accrued interest has also become Plaintiffs' and Class members' property.

315.     In regard to Interstate Lottery Plaintiffs and Interstate Lottery Class members, any postdeprivation remedy offered by the Illinois Department of the Lottery and B.R. Lane would be also be inadequate because Interstate Lottery Plaintiffs and Interstate Lottery Class members could not recover lottery winnings that are being held by other Lottery Departments and Lottery Directors, as the MUSL, Mega Millions Consortium, and Illinois do not provide any common tribunal to adjudicate their claims against all Lottery Departments and Lottery Directors.

316.     Based upon the foregoing, the Illinois Department of the Lottery and B.R. Lane have acted, and continue to act, under color of law in enacting, and continuing to enforce, their official policy, which deprives Plaintiffs and Class members of their Substantive Due Process and Procedural Due Process rights.

317.     As a direct and proximate result of the Illinois Department of the Lottery's and B.R. Lane's deprivation of Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights, Plaintiffs and Class members have suffered financial damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, pray for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class defined herein;

B.     Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiffs and the Class and against the Illinois Department of the Lottery and B.R. Lane;

D.     Issuing an order enjoining the Illinois Department of the Lottery and B.R. Lane from implementing their official policies;

E.     Awarding Plaintiffs and the Class members their lottery winnings and all accrued interest thereon;

F.     Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.     Awarding Plaintiffs reasonable attorney's fees and costs; and

H.     Granting all such further and other relief as the Court deems just and appropriate.

### COUNT IV
### 18 U.S.C. § 1961
**On Behalf of Interstate Lottery Plaintiffs and the Interstate Lottery Class Against the MUSL, the Mega Millions Consortium, All Lottery Departments, and All Lottery Directors, in Their Official Capacity and as Individuals (Assuming Defendants are <u>Not</u> Arms of the State Under the 11th Amendment)**

318.     Interstate Lottery Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

319.     At all relevant times, there was in full force and effect 18 U.S.C. § 1961, *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which states, in relevant part, as follows:

> (1) 'racketeering activity' means . . . (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1343 (relating to wire fraud) . . . .

18 U.S.C. § 1961(1)(B).

320.    At all relevant times, there was in effect a certain statute relating to wire fraud: Fraud by Wire, Radio, or Television, 18 U.S.C. § 1343; which made it unlawful for persons to use the wires of interstate commerce to defraud persons of money, as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both . . . .

18 U.S.C. § 1343.

321.    At all relevant times, § 1962 of RICO stated, in pertinent part, as follows:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .
>
> * * *
>
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a) . . . or (c) of this section.

18 U.S.C. § 1962(a), (c), and (d).

322.    At all relevant times, § 1964(c) of RICO stated, in pertinent part, as follows:

> Any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C. § 1964(c).

323.    The Lottery Departments and their Lottery Directors are not arms of the state for purposes of the Eleventh Amendment because the Lottery Departments are legally and financially autonomous from their jurisdictions' governments, raise and maintain funds

independently, are not reliant on funding or tax revenues from their jurisdictions, and segregate their operating expenses from the general treasuries of their jurisdictions' governments. Any judgment against the Lottery Departments and their Lottery Directors would not be paid from the general treasuries of their respective jurisdictions' governments, as lottery funds and operating budgets are held in a separate, special account.

324.   Each Lottery Department and Lottery Director is a person, as set forth by 18 U.S.C. § 1961.

325.   Each Lottery Department and Lottery Director is a member of the MUSL, the Mega Millions Consortium, or both. Each Lottery Department and Lottery Director is a signatory to Lottery Agreements establishing their membership in the MUSL or the Mega Millions Consortium.

326.   All Lottery Departments and Lottery Directors, collectively, through the MUSL and the Mega Millions Consortium, administer and manage the Powerball and Mega Millions interstate lottery games, and are responsible for advertising and selling lottery tickets for those games, pursuant to the Cross-Selling Agreement.

327.   The MUSL and the Mega Millions Consortium, individually, and in concert, pursuant to the Cross-Selling Agreement, are "enterprises," as set forth by 18 U.S.C. § 1961.

328.   The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium committed wire fraud as defined in 18 U.S.C. § 1343, and thereby violated RICO, by creating a scheme to intentionally defraud Interstate Lottery Plaintiffs and Interstate Class members. This scheme consisted of selling Mega Millions and Powerball lottery tickets, and promising and advertising that a winning ticket would entitle the winner to payment of a prize— including winners from the state of Illinois. In spite of these promises and representations, the

Lottery Departments and Lottery Directors knew that prize payments would not be disbursed to winners in the state of Illinois. The Lottery Departments and Lottery Directors used telephone, email, and other electronic means of communication to communicate with each other to conspire in furtherance of the scheme, to advertise their false promises to Interstate Lottery Plaintiffs and Interstate Class members, and to induce Interstate Lottery Plaintiffs and Interstate Class members into purchasing lottery tickets.

329. The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium obtained Interstate Lottery Plaintiffs' and Interstate Lottery Class members' money used to purchase lottery tickets, and Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property (*i.e.*, their winnings), through false and fraudulent advertisements and promises that Interstate Lottery Plaintiffs and Interstate Lottery Class members could win money by playing the Mega Millions and Powerball lottery games, and that they would pay those lottery winnings to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

330. The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium unlawfully received or acquired interests in Interstate Lottery Plaintiffs' and Interstate Lottery Class members' money—both the proceeds derived from the sale of lottery tickets as well as Interstate Lottery Plaintiffs' and Interstate Lottery Class members' winnings.

331. The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium invested that money to further their scheme by using the income derived from the their fraudulent sale of Mega Millions and Powerball tickets to finance the continuing operations of the MUSL and Mega Millions Consortium enterprises, and sell additional fraudulent lottery tickets.

332.    The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium continue to operate the scheme by advertising and selling tickets for the Mega Millions and Powerball lottery games, which will not be paid—just as they have done, and continue to do, to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

333.    As a direct and proximate cause of the foregoing, Interstate Lottery Plaintiffs and Interstate Lottery Class members have suffered financial damages.

## PRAYER FOR RELIEF

WHEREFORE, Interstate Lottery Plaintiffs, individually, and on behalf of the Interstate Lottery Class, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Interstate Lottery Class defined herein;

B.    Designating Interstate Lottery Plaintiffs as representatives of the Interstate Lottery Class and their undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Interstate Lottery Plaintiffs and the Interstate Lottery Class and against the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors;

D.    Issuing an order enjoining the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors from implementing their official policies;

E.    Awarding Interstate Lottery Plaintiffs and the Interstate Lottery Class members their lottery winnings and all accrued interest thereon;

F.    Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.    Awarding Interstate Lottery Plaintiffs reasonable attorney's fees and costs; and

H.    Granting all such further and other relief as the Court deems just and appropriate.

**COUNT V**
**Civil Conspiracy**
**On Behalf of Interstate Lottery Plaintiffs and the Interstate Lottery Class Against the MUSL, the Mega Millions Consortium, All Lottery Departments, and All Lottery Directors, in Their Official Capacity and as Individuals (Assuming Defendants are Not Arms of the State Under the 11th Amendment)**

334.    Interstate Lottery Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

335.    The Lottery Departments and their Lottery Directors are not arms of the state for purposes of the Eleventh Amendment because the Lottery Departments are legally and financially autonomous from their jurisdictions' governments, raise and maintain funds independently, are not reliant on funding or tax revenues from their jurisdictions, and segregate their operating expenses from the general treasuries of their jurisdictions' governments. Any judgment against the Lottery Departments and their Lottery Directors would not be paid from the general treasuries of their respective jurisdictions' governments, as lottery funds and operating budgets are held in a separate, special account.

336.    Each Lottery Department and Lottery Director is a member of the MUSL, the Mega Millions Consortium, or both. Each Lottery Department and Lottery Director is a signatory to Lottery Agreements establishing their membership in the MUSL or the Mega Millions Consortium.

337.    All Lottery Departments and Lottery Directors, collectively, through the MUSL and the Mega Millions Consortium, administer and manage the Powerball and Mega Millions

73

interstate lottery games, and are responsible for advertising and selling lottery tickets for those games, pursuant to the Cross-Selling Agreement.

338.     As members of the MUSL or the Mega Millions Consortium, and as signatories to the Cross-Selling Agreement, the Lottery Departments and Lottery Directors participated in a common scheme to obtain Interstate Lottery Plaintiffs' and Interstate Lottery Class members' money and property.

339.     The Lottery Departments and Lottery Directors—though their association with the MUSL and Mega Millions Consortium—knowingly and voluntarily agreed to participate in, and participated in, a common scheme to commit an unlawful act (*e.g.*, conversion) and common scheme to commit a lawful act in an unlawful manner (*e.g.*, fraudulently inducing Interstate Lottery Plaintiffs and Interstate Lottery Class members to purchase lottery tickets).

340.     The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium all conspired to convert Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property by retaining, misappropriating, and otherwise failing to transfer possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery prize money to Interstate Lottery Plaintiffs and Interstate Lottery Class members, and using Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property to accrue interest thereon, which also was to be, and was, converted.

341.     In furtherance of that common scheme, the Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium sold Mega Millions and Powerball lottery tickets to Illinois residents, including Interstate Lottery Plaintiffs and Interstate Lottery Class members, even though they knew that no Illinois resident would be paid their winnings.

342. The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium, or some combination of the foregoing, did convert Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property by retaining, misappropriating, and otherwise failing to transfer possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery prize money to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

343. The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium, or some combination of the foregoing, did convert, and continue to convert, accrued interest on Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property.

344. The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium also conspired to acquire Interstate Lottery Plaintiffs' and Interstate Lottery Class members' money through fraudulent means by offering, promising, and advertising that the winner of the Mega Millions and Powerball lottery games would be entitled to payment of a jackpot (*i.e.*, a large sum of money reserved for the winner), even though they knew that they would not be paid their jackpot.

345. In furtherance of that common scheme, the Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium advertised and represented that the winner of the Mega Millions and Powerball lottery games would be entitled to payment of a jackpot.

346. The Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium, or some combination of the foregoing, did acquire Interstate Lottery Plaintiffs' and Interstate Lottery Class members' money through fraudulent means by offering, promising, and advertising that the winner of the Mega Millions and Powerball lottery games would be entitled to payment of a jackpot, and then not paying such a jackpot.

347. The aforementioned tortious and fraudulent acts were committed by the Lottery Departments, Lottery Directors, MUSL, and Mega Millions Consortium in furtherance and pursuance of their conspiratorial agreement to deprive Interstate Lottery Plaintiffs and Interstate Lottery Class members of their money and property, and the accrued interest thereon.

348. All Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium are jointly liable for the tortious and fraudulent conduct of one another because they (a) performed the tortious acts in concert with the others and pursuant to a common design, (b) knew that the other parties' conduct constituted tortious and fraudulent conduct, and (c) gave substantial assistance and/or encouragement to the other parties in carrying out the tortious and fraudulent acts.

349. All Lottery Departments' and Lottery Directors', the MUSL's, and the Mega Millions Consortium's acts, separately considered, constituted tortious and fraudulent conduct towards Interstate Lottery Plaintiffs and Interstate Lottery Class members.

350. As a direct and proximate result of the foregoing, Interstate Lottery Plaintiffs and Interstate Lottery Class members have suffered financial damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Interstate Lottery Plaintiffs, individually, and on behalf of the Interstate Lottery Class, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Interstate Lottery Class defined herein;

B. Designating Interstate Lottery Plaintiffs as representatives of the Interstate Lottery Class and their undersigned counsel as Class Counsel;

C. Entering judgment in favor of Interstate Lottery Plaintiffs and the Interstate Lottery Class and against the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors;

D.  Issuing an order enjoining the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors from implementing their official policies;

E.  Awarding Interstate Lottery Plaintiffs and the Interstate Lottery Class members their lottery winnings and all accrued interest thereon;

F.  Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.  Awarding Interstate Lottery Plaintiffs reasonable attorney's fees and costs; and

H.  Granting all such further and other relief as the Court deems just and appropriate.

## COUNT VI
## Conversion
**On Behalf of Interstate Lottery Plaintiffs and the Interstate Lottery Class Against the MUSL, the Mega Millions Consortium, All Lottery Departments, and All Lottery Directors, in Their Official Capacity and as Individuals (Assuming Defendants are <u>Not</u> Arms of the State Under the 11th Amendment)**

351.  Interstate Lottery Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

352.  The Lottery Departments and their Lottery Directors are not arms of the state for purposes of the Eleventh Amendment because the Lottery Departments are legally and financially autonomous from their jurisdictions' governments, raise and maintain funds independently, are not reliant on funding or tax revenues from their jurisdictions, and segregate their operating expenses from the general treasuries of their jurisdictions' governments. Any judgment against the Lottery Departments and their Lottery Directors would not be paid from the

77

general treasuries of their respective jurisdictions' governments, as lottery funds and operating budgets are held in a separate, special account.

353.    Each Lottery Department and Lottery Director is a member of the MUSL, the Mega Millions Consortium, or both.  Each Lottery Department and Lottery Director is a signatory to Lottery Agreements establishing their membership in the MUSL or the Mega Millions Consortium.

354.    All Lottery Departments and Lottery Directors, collectively, through the MUSL and the Mega Millions Consortium, administer and manage the Powerball and Mega Millions interstate lottery games, and are responsible for advertising and selling lottery tickets for those games, pursuant to the Cross-Selling Agreement.

355.    All Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium—aside from the Illinois Department of the Lottery and B.R. Lane—are obligated by their respective Lottery Agreements, and the principles of equity and law, to transmit lottery money to the Illinois Department of the Lottery and B.R. Lane so that the Illinois Department of the Lottery and B.R. Lane can pay Interstate Lottery Plaintiffs and Interstate Lottery Class members their lottery winnings.

356.    The Illinois Department of the Lottery and B.R. Lane are obligated by their respective Lottery Agreements, and the principles of equity and law, to transfer possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

357.    Therefore, all Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium are obligated by the principles of equity and law to transfer

possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

358.    Interstate Lottery Plaintiffs and Interstate Lottery Class members had, and continue to have, full and exclusive property rights in the winnings (*i.e.*, ownership) because they met all of the requirements of the Illinois Lottery Law, which entitled Interstate Lottery Plaintiffs and Interstate Lottery Class members to the winnings based on their respective lottery purchases.

359.    Interstate Lottery Plaintiffs and Interstate Lottery Class members had, and continue to have, immediate rights to possession of the winnings because their full and exclusive property rights in the winnings (*i.e.*, ownership) have vested.

360.    By extension, Interstate Lottery Plaintiffs and Interstate Lottery Class members had, and continue to have, full and exclusive property rights (*i.e.*, ownership) to any accrued interest on their winnings.

361.    The Lottery Departments and Lottery Directors—aside from the Illinois Department of the Lottery and B.R. Lane—the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, unlawfully converted Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property when they failed to transmit the lottery money to the Illinois Department of the Lottery and B.R. Lane.

362.    The Illinois Department of the Lottery and B.R. Lane, unlawfully converted Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property when they failed to transfer possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

363.    Therefore, all Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, unlawfully retained,

controlled, and possessed Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property when Interstate Lottery Plaintiffs and Interstate Lottery Class members failed to receive their property (*i.e.*, their lottery winnings).

364.    All Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, unlawfully retained, controlled, and possessed—and continue to unlawfully retain, control, and possess—Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property by retaining accrued interest on Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings.

365.    Interstate Lottery Plaintiffs and Interstate Lottery Class members have demanded, and continue to demand, that the Illinois Department of the Lottery and B.R. Lane—and by extension, all Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium—transfer possession of their property, which includes their winnings and interest accrued thereon, to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

366.    To the extent that the Lottery Departments and Lottery Directors—aside from the Illinois Department of the Lottery and B.R. Lane—the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, have possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property, it would be futile for Interstate Lottery Plaintiffs and Interstate Lottery Class members to demand that those entities transfer Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property to the Illinois Department of the Lottery and B.R. Lane because those entities are already bound to transfer said property, pursuant to the Lottery Agreements, but refuse to do so.

367.    As a direct and proximate result of the foregoing, Interstate Lottery Plaintiffs and Interstate Lottery Class members have suffered financial damages.

## PRAYER FOR RELIEF

WHEREFORE, Interstate Lottery Plaintiffs, individually, and on behalf of the Interstate Lottery Class, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Interstate Lottery Class defined herein;

B. Designating Interstate Lottery Plaintiffs as representatives of the Interstate Lottery Class and their undersigned counsel as Class Counsel;

C. Entering judgment in favor of Interstate Lottery Plaintiffs and the Interstate Lottery Class and against the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors;

D. Issuing an order enjoining the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors from implementing their official policies;

E. Awarding Interstate Lottery Plaintiffs and the Interstate Lottery Class members their lottery winnings and all accrued interest thereon;

F. Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G. Awarding Interstate Lottery Plaintiffs reasonable attorney's fees and costs; and

H. Granting all such further and other relief as the Court deems just and appropriate.

<u>COUNT VII</u>
<u>Conversion</u>

**On Behalf of all Plaintiffs and the Class Against the Illinois Department of the Lottery, and B.R. Lane, in His Official Capacity and as an Individual
(Assuming These Defendants are <u>Not</u> Arms of the State Under the 11th Amendment)**

368.    Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

369.    The Illinois Department of the Lottery and B.R. Lane are not arms of the state of Illinois for purposes of the Eleventh Amendment because they are legally and financially autonomous from the Illinois government, raise and maintain funds independently, are not reliant on funding or tax revenues from the state of Illinois, and segregate their operating expenses from the general treasuries of the state of Illinois. Any judgment against the Illinois Department of the Lottery and B.R. Lane would not be paid from the general treasury of the state of Illinois, as lottery funds and operating budgets are held in a separate, special account.

370.    The Illinois Department of the Lottery and B.R. Lane are obligated by the principles of equity and law to transfer possession of Plaintiffs' and Class members' lottery winnings to Plaintiffs and Class members.

371.    Plaintiffs and Class members had, and continue to have, full and exclusive property rights in the winnings (*i.e.*, ownership) because they met all of the requirements of the Illinois Lottery Law, which entitled Plaintiffs and Class members to the winnings based on their respective lottery purchases.

372.    Plaintiffs and Class members had, and continue to have, immediate rights to possession of the winnings because their full and exclusive property rights in the winnings (*i.e.*, ownership) have vested.

373.    By extension, Plaintiffs and Class members had, and continue to have, full and exclusive property rights (*i.e.*, ownership) to any accrued interest on their winnings.

374.    The Illinois Department of the Lottery and B.R. Lane unlawfully converted Plaintiffs' and Class members' property when they failed to transfer possession of Plaintiffs' and Class members' lottery winnings to Plaintiffs and Class members.

375.    The Illinois Department of the Lottery and B.R. Lane unlawfully converted, and continue to unlawfully convert, Plaintiffs' and Class members' property when they failed to transfer possession of interest accrued on Plaintiffs' and Class members' lottery winnings to Plaintiffs and Class members.

376.    Plaintiffs and Class members have demanded, and continue to demand, that the Illinois Department of the Lottery and B.R. Lane transfer possession of their property, which includes their winnings and interest accrued thereon, to Plaintiffs and Class members.

377.    As a direct and proximate result of the foregoing, Plaintiffs and Class members have suffered financial damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class defined herein;

B.    Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiffs and Class and against the Illinois Department of the Lottery and B.R. Lane;

D.    Issuing an order enjoining the Illinois Department of the Lottery and B.R. Lane from implementing their official policies;

E.    Awarding Plaintiffs and Class members their lottery winnings and all accrued interest thereon;

F.    Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.    Awarding Plaintiffs reasonable attorney's fees and costs; and

H.    Granting all such further and other relief as the Court deems just and appropriate.

## COUNT VIII
### Unjust Enrichment
**On Behalf of Interstate Lottery Plaintiffs and the Interstate Lottery Class Against the MUSL, the Mega Millions Consortium, All Lottery Departments, and All Lottery Directors, in Their Official Capacity and as Individuals (Assuming Defendants are <u>Not</u> Arms of the State Under the 11th Amendment)**

378.    Interstate Lottery Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

379.    The Lottery Departments and their Lottery Directors are not arms of the state for purposes of the Eleventh Amendment because the Lottery Departments are legally and financially autonomous from their jurisdictions' governments, raise and maintain funds independently, are not reliant on funding or tax revenues from their jurisdictions, and segregate their operating expenses from the general treasuries of their jurisdictions' governments. Any judgment against the Lottery Departments and their Lottery Directors would not be paid from the general treasuries of their respective jurisdictions' governments, as lottery funds and operating budgets are held in a separate, special account.

380.    Each Lottery Department and Lottery Director is a member of the MUSL, the Mega Millions Consortium, or both.  Each Lottery Department and Lottery Director is a signatory to Lottery Agreements establishing their membership in the MUSL or the Mega Millions Consortium.

381.    All Lottery Departments and Lottery Directors, collectively, through the MUSL and the Mega Millions Consortium, administer and manage the Powerball and Mega Millions interstate lottery games, and are responsible for advertising and selling lottery tickets for those games, pursuant to the Cross-Selling Agreement.

382.    All Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium—aside from the Illinois Department of the Lottery and B.R. Lane—are obligated by their respective Lottery Agreements, and the principles of equity and law, to transmit lottery money to the Illinois Department of the Lottery and B.R. Lane so that the Illinois Department of the Lottery and B.R. Lane can pay Interstate Lottery Plaintiffs and Interstate Lottery Class members their lottery winnings.

383.    The Illinois Department of the Lottery and B.R. Lane are obligated by their respective Lottery Agreements, and the principles of equity and law, to transfer possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

384.    Therefore, all Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium are obligated by the principles of equity and law to transfer possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

385.    Interstate Lottery Plaintiffs and Interstate Lottery Class members had, and continue to have, full and exclusive property rights in the winnings (*i.e.*, ownership) because they met all of the requirements of the Illinois Lottery Law, which entitled Interstate Lottery Plaintiffs and Interstate Lottery Class members to the winnings based on their respective lottery purchases.

386.    Interstate Lottery Plaintiffs and Interstate Lottery Class members had, and continue to have, immediate rights to possession of the winnings because their full and exclusive property rights in the winnings (*i.e.*, ownership) have vested.

387.    By extension, Interstate Lottery Plaintiffs and Interstate Lottery Class members had, and continue to have, full and exclusive property rights (*i.e.*, ownership) to any accrued interest on their winnings.

388.    The Lottery Departments and Lottery Directors—aside from the Illinois Department of the Lottery and B.R. Lane—the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, unlawfully retained Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property when they failed to transmit the lottery money to the Illinois Department of the Lottery and B.R. Lane.

389.    The Illinois Department of the Lottery and B.R. Lane, unlawfully retained Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property when they failed to transfer possession of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

390.    Therefore, all Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, unlawfully retained, controlled, and possessed Interstate Lottery Plaintiffs' and Interstate Lottery Class members'

property when Interstate Lottery Plaintiffs and Interstate Lottery Class members failed to receive their property (*i.e.*, their lottery winnings).

391. All Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, unlawfully retained, controlled, and possessed—and continue to unlawfully retain, control, and possess—Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property by retaining accrued interest on Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings.

392. In light of the foregoing, all Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, have unjustly retained a benefit—Interstate Lottery Plaintiffs' and Interstate Lottery Class members' winnings, and the interest accrued thereon—to the detriment of Interstate Lottery Plaintiffs and the Interstate Lottery Class members, as they have deprived Interstate Lottery Plaintiffs and the Interstate Lottery Class members of their rights to use and enjoy their property, and accrue interest thereon.

393. All Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, know of and appreciate that benefit.

394. All Lottery Departments' and Lottery Directors', the MUSL's, and the Mega Millions Consortium's, or some combination of the foregoing, retention of that benefit violates the fundamental principles of justice, equity, and good conscience.

395. Since all Lottery Departments and Lottery Directors, the MUSL, and the Mega Millions Consortium, or some combination of the foregoing, have retained money to which they are not entitled, the principles of equity and good conscience require that they deliver that money to its rightful owners—Interstate Lottery Plaintiffs and the Interstate Lottery Class members.

## PRAYER FOR RELIEF

WHEREFORE, Interstate Lottery Plaintiffs, individually, and on behalf of the Interstate

Lottery Class, pray for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Interstate Lottery Class defined herein;

B. Designating Interstate Lottery Plaintiffs as representatives of the Interstate Lottery Class and their undersigned counsel as Class Counsel;

C. Entering judgment in favor of Interstate Lottery Plaintiffs and the Interstate Lottery Class and against the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors;

D. Issuing an order enjoining the MUSL, the Mega Millions Consortium, all Lottery Departments, and all Lottery Directors from implementing their official policies;

E. Awarding Interstate Lottery Plaintiffs and the Interstate Lottery Class members their lottery winnings and all accrued interest thereon;

F. Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G. Awarding Interstate Lottery Plaintiffs reasonable attorney's fees and costs; and

H. Granting all such further and other relief as the Court deems just and appropriate.

## COUNT IX
### Unjust Enrichment
**On Behalf of all Plaintiffs and the Class Against the Illinois Department of the Lottery, and B.R. Lane, in His Official Capacity and as an Individual**
**(Assuming These Defendants are <u>Not</u> Arms of the State Under the 11th Amendment)**

396.    Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

397.    The Illinois Department of the Lottery and B.R. Lane are not arms of the state of Illinois for purposes of the Eleventh Amendment because they are legally and financially autonomous from the Illinois government, raise and maintain funds independently, are not reliant on funding or tax revenues from the state of Illinois, and segregate their operating expenses from the general treasuries of the state of Illinois. Any judgment against the Illinois Department of the Lottery and B.R. Lane would not be paid from the general treasury of the state of Illinois, as lottery funds and operating budgets are held in a separate, special account.

398.    The Illinois Department of the Lottery and B.R. Lane are obligated by the principles of equity and law to transfer possession of Plaintiffs' and Class members' lottery winnings to Plaintiffs and Class members.

399.    Plaintiffs and Class members had, and continue to have, full and exclusive property rights in the winnings (*i.e.*, ownership) because they met all of the requirements of the Illinois Lottery Law, which entitled Plaintiffs and Class members to the winnings based on their respective lottery purchases.

400.    Plaintiffs and Class members had, and continue to have, immediate rights to possession of the winnings because their full and exclusive property rights in the winnings (*i.e.*, ownership) have vested.

401. By extension, Plaintiffs and Class members had, and continue to have, full and exclusive property rights (*i.e.*, ownership) to any accrued interest on their winnings.

402. The Illinois Department of the Lottery and B.R. Lane unlawfully retained Plaintiffs' and Class members' property when they failed to transfer possession of Plaintiffs' and Class members' lottery winnings to Plaintiffs and Class members.

403. The Illinois Department of the Lottery and B.R. Lane unlawfully retained Plaintiffs' and Class members' property when they failed to transfer possession of interest accrued on Plaintiffs' and Class members' lottery winnings to Plaintiffs and Class members.

404. In light of the foregoing, the Illinois Department of the Lottery and B.R. Lane have unjustly retained a benefit—Plaintiffs' and Class members' winnings, and the interest accrued thereon—to the detriment of Plaintiffs and the Class members, as they have deprived Plaintiffs and the Class members of their rights to use and enjoy their property, and accrue interest thereon.

405. The Illinois Department of the Lottery and B.R. Lane know of and appreciate that benefit.

406. The Illinois Department of the Lottery's and B.R. Lane's retention of that benefit violates the fundamental principles of justice, equity, and good conscience.

407. Since the Illinois Department of the Lottery and B.R. Lane have retained money to which they are not entitled, the principles of equity and good conscience require that they deliver that money to its rightful owners—Plaintiffs and the Class members.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, pray for an Order as follows:

A.     Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class defined herein;

B.     Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C.     Entering judgment in favor of Plaintiffs and Class and against the Illinois Department of the Lottery and B.R. Lane;

D.     Issuing an order enjoining the Illinois Department of the Lottery and B.R. Lane from implementing their official policies;

E.     Awarding Plaintiffs and Class members their lottery winnings and all accrued interest thereon;

F.     Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.     Awarding Plaintiffs reasonable attorney's fees and costs; and

H.     Granting all such further and other relief as the Court deems just and appropriate.

**COUNT X**
***Pled in the Alternative to Count II***
**42 U.S.C. § 1983**
**On Behalf of Interstate Lottery Plaintiffs and the**
**Interstate Lottery Class Against All Lottery Directors, in Their Official Capacities**
**and as Individuals**
**(Assuming These Defendants <u>Are</u> Arms of the State Under the 11th Amendment)**

408.     Interstate Lottery Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

409.     To the extent the Court determines that the Lottery Departments and their Lottery Directors are arms of the state for purposes of the Eleventh Amendment, Interstate Lottery Plaintiffs and Interstate Lottery Class members bring this Count against all Lottery Directors in the alternative to Count II.

410.     Despite being considered arms of the state, any judgment against the Lottery Directors would not be paid from the general treasuries of their respective jurisdictions' governments, as lottery funds and operating budgets are held in a separate, special account.

411.     Since the Lottery Directors' unconstitutional conduct is ongoing, any relief granted will be prospective in nature.

412.     At all relevant times, there was in effect 42 U.S.C. § 1983, which states, in relevant part:

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

413.     As stated above, the Lottery Directors have adopted and authorized official policies of non-payment as to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

414.     Each Lottery Director is a "person" as interpreted in 42 U.S.C. § 1983.

415.     The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee that no State shall "deprive any person of life, liberty or property, without due process of law."  This principle is known as "Due Process."

416.     Due Process consists of two components, Substantive Due Process and Procedural Due Process.  Substantive Due Process requires that state action does not impermissibly deprive a person of their fundamental rights to life, liberty, or property. Procedural Due Process requires

that adequate procedures are in place before a state actor permissibly deprives (*i.e.*, Substantive Due Process is not implicated) a person of life, liberty, or property.

417.    The Fifth Amendment's "Takings Clause" of the U.S. Constitution states that "nor shall private property be taken for public use without just compensation." The Takings Clause is made applicable to the States by way of the Fourteenth Amendment to the U.S. Constitution.

418.    A "taking" is effectuated when a property owner is denied the right to use his property for all economically beneficial uses. When a taking is without just compensation, a state actor deprives a citizen of his Substantive Due Process rights.

419.    When a taking is certain to occur, and a state actor does not give a citizen the opportunity to a predeprivation hearing to assert his legal interests relative to the property being subjected to a taking, a state actor deprives that citizen of his Procedural Due Process Rights.

420.    In this case, Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights have been violated by the Lottery Directors' official policies.

421.    The Lottery Directors' official policies deprived, and continue to deprive, Interstate Lottery Plaintiffs and Interstate Lottery Class members of all beneficial uses of their property (*i.e.*, their lottery winnings).

422.    The Lottery Directors' official policies do not provide Interstate Lottery Plaintiffs and Interstate Lottery Class members with any compensation whatsoever. Even if Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property is eventually returned, the Lottery Directors have not indicated that they will compensate Interstate Lottery Plaintiffs and

Interstate Lottery Class members with the accrued interest on their lottery winnings, and therefore, that property—the accrued interest—will have been taken without just compensation.

423.    Since the Lottery Directors' official policies constitute a taking, without just compensation, Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process rights (*i.e.*, constitutional rights) have been violated. Therefore, the Lottery Directors' official policies are unconstitutional as applied to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

424.    Additionally, there is no set of circumstances in which the Lottery Directors' official policies of depriving Interstate Lottery Plaintiffs and Interstate Lottery Class members of the use of their property and accrued interest thereon would *not* violate the Substantive Due Process rights of any citizen subjected to those policies.  Those official policies are therefore facially invalid.

425.    Even if the Lottery Directors' deprivation of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property did not violate their Substantive Due Process rights, the Lottery Directors' official policies also deprived, and continue to deprive, Interstate Lottery Plaintiffs and Interstate Lottery Class members of a fair opportunity to be heard prior to being deprived of their property (*i.e.*, their lottery winnings).

426.    The Lottery Directors were under an obligation to provide Interstate Lottery Plaintiffs and Interstate Lottery Class members with a predeprivation hearing because the Lottery Directors knew that their official policies would effectuate a taking.

427.    Therefore, the Lottery Directors' official policies, as applied to Interstate Lottery Plaintiffs and Interstate Lottery Class members, violate Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Procedural Due Process rights (*i.e.*, their constitutional rights).

94

428.    Additionally, there is no set of circumstances in which the Lottery Directors' official policies of depriving Interstate Lottery Plaintiffs and Interstate Lottery Class members of a predeprivation hearing would *not* violate the Procedural Due Process rights of any citizen subjected to those policies.  Those official policies are therefore facially invalid.

429.    At all relevant times, the Lottery Directors were, and continue to be, acting under color of law when carrying out their governmentally delegated functions in connection with operating lottery games.

430.    As such, the Lottery Directors had, and continue to have, a duty and obligation to comply with the U.S. Constitution when carrying out their governmentally delegated functions in connection with operating lottery games.

431.    However, the Lottery Directors, acting under the color of State law, denied Interstate Lottery Plaintiffs and Interstate Lottery Class members of their Substantive Due Process and Procedural Due Process rights by adopting, and continuing to enforce, their official policies to deprive Interstate Lottery Plaintiffs and Interstate Lottery Class members of their property (*i.e.*, their lottery winnings) and a predeprivation hearing.

432.    The actions of the Lottery Directors, pursuant to their official policies, constitute violations of rights guaranteed to Interstate Lottery Plaintiffs and Interstate Lottery Class members by the Fifth and Fourteenth Amendments to the U.S. Constitution.

433.    The Lottery Directors committed these acts intentionally, knowing that violations of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights would be violated by their official policies.

434.    To the extent that the Lottery Directors for jurisdictions other than Illinois have already transferred Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property

to the possession of the Illinois Department of the Lottery and B.R. Lane, these actions still constitute violations of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights because the Lottery Directors from jurisdictions other than Illinois knew, prior to doing so, that said actions would effectuate a taking without just compensation in light of the Illinois Department of the Lottery's and B.R. Lane's official policy to not pay out these winnings.

435.    Moreover, Interstate Lottery Plaintiffs and Interstate Lottery Class members do not have any adequate state remedies because the MUSL and Mega Millions Consortium do not provide any forum for Interstate Lottery Plaintiffs and Interstate Lottery Class members to seek redress, as there is no common tribunal to adjudicate their claims against all responsible Lottery Directors.

436.    Even if Interstate Lottery Plaintiffs and Interstate Lottery Class members attempted to seek redress through alternative forums, those forums would be inadequate for the following reasons.  First, Interstate Lottery Plaintiffs and Interstate Lottery Class members would be required to file separate actions in each jurisdiction against each Lottery Director in order to try to recover that jurisdiction's proportional share of the winnings. Second, Interstate Lottery Plaintiffs and Interstate Lottery Class members cannot possibly know which Lottery Director is in possession of their lottery winnings, and how much of those winnings each Lottery Director is in possession of. Third, even if Interstate Lottery Plaintiffs and Interstate Lottery Class members did have such information, each Lottery Director could subsequently transfer Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to another Lottery Director. Finally, any postdeprivation remedy offered by the Lottery Directors would be inadequate, as Interstate Lottery Plaintiffs and Interstate Lottery Class members may be precluded from

96

recovering the accrued interest on their winnings, despite the fact that the accrued interest has also become Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property, if Eleventh Amendment prohibitions were applicable. These reasons apply even if some or all of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings were in possession of B.R. Lane.

437.     In addition, any postdeprivation remedy offered by the Lottery Directors would be futile, as the Lottery Directors are *already* knowingly violating constitutional and statutory law. Despite knowing of their legal violations, the Lottery Directors continue to enforce their illegal official policies. Therefore, any postdeprivation remedy would be futile, as the Lottery Directors would ignore it, just as they have ignored their obligations under existing statutory and constitutional law.

438.     Based upon the foregoing, the Lottery Directors have acted, and continue to act, under color of law in enacting, and continuing to enforce, their official policies, which deprive Interstate Lottery Plaintiffs and Interstate Lottery Class members of their Substantive Due Process and Procedural Due Process rights.

439.     As a direct and proximate result of the Lottery Directors' deprivation of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights, Interstate Lottery Plaintiffs and Interstate Lottery Class members have been, and continue to be, damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Interstate Lottery Plaintiffs, individually, and on behalf of the Interstate Lottery Class, pray for an Order as follows:

A.      Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Interstate Lottery Class defined herein;

B.      Designating Interstate Lottery Plaintiffs as representatives of the Interstate Lottery Class and their undersigned counsel as Class Counsel;

C.      Entering judgment in favor of Interstate Lottery Plaintiffs and the Interstate Lottery Class and against all Lottery Directors;

D.      Issuing an order enjoining all Lottery Directors from implementing their official policies;

E.      Awarding Interstate Lottery Plaintiffs and Interstate Lottery Class members their lottery winnings;

F.      Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.      Awarding Interstate Lottery Plaintiffs reasonable attorney's fees and costs; and

H.      Granting all such further and other relief as the Court deems just and appropriate.

## COUNT XI
### *Plead in the Alternative to Count III*
### 42 U.S.C. § 1983
**On Behalf of all Plaintiffs and the Class Against B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer, in Their Official Capacities and as Individuals**
**(Assuming These Defendants Are Arms of the State Under the 11th Amendment)**

440.    Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

441.     To the extent the Court determines that the Illinois Department of the Lottery and B.R. Lane are arms of the state for purposes of the Eleventh Amendment, Plaintiffs and Class members bring this Count against B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer in the alternative to Count III.

442.     Despite being considered arms of the state, any judgment against B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer would not be paid from the general treasuries of the Illinois government, as lottery funds and operating budgets are held in a separate, special account.

443.     Since the B.R. Lane's, the Illinois Comptroller's, and the Illinois Treasurer's unconstitutional conduct is ongoing, any relief granted will be prospective in nature.

444.     At all relevant times, there was in effect 42 U.S.C. § 1983, which states, in relevant part:

> Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

445.     The Illinois Comptroller and the Illinois Treasurer adopted the Illinois B.R. Lane's official policy of non-payment as to Plaintiffs and Class members.

446.     The Illinois Comptroller, the Illinois Treasurer, and B.R. Lane are each a "person" as interpreted in 42 U.S.C. § 1983.

447.     The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee that no State shall "deprive any person of life, liberty or property, without due process of law." This principle is known as "Due Process."

448. Due Process consists of two components, Substantive Due Process and Procedural Due Process. Substantive Due Process requires that state action does not impermissibly deprive a person of their fundamental rights to life, liberty, or property. Procedural Due Process requires that adequate procedures are in place before a state actor permissibly deprives (*i.e.*, Substantive Due Process is not implicated) a person of life, liberty, or property.

449. The Fifth Amendment's "Takings Clause" of the U.S. Constitution states that "nor shall private property be taken for public use without just compensation." The Takings Clause is made applicable to the States by way of the Fourteenth Amendment to the U.S. Constitution.

450. A "taking" is effectuated when a property owner is denied the right to use his property for all economically beneficial uses. When a taking is without just compensation, a state actor deprives a citizen of his Substantive Due Process rights.

451. When a taking is certain to occur, and a state actor does not give a citizen the opportunity to a predeprivation hearing to assert his legal interests relative to the property being subjected to a taking, a state actor deprives that citizen of his Procedural Due Process Rights.

452. In this case, Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights have been violated by the Illinois Comptroller's, the Illinois Treasurer's and B.R. Lane's official policy.

453. The Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policy deprived, and continues to deprive, Plaintiffs and Class members of all beneficial uses of their property (*i.e.*, their lottery winnings).

454. The Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policy does not provide Plaintiffs and Class members with any compensation whatsoever. Even if

Plaintiffs' and Class members' property is eventually returned, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane have not indicated that they will compensate Plaintiffs and Class members with the accrued interest on their lottery winnings, and therefore, that property—the accrued interest—will have been taken without just compensation.

455.    Since the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policy constitutes a taking, without just compensation, Plaintiffs' and Class members' Substantive Due Process rights (*i.e.*, constitutional rights) have been violated. Therefore, the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policy is unconstitutional as applied to Plaintiffs and Class members.

456.    Additionally, there is no set of circumstances in which the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policy of depriving Plaintiffs and Class members of the use of their property and accrued interest thereon would *not* violate the Substantive Due Process rights of any citizen subjected to it.  That official policy is therefore facially invalid.

457.    Even if the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's deprivation of Plaintiffs' and Class members' property did not violate their Substantive Due Process rights, the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policy also deprived, and continues to deprive, Plaintiffs and Class members of a fair opportunity to be heard prior to being deprived of their property (*i.e.*, their lottery winnings).

458.    The Illinois Comptroller, the Illinois Treasurer, and B.R. Lane were under an obligation to provide Plaintiffs and Class members with a predeprivation hearing because the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane knew that their official policy would effectuate a taking.

459.    Therefore, the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policy, as applied to Plaintiffs and Class members, violates Plaintiffs' and Class members' Procedural Due Process rights (*i.e.*, their constitutional rights).

460.    Additionally, there is no set of circumstances in which the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policy of depriving Plaintiffs and Class members of a predeprivation hearing would *not* violate the Procedural Due Process rights of any citizen subjected to it.  That official policy is therefore facially invalid.

461.    At all relevant times, The Illinois Comptroller, the Illinois Treasurer, and B.R. Lane were, and continue to be, acting under color of law when carrying out their governmentally delegated functions in connection with operating lottery games offered in Illinois.

462.    As such, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane had, and continue to have, a duty and obligation to comply with the U.S. Constitution when carrying out their governmentally delegated functions in connection with operating lottery games offered in Illinois.

463.    However, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane, acting under the color of State law, denied Plaintiffs and Class members of their Substantive Due Process and Procedural Due Process rights by adopting, and continuing to enforce, their official policy to deprive Plaintiffs and Class members of their property (*i.e.*, their lottery winnings) and a predeprivation hearing.

464.    The actions of the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane, pursuant to their official policy, constitute violations of rights guaranteed to Plaintiffs and Class members by the Fifth and Fourteenth Amendments to the U.S. Constitution.

465.     The Illinois Comptroller, the Illinois Treasurer, and B.R. Lane committed these acts intentionally, knowing that violations of Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights would be violated by their official policy.

466.     Any postdeprivation remedy offered by the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane would be futile, as the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane are *already* knowingly violating constitutional and statutory law. Despite knowing of their legal violations, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane continue to enforce their illegal official policy.  Therefore, any postdeprivation remedy would be futile, as the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane would ignore it, just as they have ignored their obligations under existing statutory and constitutional law.

467.     In addition, any postdeprivation remedy offered by the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane would be inadequate, as Plaintiffs and Class members may be precluded from recovering the accrued interest on their winnings, despite the fact that the accrued interest has also become Plaintiffs' and Class members' property.

468.     In regard to Interstate Lottery Plaintiffs and Interstate Lottery Class members, any postdeprivation remedy offered by the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane would be also be inadequate because Interstate Lottery Plaintiffs and Interstate Lottery Class members could not recover lottery winnings that are being held by other Lottery Directors, as the MUSL, Mega Millions Consortium, and Illinois do not provide any common tribunal to adjudicate their claims against all Lottery Directors.

469.     Based upon the foregoing, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane have acted, and continue to act, under color of law in enacting, and continuing to

103

enforce, their official policy, which deprives Plaintiffs and Class members of their Substantive Due Process and Procedural Due Process rights.

470.    As a direct and proximate result of the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's deprivation of Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights, Plaintiffs and Class members have been, and continue to be, damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class defined herein;

B.    Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiffs and Class and against B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer;

D.    Issuing an order enjoining B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer from implementing their official policies;

E.    Awarding Plaintiffs and Class members their lottery winnings and all accrued interest thereon;

F.    Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.    Awarding Plaintiffs reasonable attorney's fees and costs; and

H.     Granting all such further and other relief as the Court deems just and appropriate.

### COUNT XII
*Pled in the Alternative to Counts IV through IX*
### Mandatory Injunction
**On Behalf of Interstate Lottery Plaintiffs and the**
**Interstate Lottery Class Against All Lottery Directors, in Their Official Capacities**
**and as Individuals**
**(Assuming These Defendants Are Arms of the State Under the 11th Amendment)**

471.    Interstate Lottery Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

472.    To the extent the Court determines that the Lottery Departments and their Lottery Directors are arms of the state for purposes of the Eleventh Amendment, Interstate Lottery Plaintiffs and Interstate Lottery Class members bring this Count against all Lottery Directors in the alternative to Counts IV through IX.

473.    Despite being considered arms of the state, any judgment against the Lottery Directors would not be paid from the general treasuries of their respective jurisdictions' governments, as lottery funds and operating budgets are held in a separate, special account.

474.    Since the Lottery Directors' unconstitutional conduct is ongoing, any relief granted will be prospective in nature.

475.    As stated above, the Lottery Directors have adopted and authorized official policies of non-payment as to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

476.    The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee that no State shall "deprive any person of life, liberty or property, without due process of law."  This principle is known as "Due Process."

105

477.     Due Process consists of two components, Substantive Due Process and Procedural Due Process.  Substantive Due Process requires that state action does not impermissibly deprive a person of their fundamental rights to life, liberty, or property. Procedural Due Process requires that adequate procedures are in place before a state actor permissibly deprives (*i.e.*, Substantive Due Process is not implicated) a person of life, liberty, or property.

478.     The Fifth Amendment's "Takings Clause" of the U.S. Constitution states that "nor shall private property be taken for public use without just compensation."  The Takings Clause is made applicable to the States by way of the Fourteenth Amendment to the U.S. Constitution.

479.     A "taking" is effectuated when a property owner is denied the right to use his property for all economically beneficial uses. When a taking is without just compensation, a state actor deprives a citizen of his Substantive Due Process rights.

480.     When a taking is certain to occur, and a state actor does not give a citizen the opportunity to a predeprivation hearing to assert his legal interests relative to the property being subjected to a taking, a state actor deprives that citizen of his Procedural Due Process Rights.

481.     In this case, Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights have been violated by the Lottery Directors' official policies.

482.     The Lottery Directors' official policies deprived, and continue to deprive, Interstate Lottery Plaintiffs and Interstate Lottery Class members of all beneficial uses of their property (*i.e.*, their lottery winnings).

483.     The Lottery Directors' official policies do not provide Interstate Lottery Plaintiffs and Interstate Lottery Class members with any compensation whatsoever. Even if Interstate

Lottery Plaintiffs' and Interstate Lottery Class members' property is eventually returned, the Lottery Directors have not indicated that they will compensate Interstate Lottery Plaintiffs and Interstate Lottery Class members with the accrued interest on their lottery winnings, and therefore, that property—the accrued interest—will have been taken without just compensation.

484.     Since the Lottery Directors' official policies constitute a taking, without just compensation, Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process rights (*i.e.*, constitutional rights) have been violated. Therefore, the Lottery Directors' official policies are unconstitutional as applied to Interstate Lottery Plaintiffs and Interstate Lottery Class members.

485.     Additionally, there is no set of circumstances in which the Lottery Directors' official policies of depriving Interstate Lottery Plaintiffs and Interstate Lottery Class members of the use of their property and accrued interest thereon would *not* violate the Substantive Due Process rights of any citizen subjected to those policies.  Those official policies are therefore facially invalid.

486.     Even if the Lottery Directors' deprivation of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property did not violate their Substantive Due Process rights, the Lottery Directors' official policies also deprived, and continue to deprive, Interstate Lottery Plaintiffs and Interstate Lottery Class members of a fair opportunity to be heard prior to being deprived of their property (*i.e.*, their lottery winnings).

487.     The Lottery Directors were under an obligation to provide Interstate Lottery Plaintiffs and Interstate Lottery Class members with a predeprivation hearing because the Lottery Directors knew that their official policies would effectuate a taking.

488.    Therefore, the Lottery Directors' official policies, as applied to Interstate Lottery Plaintiffs and Interstate Lottery Class members, violate Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Procedural Due Process rights (*i.e.*, their constitutional rights).

489.    Additionally, there is no set of circumstances in which the Lottery Directors' official policies of depriving Interstate Lottery Plaintiffs and Interstate Lottery Class members of a predeprivation hearing would *not* violate the Procedural Due Process rights of any citizen subjected to those policies.  Those official policies are therefore facially invalid.

490.    At all relevant times, the Lottery Directors were, and continue to be, arms of the state when carrying out their governmentally delegated functions in connection with operating lottery games.

491.    As such, the Lottery Directors had, and continue to have, a duty and obligation to comply with the U.S. Constitution when carrying out their governmentally delegated functions in connection with operating lottery games.

492.    However, the Lottery Directors, as arms of the state, denied, and continue to deny, Interstate Lottery Plaintiffs and Interstate Lottery Class members of their Substantive Due Process and Procedural Due Process rights by adopting, and continuing to enforce, their official policies to deprive Interstate Lottery Plaintiffs and Interstate Lottery Class members of their property (*i.e.*, their lottery winnings) and a predeprivation hearing.

493.    The actions of the Lottery Directors, pursuant to their official policies, constitute violations of rights guaranteed to Interstate Lottery Plaintiffs and Interstate Lottery Class members by the Fifth and Fourteenth Amendments to the U.S. Constitution.

494.    The Lottery Directors committed these acts intentionally, knowing that violations of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights would be violated by their official policies.

495.    To the extent that the Lottery Directors for jurisdictions other than Illinois have already transferred Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property to the possession of the Illinois Department of the Lottery and B.R. Lane, these actions still constitute violations of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and Procedural Due Process rights because the Lottery Directors from jurisdictions other than Illinois knew, prior to doing so, that said actions would effectuate a taking without just compensation in light of the Illinois Department of the Lottery's and B.R. Lane's official policy to not pay out these winnings.

496.    Moreover, Interstate Lottery Plaintiffs and Interstate Lottery Class members do not have any adequate state remedies because the MUSL and Mega Millions Consortium do not provide any forum for Interstate Lottery Plaintiffs and Interstate Lottery Class members to seek redress, as there is no common tribunal to adjudicate their claims against all responsible Lottery Directors.

497.    Even if Interstate Lottery Plaintiffs and Interstate Lottery Class members attempted to seek redress through alternative forums, those forums would be inadequate for the following reasons.  First, Interstate Lottery Plaintiffs and Interstate Lottery Class members would be required to file separate actions in each jurisdiction against each Lottery Director in order to try to recover that jurisdiction's proportional share of the winnings. Second, Interstate Lottery Plaintiffs and Interstate Lottery Class members cannot possibly know which Lottery Director is in possession of their lottery winnings, and how much of those winnings each Lottery Director is

in possession of. Third, even if Interstate Lottery Plaintiffs and Interstate Lottery Class members did have such information, each Lottery Director could subsequently transfer Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings to another Lottery Director. Finally, any postdeprivation remedy offered by the Lottery Directors would be inadequate, as Interstate Lottery Plaintiffs and Interstate Lottery Class members may be precluded from recovering the accrued interest on their winnings, despite the fact that the accrued interest has also become Interstate Lottery Plaintiffs' and Interstate Lottery Class members' property, if Eleventh Amendment prohibitions were applicable. These reasons apply even if some or all of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' lottery winnings were in possession of B.R. Lane.

498.    In addition, any postdeprivation remedy offered by the Lottery Directors would be futile, as the Lottery Directors are *already* knowingly violating constitutional and statutory law. Despite knowing of their legal violations, the Lottery Directors continue to enforce their illegal official policies. Therefore, any postdeprivation remedy would be futile, as the Lottery Directors would ignore it, just as they have ignored their obligations under existing statutory and constitutional law.

499.    Based upon the foregoing, the Lottery Directors have acted, and continue to act, as arms of the state, in enacting, and continuing to enforce, their official policies, which deprive Interstate Lottery Plaintiffs and Interstate Lottery Class members of their Substantive Due Process and Procedural Due Process rights.

500.    As a direct and proximate result of the Lottery Directors' deprivation of Interstate Lottery Plaintiffs' and Interstate Lottery Class members' Substantive Due Process and

Procedural Due Process rights, Plaintiffs and Class members have been, and continue to be, damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Interstate Lottery Plaintiffs, individually, and on behalf of the Interstate Lottery Class, pray for an Order as follows:

A.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Interstate Lottery Class defined herein;

B.   Designating Interstate Lottery Plaintiffs as representatives of the Interstate Lottery Class and their undersigned counsel as Class Counsel;

C.   Entering judgment in favor of Interstate Lottery Plaintiffs and the Interstate Lottery Class and all Lottery Directors;

D.   Issuing an order enjoining all Lottery Directors from implementing their official policies;

E.   Awarding Interstate Lottery Plaintiffs and Interstate Lottery Class members their lottery winnings and all accrued interest thereon;

F.   Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.   Awarding Interstate Lottery Plaintiffs reasonable attorney's fees and costs; and

H.   Granting all such further and other relief as the Court deems just and appropriate.

**COUNT XIII**
*Pled in the Alternative to Counts IV through IX*
**Mandatory Injunction**
**On Behalf of all Plaintiffs and the Class Against B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer, in Their Official Capacities and as Individuals**
**(Assuming These Defendants Are Arms of the State Under the 11th Amendment)**

501.    Plaintiffs repeat and reallege Paragraphs 1-243 with the same force and effect as though fully set forth herein.

502.    To the extent the Court determines that the Illinois Department of the Lottery and B.R. Lane are arms of the state for purposes of the Eleventh Amendment, Plaintiffs and Class members bring this Count against B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer in the alternative to Counts IV through IX.

503.    Since the B.R. Lane's, the Illinois Comptroller's, and the Illinois Treasurer's unconstitutional conduct is ongoing, any relief granted will be prospective in nature.

504.    Despite being considered arms of the state, any judgment against B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer would not be paid from the general treasuries of the Illinois government, as lottery funds and operating budgets are held in a separate, special account.

505.    As stated above, the Illinois Comptroller and the Illinois Treasurer adopted B.R. Lane's official policies of non-payment as to Plaintiffs and Class members.

506.    The Fifth and Fourteenth Amendments to the U.S. Constitution guarantee that no State shall "deprive any person of life, liberty or property, without due process of law."  This principle is known as "Due Process."

507.    Due Process consists of two components, Substantive Due Process and Procedural Due Process.  Substantive Due Process requires that state action does not impermissibly deprive a person of their fundamental rights to life, liberty, or property. Procedural Due Process requires

that adequate procedures are in place before a state actor permissibly deprives (*i.e.*, Substantive Due Process is not implicated) a person of life, liberty, or property.

508.    The Fifth Amendment's "Takings Clause" of the U.S. Constitution states that "nor shall private property be taken for public use without just compensation."  The Takings Clause is made applicable to the States by way of the Fourteenth Amendment to the U.S. Constitution.

509.    A "taking" is effectuated when a property owner is denied the right to use his property for all economically beneficial uses. When a taking is without just compensation, a state actor deprives a citizen of his Substantive Due Process rights.

510.    When a taking is certain to occur, and a state actor does not give a citizen the opportunity to a predeprivation hearing to assert his legal interests relative to the property being subjected to a taking, a state actor deprives that citizen of his Procedural Due Process Rights.

511.    In this case, Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights have been violated by the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies.

512.    The Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies deprived, and continue to deprive, Plaintiffs and Class members of all beneficial uses of their property (*i.e.*, their lottery winnings).

513.    The Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies do not provide Plaintiffs and Class members with any compensation whatsoever. Even if Plaintiffs' and Class members' property is eventually returned, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane have not indicated that they will compensate Plaintiffs and

Class members with the accrued interest on their lottery winnings, and therefore, that property—the accrued interest—will have been taken without just compensation.

514. Since the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies constitute a taking, without just compensation, Plaintiffs' and Class members' Substantive Due Process rights (*i.e.*, constitutional rights) have been violated. Therefore, the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies are unconstitutional as applied to Plaintiffs and Class members.

515. Additionally, there is no set of circumstances in which the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies of depriving Plaintiffs and Class members of the use of their property and accrued interest thereon would *not* violate the Substantive Due Process rights of any citizen subjected to those policies. Those official policies are therefore facially invalid.

516. Even if the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's deprivation of Plaintiffs' and Class members' property did not violate their Substantive Due Process rights, the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies also deprived, and continue to deprive, Plaintiffs and Class members of a fair opportunity to be heard prior to being deprived of their property (*i.e.*, their lottery winnings).

517. The Illinois Comptroller, the Illinois Treasurer, and B.R. Lane were under an obligation to provide Plaintiffs and Class members with a predeprivation hearing because the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane knew that their official policies would effectuate a taking.

518. Therefore, the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies, as applied to Plaintiffs and Class members, violate Plaintiffs' and Class members' Procedural Due Process rights (*i.e.*, their constitutional rights).

519. Additionally, there is no set of circumstances in which the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's official policies of depriving Plaintiffs and Class members of a predeprivation hearing would *not* violate the Procedural Due Process rights of any citizen subjected to those policies. Those official policies are therefore facially invalid.

520. At all relevant times, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane were, and continue to be, arms of the state when carrying out their governmentally delegated functions in connection with operating lottery games.

521. As such, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane had, and continue to have, a duty and obligation to comply with the U.S. Constitution when carrying out their governmentally delegated functions in connection with operating lottery games.

522. However, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane, as arms of the state, denied, and continue to deny, Plaintiffs and Class members of their Substantive Due Process and Procedural Due Process rights by adopting, and continuing to enforce, their official policies to deprive Plaintiffs and Class members of their property (*i.e.*, their lottery winnings) and a predeprivation hearing.

523. The actions of the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane, pursuant to their official policies, constitute violations of rights guaranteed to Plaintiffs and Class members by the Fifth and Fourteenth Amendments to the U.S. Constitution.

524. The Illinois Comptroller, the Illinois Treasurer, and B.R. Lane committed these acts intentionally, knowing that violations of Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights would be violated by their official policies.

525. Any postdeprivation remedy offered by the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane would be futile, as the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane are *already* knowingly violating constitutional and statutory law. Despite knowing of their legal violations, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane continue to enforce their illegal official policy. Therefore, any postdeprivation remedy would be futile, as the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane would ignore it, just as they have ignored their obligations under existing statutory and constitutional law.

526. In addition, any postdeprivation remedy offered by the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane would be inadequate as Plaintiffs and Class members may be precluded from recovering the accrued interest on their winnings, despite the fact that the accrued interest has also become Plaintiffs' and Class members' property.

527. In regard to Interstate Lottery Plaintiffs and Interstate Lottery Class members, any postdeprivation remedy offered by the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane would be also be inadequate because Interstate Lottery Plaintiffs and Interstate Lottery Class members could not recover lottery winnings that are being held by other Lottery Directors, as the MUSL, Mega Millions Consortium, and Illinois do not provide any common tribunal to adjudicate their claims against all Lottery Directors.

528. Based upon the foregoing, the Illinois Comptroller, the Illinois Treasurer, and B.R. Lane have acted, and continue to act, as arms of the state, in enacting, and continuing to

enforce, their official policies, which deprive Plaintiffs and Class members of their Substantive Due Process and Procedural Due Process rights.

529.    As a direct and proximate result of the Illinois Comptroller's, the Illinois Treasurer's, and B.R. Lane's deprivation of Plaintiffs' and Class members' Substantive Due Process and Procedural Due Process rights, Plaintiffs and Class members have been, and continue to be, damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually, and on behalf of the Class, pray for an Order as follows:

A.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23, and certifying the Class defined herein;

B.    Designating Plaintiffs as representatives of the Class and their undersigned counsel as Class Counsel;

C.    Entering judgment in favor of Plaintiffs and Class and against B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer;

D.    Issuing an order enjoining B.R. Lane, the Illinois Comptroller, and the Illinois Treasurer from implementing their official policies;

E.    Awarding Plaintiffs and Class members their lottery winnings and all accrued interest thereon;

F.    Issuing an order to (1) prevent the Illinois Department of the Lottery from selling lottery tickets, for both interstate and intrastate games, with potential winnings in excess of $600, (2) prevent the Illinois Department of the Lottery from making payments to finance the operation of the Illinois Lottery until all Illinois Lottery Winners are paid, (3) post a notice at the point of sale to inform individuals that they will not be able to collect winnings in excess of $600, to the extent the Illinois Department of the Lottery continues to sell lottery tickets, and (4) require Defendants to transfer all unpaid lottery winnings and accrued interest thereon to the custody of the Court;

G.    Awarding Plaintiffs reasonable attorney's fees and costs; and

H.    Granting all such further and other relief as the Court deems just and appropriate.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

All Plaintiffs, individually, and on behalf of all others similarly situated,

By:   _s/Thomas A. Zimmerman, Jr._
      Thomas A. Zimmerman, Jr. (IL #6231944)
      *tom@attorneyzim.com*
      Amelia S. Newton (IL #6190594)
      *amy@attorneyzim.com*
      Matthew C. De Re (IL #6317913)
      *matt@attorneyzim.com*
      Nicholas J. Hagman (IL #6317689)
      *nick@attorneyzim.com*
      ZIMMERMAN LAW OFFICES, P.C.
      77 West Washington Street, Suite 1220
      Chicago, Illinois 60602
      (312) 440-0020 telephone
      (312) 440-4180 facsimile
      www.attorneyzim.com

Counsel for the Plaintiffs and Class