IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RHONDA RASCHE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 15 C 7918 |
| v. | ) | |
| | ) | JUDGE CASTILLO |
| B.R. LANE, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ILLINOIS STATE DEFENDANTS' RESPONSE TO
PLAINTIFFS' MOTION FOR TRO AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………1

BACKGROUND ON ILLINOIS STATE LOTTERY……………………………………5

ARGUMENT……………………………………………………………………7

I.     PRELIMINARY INJUNCTION STANDARDS…………………………………………7

II.    PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IN
THE ABSENCE OF A TRO OR PRELIMINARY INJUNCTION;
ADEQUATE LEGAL REMEDIES EXIST………………………………………………8

III.   THE ELEVENTH AMENDMENT BARS THIS ACTION…………………………9

      A.   Summary of argument……………………………………………………9

      B.   Plaintiffs cannot overcome the Eleventh Amendment through
the guise of "prospective injunctive relief" where the real effect
is to control the State's Treasury……………………………………………...10

      C.   The Illinois Lottery Defendants are arms of the state…………………………….12

            1.    The Lottery is not financially autonomous from the State……………13

            2.    The Lottery's general legal status is that of an arm of
the State………………………………………………………………16

            3.    Only the Comptroller and Treasurer are able to control the
funds in the State Lottery Fund, and both are unquestionably
protected by Eleventh Amendment Immunity…………………………19

      D.   The Eleventh Amendment bars state law claims against state officials
in their official capacities…………………………………………………………20

IV.   THERE IS NO LIKELIHOOD OF SUCCESS ON THE PLAINTIFFS' DUE PROCESS
CLAIMS…………………………………………………………………………...20

CONCLUSION…………………………………………………………………………23

**CASES**                                                                     **PAGE(S)**

*Am. Fed. of State, County, and Mun. Employees v. Netsch,*
216 Ill. App. 3d 566 (Ill. App. Ct. 1991)……………………………………………………4

*Am. Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796 (7th Cir. 2002)………………………8-9

*American Hospital Supply Co. v. Hospital Products Limited*,
780 F.2d 589 (7th Cir. 1986)……………………………………………………………7

*Ameritech Corp. v. McCann,* 176 F. Supp. 2d 870 (E.D. Wis. 2001)………………………20 n.3

*Board of Regents v. Roth,* 408 U.S. 564 (1972)………………………………………………21

*Bd. of Trustees* v. *Burris,* 118 Ill. 2d 465 (1987)…………………………………………...16

*British Ins. Co. of Cayman v. Safety National Casualty,* 335 F.3d 205 (3rd Cir. 2003)…………...6

*Brown v. Brienen,* 722 F.2d 360 (7th Cir. 1983)…………………………………………...5, 21, 22

*Brown v. State of Wisconsin*, 602 N.W.2d 79 (1999)…………………………………………...6

*Burrus v. State Lottery Comm. of Indiana*, 546 F.3d 417 (7th Cir. 2008)…………...2-3, 13, 16, 17

*Casey v. Depetrillo,* 697 F.2d 22 (1st Cir. 1983)………………………………………………23

*Cooper v. Salazar,* 196 F.3d 809 (7th Cir. 1999)……………………………………………….7

*Council 31 of the Am. Fed'n of State, County, & Mun. Employees v. Quinn*,
680 F.3d 875 (7th Cir. 2012)…………………………………………………………...11

*Daniels v. Area Plan Comm'n of Allen County*, 306 F.3d 445 (7th Cir. 2002)………………….23

*Edelman v. Jordan,* 415 U.S. 651 (1974)…………………………………………………...19

*Ellis v. Sheahan,* 412 F.3d 754 (7th Cir. 2005)…………………………………………...21

*Ex parte Young*, 209 U.S. 123 (1908)……………………………………………………2, 9

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America,*
549 F.3d 1079 (7th Cir. 2008)…………………………………………………………..7

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund,* 527 U.S. 308 (1999)………………8

*Haynes v. Department of the Lottery,* 630 So.2d 1177 (Fla. App. Ct. 1994)…………………...5-6

*Hess v. Port Auth. Trans Hudson Corp.*, 513 U.S. 30 (1994)…………………………………11, 19

*Horwitz-Mathews, Inc. v. City of Chicago,* 78 F.3d 1248 (7th Cir. 1996)………………………..22

*Houghton v. Big Red Keno, Inc.*, 574 N.W.2d 494 (Neb. 1998)…………………………………….5

*Ind. Protection and Advocacy v. Ind. Family and Soc. Servs. Adm.,*
603 F.3d 365, 370-71 (7th Cir. 2010)………………………………………………………………9 n.2

*Jones v. ABN AMRO Mort. Group,* 551 F. Supp. 2d 400 (E.D. Pa. 2008)…………………..20 n.3

*Kashani v. Purdue Univ.*, 813 F.2d 843 (7th Cir. 1987)…………………………………………...12-13

*Khan v. Bland,* 630 F.3d 519 (7th Cir. 2010)………………………………………………………22

*Loane v. State of Illinois,* 59 Ill. Ct. of Claims 325 (2006)……………………………………….5

*Malone v. Schenk*, 638 F. Supp. 423 (C.D. Ill. 1985)……………………………………………...12, 13

*McDonough Associates, Inc. v. Grunloh,* 722 F.3d 1043 (7th Cir. 2013)…………..2, 3, 10, 11, 12

*Mid-American Waste Systems v. City of Gary, Ind.,* 49 F.3d 286 (7th Cir. 1995)………………..22

*Monfardini v. Quinlan,* No. 02 C 4284, 2003 WL 21384642 (N.D. Ill. 2003)……………………8

*Moore v. Watson,* 838 F. Supp. 2d 735 (N. D. Ill. 2012)………………………………………...20

*Peters v.Village of Clifton,* 498 F.3d 727 (7th Cir. 2007)………………………………………...23

*Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89 (1984)………………………..9

*Quern v. Jordan,* 440 U.S. 332 (1979)…………………………………………………………...20

*Rice v. Ohio Lottery Commission*, 708 N.E.2d 796 (Ohio 1999)…………………………………6

*Smith v. Jones,* 113 Ill. 2d 126 (1986)……………………………………………………………5, 9

*Sorrentino v. Godinez,* 777 F.3d 410 (7th Cir. 2015)……………………………………………22

*Taake v. County of Monroe,* 530 F.3d 538 (7th Cir. 2008)………………………………………22

*Will v. Mich. Dep't of State Police,* 491 U.S. 58 (1989)…………………………………………20

*Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92 (1st Cir. 2002)…………………..17-18, 18

**ILLINOIS CONSTIUTITONAL PROVISIONS**

Ill. Const. art. VIII, §2(b)……………………………………………………...4, 16

Ill. Const. art. V, §17………………………………………………………14, 19

Ill. Const. art. V, §18………………………………………………………14, 19

**STATUTES AND ADMINISTRATIVE REGULATIONS**

28 U.S.C § 2201……………………………………………………………...20 n.3

28 U.S.C. § 2202……………………………………………………………20 n.3

42 U.S.C. § 1983…………………………………………………………….1, 20

15 ILCS 205/4……………………………………………………………………18

20 ILCS 5/5-15………………………………………………………………..3, 17

20 ILCS 1605/2……………………………………………………………15, 17

20 ILCS 1605/5(a)………………………………………………………………18

20 ILCS 1605/7.1……………………………………………………………...18

20 ILCS 1605/9(j)……………………………………………………………...15

20 ILCS 1605/12………………………………………………………………18

20 ILCS 1605/20………………………………………………………13, 14, 19

20 ILCS 1605/21………………………………………………………13, 14, 17

20 ILCS 1605/20.1……………………………………………………………14

20 ILCS 1605/20.1(a)………………………………………………14, 15, 19

20 ILCS 1605/20.1(b)…………………………………………………………15

20 ILCS 1605/25………………………………………………………………18

30 ILCS 230/2(a)(4)…………………………………………………………...16

Ind. Code §4-30-1-2(1)………………………………………………………16, 17

Ind. Code §§4-30-1-2(3)……………………………………………………………...17

Ind. Code §4-30-3-1……………………………………………………………...17

11 Ill. Adm. Code 1770.160(d)……………………………………………………7

**OTHER AUTHORITIES**

1991 Ind. OAG No. 10 (Indiana Attorney General Opinion)……………………………17

The Illinois Department of Lottery, its Director B. R. Lane, the Illinois State Treasurer, Michael Frerichs, and the Illinois Comptroller, Leslie Munger[1] (the Illinois State Defendants), by their attorney, Lisa Madigan, Attorney General of Illinois, submit their response to Plaintiffs' motion for temporary restraining order and preliminary injunction.

## INTRODUCTION

Illinois's elected officials have not been able to agree on a state budget for fiscal year 2016. This impasse, now almost five months old, has led to regrettable delays in the State's legal ability to pay its creditors and grant recipients. The legal inability to do so is rooted in the Illinois Constitution, which requires that the state legislature authorize the expenditure of public funds in an annual budget. Plaintiffs are one group of those creditors--they have won prizes in the State Lottery and have filed a federal lawsuit to collect the money.

Plaintiffs' amended complaint is 118 pages long, contains 529 paragraphs, and names as defendants not just Illinois state defendants, but state lottery departments in 44 states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands. There are 13 counts with various permutations, including constitutional due process claims brought under 42 U. S. C. § 1983, RICO (racketeering claims against all the state lottery directors), and civil conspiracy, among others.

Despite the complexity, the core relief sought by plaintiffs is quite straightforward—pay us the money we won plus interest. The State's response to this massive filing can be summarized in three words: the Eleventh Amendment. Indeed, not just the motion for preliminary relief, but the entire case, can be decided with a citation to one recent, and

---

[1] The Comptroller wishes to express on the record that her role is to process payments owed by the State pursuant to law, and will do so when the current budget impasse ends and pursuant to existing court orders. She will follow the directives of the Court with respect to all matters in litigation, as she has done in other litigation resulting from the current lack of a state budget.

controlling, Seventh Circuit decision, *McDonough Associates, Inc. v. Grunloh,* 722 F.3d 1043 (7th Cir. 2013). In *McDonough*, the plaintiffs sued the Illinois Department of Transportation for money claimed owed to them, and their claims were barred by the Eleventh Amendment. Substitute the Department of Lottery for IDOT, and the cases are essentially identical.

Like *McDonough*, this is not a case that fits the primary exception to the State's Eleventh Amendment immunity, *Ex parte Young*, 209 U.S. 123 (1908), which permits suits for prospective injunctive relief against state officials if the state official is violating federal law. Here, as in *McDonough*, there is nothing prospective about the relief sought. The relief sought is a retroactive award of money from the state treasury. Plaintiffs in *McDonough* tried to fit their state law contract claims under *Ex parte Young,* and failed. This case is no different.

Absent a waiver by the State or action by Congress abrogating Eleventh Amendment immunity under its power to legislate under section 5 of the Fourteenth Amendment, the Eleventh Amendment bars actions against the State and its agencies or departments, regardless of the relief sought. This includes barring retroactive awards of money damages or payments out of the state treasury (this includes claims for interest as well as the prize money). This case should end there. Against this, in an effort to avoid the Eleventh Amendment bar, plaintiffs argue that the Department of the Lottery is not an "arm of the state" by trying to analogize it to the Indiana Lottery Commission, which has been held not entitled to Eleventh Amendment protection because of its autonomy from the rest of Indiana government. See *Burrus v. State Lottery Comm. of Indiana*, 546 F.3d 417 (7th Cir. 2008). But unlike the Indiana Lottery Commission, the Illinois Department of the Lottery is a "Department of State government," defined as such by law, 20 ILCS 5/5-15, whose funding and authority to award prizes to lottery winners is controlled by Illinois law and the Illinois Treasurer, as we will show in some detail.

2

The Eleventh Amendment does additional work in eliminating state law claims, such as Counts V, VI, VII, VIII, and IX, alleging civil conspiracy, conversion, and unjust enrichment. Federal courts lack jurisdiction to compel state officials to conform their conduct to state law.

In an effort to avoid Eleventh Amendment immunity, plaintiffs open their TRO motion by asserting a false premise: that the Illinois Department of the Lottery and its Director, B. R. Lane, "adopted their *official policy* to cease making payments to winners of all lottery games"…over $25,000. Doc. 17 at 1 (emphasis added). There is no legal merit to Plaintiffs' suggestion that Director Lane has any official discretion to decide when and how to pay lottery winners without appropriation authority. Plaintiffs effectively concede this in their amended complaint, where they allege that the real reason for the delay is the lack of a state budget. Doc.12 at ¶¶33-34, 40. The real party in interest here is not Director Lane, as author of some inchoate "policy," but the State of Illinois itself. The Eleventh Amendment is in play here, and controls.

Plaintiffs also do not have any likelihood of success on their due process claim. Plaintiffs attempt to plead a federal due process claim out of what is essentially a claim based in state law. But state courts have held that disputes about lottery prizes are essentially contract claims—*state law* contract claims. Certainly if plaintiffs have legitimately won the lottery, they have a claim in state law to receive their prizes. No one disputes this, and no one disputes that plaintiffs will be paid once the State's political leaders reach an agreement. Nor is there any evidence in the record to suggest that the State of Illinois lacks the ability to pay. During this budget impasse, the State is meeting its payroll obligations, collecting taxes, and collecting revenue from the lottery. Public education is being funded through an appropriation for that purpose. Payments to others are being delayed, but they are not being denied. In normal circumstances, plaintiffs have adequate

3

post-deprivation remedies in the Illinois Court of Claims for state law breach of contract claims. In this unusual situation of a protracted impasse over the state budget, plaintiffs' redress will come through the state legislature when the budget is passed. There is no federal due process claim, because the Fourteenth Amendment was not intended to displace all of state contract and tort law.

While there is no dispute that any legitimate winner of the lottery should (and will be) paid, this case raises far bigger federalism concerns should the plaintiffs succeed in persuading this Court to intervene. For example, lottery claimants can't be distinguished from other vendors awaiting payment for services rendered to the State: utility companies or employees awaiting travel reimbursements, to name a couple examples. There is no basis for the claims of lottery winners to trump those of others who are in line to collect money from the State.

Under Article 8, section 2(b) of the Illinois Constitution, "The General Assembly by law shall make appropriations for all expenditures of public funds by the State." See *Am. Fed. of State, County, and Mun. Employees v. Netsch*, 216 Ill. App. 3d 566, 567-68 (Ill. App. Ct. 1991) ("Stated simply, when State money has once been received by the State treasurer, the constitution prevents its withdrawal except in pursuance of an appropriation made by law."). In effect, plaintiffs are alleging that this provision of the state Constitution is unconstitutional as to persons who have won the state lottery—a result with enormous consequences for federalism. There is no basis in federal law for this extraordinary proposition. Plaintiffs who have won a lottery game have a claim for their lottery prize, which the State will honor once the State's elected officials reach a budget agreement.[2] And although it is highly unlikely to be necessary, lottery winners alleging a breach of contract have a forum to pursue those claims in the Illinois

---

[2] This Court can take judicial notice that the Illinois House has recently passed HB 4305, which would appropriate money for the Lottery. The bill awaits action by the Senate. It is not as if there is some obdurate singling out of the lottery winners and a deliberate effort to deny their claims. They are a part of the larger budget impasse.

Court of Claims. There is no legitimate federal claim here, even if the Eleventh Amendment were not in play.

## BACKGROUND ON ILLINOIS STATE LOTTERY

The essentially "state law" nature of the lottery can be clearly seen by an examination of the lottery process itself. (These facts also may have some bearing on the federal claims made by plaintiff with respect to due process and takings.) An Illinois lottery ticket contains this language on the back: "Tickets, transactions, and winners are subject to all Lottery procedures, rules, directives, and state law. Official game rules are on file at the Illinois Lottery." Ex. A. On the Department's website, one will find the General Rules for the Illinois Lottery, including section 2.9, Governing Law. Ex. B at 12. This section again states that playing the game means that individual agrees to comply with the Lottery rules, directives, and governing law. *Id.*

The State's promise to pay lottery winnings is essentially a contract and is governed by contract law. Many state cases from around the country have so held, including Illinois. See *Smith v. Jones,* 113 Ill. 2d 126 (1986) (holding lottery ticket holders' claim barred by state sovereign immunity and noting their contract action could be pursued administratively or in the Illinois Court of Claims); *Loane v. State of Illinois,* 59 Ill. Ct. of Claims 325 (2006); *Houghton v. Big Red Keno, Inc.,* 254 Neb. 81, 574 N.W.2d 494 (1998) (collecting cases); *Haynes v. Department of the Lottery,* 630 So.2d 1177 (Fla. App. Ct. 1994); *Rice v. Ohio Lottery Commission*, 96 Ohio Misc.2d 25, 708 N.E.2d 796 (1999); *Brown v. State of Wisconsin,* 230 Wis.2d 355, 602 N.W.2d 79 (1999).

Plaintiffs have not limited their case to claims against Illinois: Plaintiffs have sued all the states that participate in multistate games such as Mega Millions and Powerball. They have sued them on theories of RICO, civil conspiracy, conversion, and unjust enrichment. Plaintiffs' action

thus is contrary to Section 2.9 of the general lottery rules, which state: "Litigation, if any, shall only be maintained with the state in which the Mega Millions ticket was purchased and only against the party lottery that issued the ticket." Ex. B at 12. When someone wins a very large Mega Millions jackpot, other states in the game contribute to the paying state, Ex. C, Froelich Dec., ¶¶24-30, but there is no privity between the winner of the ticket and the other states, as Section 2.9 makes clear. One might analogize the situation to the relationship between an insured, the insurer who has a contract with the insured, and a re-insurer who is contractually bound to the insurer to cover any excess risk. As a general rule, the insured has no claim against the reinsurer. See *British Ins. Co. of Cayman v. Safety National Casualty,* 335 F.3d 205, 211-12 (3rd Cir. 2003). At the November 12 hearing before Judge Blakey, plaintiffs disclaimed seeking any preliminary injunctive relief against all the other state lottery agencies and their directors. That is welcome news, but it is just as clear that there is no viable claim against any of them at all. Plaintiffs do not allege any facts suggesting that, apart from the budget impasse in Illinois, the other state lotteries have injured the prize winners in any way whatever.

As a final preliminary matter, we note that at the November 12 hearing before Judge Blakey, Plaintiffs pressed vigorously for sequestration not just of prize money, but also of interest. But not only is an award of interest barred by the Eleventh Amendment because it too would come from the State's treasury, but we also are not aware of any Illinois authority that justifies awarding interest to prize winners in any event. Even without a budget impasse, lottery winners experience delays between when they win a prize and when their claim forms are submitted, approved, and paid. And in fact, the Department of the Lottery has a rule that in the case of a delay because of litigation over a disputed claim where the Lottery may be part of an interpleader action, it is not liable for interest. 11 Ill. Adm. Code 1770.160(d). We expect Illinois

6

courts would reach the same conclusion in this situation, but this is not an issue we expect this Court will reach.

## ARGUMENT

## I.  PRELIMINARY INJUNCTION STANDARDS

A preliminary injunction is an extraordinary remedy, the need for which the plaintiff has to establish by a clear showing. *Cooper v. Salazar,* 196 F.3d 809 (7th Cir. 1999). To obtain one, a plaintiff must show that it will suffer irreparable harm before a final resolution of its claims, that legal remedies would be inadequate, and a likelihood of success on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America,* 549 F.3d 1079, 1086 (7th Cir. 2008). The motion must be denied if the moving party fails to establish any one of these three initial requirements. *Id.* If a plaintiff satisfies these threshold considerations, the Court should consider the balance of harms in granting or denying the injunction and considerations of the public interest, (i.e., nonparties). *Id.* See also *American Hospital Supply Co. v. Hospital Products Limited*, 780 F.2d 589, 593-94 (7th Cir. 1986).

Here, plaintiffs fall far short of the showing needed. As a threshold matter, Plaintiffs cannot show a threat of irreparable harm where their claim is essentially about the payment of money in the form of lotter prize winnings; there also are adequate remedies at law in state court (and through legislation, with the passage of a budget that will authorize the legally required appropriation). It is well established that the ability to obtain a money judgment is an adequate remedy at law and negates the existence of irreparable harm, and a plaintiff suing for money is not normally entitled to a preliminary injunction requiring the defendant to set aside money to ensure a possible judgment is paid. See *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond*

*Fund,* 527 U.S. 308, 319-20 (1999); *Monfardini v. Quinlan,* No. 02 C 4284, 2003 WL 21384642 at *2-3 (N.D. Ill. 2003).

In any event, there is no likelihood of success on the merits because plaintiffs' claims are barred by Eleventh Amendment. Nor have they established any likelihood of success on the merits of their claims. And if the Court reaches the next step of balancing harms, those harms tip against granting a preliminary injunction. We have already alluded to the serious implications to federalism if this Court were to override the State in managing its fiscal affairs through its political branches of government. The precedential implications would be tremendously adverse. Moreover, as a practical matter there would be no point to transferring tens of millions of dollars into a court fund where the disputed amounts are in the State treasury backed by the full faith and credit of the State. It makes no sense to transfer the money out of the State treasury, then transfer it back to the State for distribution in the regular course of business after a budget (or an appropriation limited to the Lottery) is approved, making the whole effort pointless.

## II.  PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF A TRO OR PRELIMINARY INJUNCTION; ADEQUATE LEGAL REMEDIES EXIST.

As a threshold matter, Plaintiffs do not present even a single shred of evidence to show that they will suffer an irreparable harm in the absence of injunctive relief. Plaintiffs' request for sequestration of money from the state treasury is based solely upon an unsupported, unfounded fear that, after the budget impasse is resolved, the State will be insolvent to the point of not being able to pay lottery winners. Doc. 17 at 24. The burden rests with Plaintiff to present evidence sufficient to demonstrate all of the elements for a TRO. See *Am. Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 805 (7th Cir. 2002). There is nothing here to support Plaintiffs' speculative fear. Indeed, the fact that HB4305—which would appropriate enough money to pay Plaintiffs

8

their lottery winnings—has passed one chamber of the General Assembly is a positive sign that an appropriation to pay lottery winnings is forthcoming. Thus, there won't be any irreparable harm if this legislation passes. And as we will discuss further below, the Illinois Court of Claims can provide a remedy for any possible breach of contract claim after the appropriation is approved. See *Smith v. Jones,* 113 Ill. 2d 126, 132-33 (1986).

## III. THE ELEVENTH AMENDMENT BARS THIS ACTION

### A. Summary of argument

The Eleventh Amendment protects unconsenting states from suit in federal court.[3] Plaintiffs do not and cannot contend that Illinois has waived its immunity, nor do they contend that this action is brought under statutes where Congress exercised its authority to abrogate the State's immunity. Section 1983 does not abrogate the immunity, nor does the Declaratory Judgment Act, nor the RICO statute. The Supreme Court has made clear "that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 101 (1984). "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.* Even if the Department of Lottery were not sued and only its Director were named, the Eleventh Amendment bar remains because the State is the real party in interest. *Id.* The only exception, long established under *Ex parte Young,* 209 U.S. 123 (1908), is that a state official may be sued for prospective injunctive relief if the state official is alleged to be violating federal law. *Pennhurst,* 465 U.S. at 102. But here, plaintiffs do not and cannot claim that Director Lane herself is empowered in her official capacity to pay lottery winnings and is not doing so for some illegitimate reason. Plaintiffs' real claim is that the Illinois legislature (i.e., the State itself) has

---

[3] The Eleventh Amendment has been treated as a matter of subject matter jurisdiction, but because it can be waived, it has more recently been described as a State's sovereign immunity from suit. See *Ind. Protection and Advocacy v. Ind. Family and Soc. Servs. Adm.,* 603 F.3d 365, 370-71 (7th Cir. 2010) (en banc).

failed to appropriate the money that would permit Director Lane and the Lottery Department to process the winning tickets which are now being held up.

In this respect, this case is identical to *McDonough v. Grunloh,* 722 F.3d 1043 (7th Cir.2013), where the Court noted:

> The Eleventh Amendment was adopted to ensure that such retroactive damage claims would not be heard in federal court absent the state's consent. Thus, courts may enjoin ongoing behavior by state officials that violates federal law. They may also order state officials to act in a certain manner going forward that may cost the state money to implement. They may not, however, direct a state to make payments to resolve a private debt or to remedy a past injury to a private party.

*Id.* at 1050-51.

In an effort to avoid the Eleventh Amendment, plaintiffs argue that the Illinois Department of the Lottery is not "an arm of the State." On its face, this claim has no merit because the Department of the Lottery is a cabinet-level department whose director is appointed by the Governor, making it a part of state government. Ex. D.

Finally, to the extent plaintiff seeks injunctive relief based on state law claims, the Eleventh Amendment bars those claims as well, as shown below.

### B.    Plaintiffs cannot overcome the Eleventh Amendment through the guise of "prospective injunctive relief" where the real effect is to control the State's Treasury.

Plaintiffs maintain that what they seek is "injunctive relief"—that is, a sequestration of money from the State Treasury into an account held by the Court—to ensure that there are funds sufficient to pay them their lottery winnings. They argue that, because this sort of relief is "prospective" in nature, it fits within the *Ex Parte Young* exception to the Eleventh Amendment. The argument is breathtaking, for if this sort of injunctive relief is granted here, then every grantee who is owed money from the State could rush to federal court and seek a sequestration of the amount of money owed to him or her until an appropriation to pay that amount is enacted. At

10

the heart of the Eleventh Amendment is the protection of the State's Treasury, see *Hess v. Port Auth. Trans Hudson Corp.*, 513 U.S. 30, 48 (1994), and the type of injunctive relief sought here directly affects the State's Treasury adversely.

It is the effect of the relief that controls the Eleventh Amendment analysis, not what Plaintiffs call the relief. *McDonough*, 722 F.3d at 1051-52 (applying Eleventh Amendment to reverse grant of injunctive relief that amounted to retroactive payment of monies owed for contract work with State). *McDonough* is controlling. McDonough tried to argue that the relief he sought was to compel the agency (IDOT) to resume normal business operations (to pay its bills), but the Seventh Circuit recognized that the essential retroactive nature of the relief sought—pay us the money we are owed—was apparent. *Id.* It is equally clear here. The lottery winners want the money they have won, not a prospective change in procedures to guarantee future lottery prizes they might win.

In *McDonough*, the court held that while *Ex Parte Young* provides a limited exception to the Eleventh Amendment for prospective injunctive relief, the Eleventh Amendment bars an order that would result in requiring a state to disburse money from its treasury. *Id.* at 1051. "*Ex parte Young* and its progeny permit equitable relief resulting in the state expenditure of funds only when that expenditure is an ancillary, not a primary, effect of the relief." *Id.* In considering whether the exception to *Ex parte Young* applies, the court instructed that "'[i]t is necessary to look not at the type of relief sought, but the effect the relief would have on the State if it were afforded to the plaintiff.'" *Id.* (quoting *Council 31 of the Am. Fed'n of State, County, & Mun. Employees v. Quinn*, 680 F.3d 875, 883 (7th Cir. 2012)). Although McDonough had characterized the relief sought as prospective injunctive relief—ordering the IDOT officials to sign contracts— the court recognized that the effect of the relief was to force the State to issue "payment for past

11

services." *Id.* at 1051-52. Because the TRO "exceeded the boundaries set by the Eleventh Amendment by ordering state officials to pay a private party for an alleged debt," the Seventh vacated the district court's TRO. *Id.* at 1052-53.

Like *McDonough*, the primary purpose of plaintiffs' request for injunctive relief here is to require the Illinois Defendants to disburse money from the state treasury. The only reason Plaintiffs seek a sequestration of money from the state treasury is to isolate the money to eventually capture it. Thus, the *primary* effect (as opposed to simply an ancillary effect) of the injunctive relief sought in this case is to pay Plaintiffs their outstanding lottery winnings. In that regard, Plaintiffs' request is just like the one made in *McDonough* and, consistent with that case, Plaintiffs' request for preliminary injunctive relief should be denied.

### C. The Illinois Lottery Defendants are arms of the state.

Plaintiffs recognize that the Eleventh Amendment poses a significant obstacle in their efforts to seek an order from a federal court compelling payment of lottery winnings. Doc. 17 at 9. To try to overcome this hurdle, they argue that the State Lottery Department and its Director B.R. Lane do not constitute "arms of the state" for purposes of the Eleventh Amendment.

At the outset, this issue has arisen in at least one other federal court decision from this circuit, *Malone v. Schenk*, 638 F. Supp. 423, 426 (C.D. Ill. 1985), and the court there held that the state lottery was protected from liability for money damages under the Eleventh Amendment because it was an arm of the State. The holding in *Malone* is consistent with later decisions that have clarified the analysis used in determining whether an entity qualifies as an arm of the State for purposes of the Eleventh Amendment. In *Kashani v. Purdue Univ.*, 813 F.2d 843, 845-47 (7th Cir. 1987), the Seventh Circuit held that to determine if an entity is an arm of the State, two factors are relevant: (1) the extent of the entity's financial autonomy from the state and (2) the

"general legal status" of the entity. The financial autonomy factor is more important. *Burrus v. State Lottery Comm'n of Ind.*, 546 F.3d 417, 420 (7th Cir. 2008). Under both prongs, the Lottery Department and B.R. Lane in her official capacity qualify as arms of the State.

When *Malone* was decided, the state lottery was not a separate agency (rather, it was a division within the Illinois Department of Revenue), but that is a distinction without a difference, for the court concluded that the state lottery was an arm of the State because all income generated by the Lottery's activities were deposited into the state treasury. 638 F. Supp. at 426. That is exactly the case with the present-day Lottery Department. The Illinois Lottery Law created a special fund known as the State Lottery Fund which consists of lottery revenues and which is in the state treasury. 20 ILCS 1605/20; Ex. C, Froelich Dec., ¶4. The lottery's revenue is maintained in the state treasury. 20 ILCS 1605/21; Ex. C, Froelich Dec., ¶¶4,7. Thus, this Court should rule consistently with *Malone* that the lottery is an arm of the State for purposes of the Eleventh Amendment.

**1. The lottery is not financially autonomous from the State.**

In determining the financial autonomy of an entity from the State, courts look at the following five factors: (1) the extent of state funding; (2) the state's oversight and control of the entity's fiscal affairs; (3) whether the state taxes the entity; (4) whether a judgment against the entity would result in the state increasing its appropriations to the entity; and (5) the entity's ability to raise funds independently. *Burrus*, 546 F.3d at 420. Here, the balance of the factors weighs in favor of finding that the lottery is an arm of the State.

*First*, the functioning of the lottery—including payment to lottery winners—is inextricably intertwined with general state funding. As noted above, the State Lottery Fund is created at 20 ILCS 1605/20, and all income arising out of the activities of the lottery are paid

13

into this special fund within the State's treasury. 20 ILCS 1605/21. Neither the lottery nor its director has any autonomous authority to disburse money from this fund. 20 ILCS 1605/20; Ex. C, Froelich Dec., ¶¶8,30. Once money has been deposited into the State's treasury, as is the case with money deposited into the State Lottery Fund, only the Illinois Treasurer has the authority to spend that money, and then only upon direction by the Illinois Comptroller. See Ill. Const. Art. V, §§17-18; Ex. C, Froelich Dec., ¶¶8,30. Because the lottery and its director have no authority to make payments from the State Lottery Fund, nor do they have any control whatsoever over that fund, or any other fund sitting in the State's treasury, the Lottery Department operates under financial dependence of the State.

We note that the lottery does have access to a limited account of public funds. 20 ILCS 1605/20.1 authorizes the lottery to pay validated prizes up to $25,000 from funds that the lottery holds in a separate account. Ex. C, Froelich Dec., ¶11. But the only authority the lottery has with respect to this account is to pay validated lottery winnings of no more than $25,000. Moreover, once this account is depleted, the lottery has no autonomous authority to replenish it. Ex. C, Froelich Dec., ¶13. Rather, "[t]he Department shall submit vouchers from time to time as needed for reimbursement of this account from moneys appropriated for prizes from the State Lottery Fund." 20 ILCS 1605/20.1(a). Thus, although the Lottery Department has control over one limited account, it cannot fund the account without an appropriation. Ex. C, Froelich Dec., ¶13. And again, only the State Treasurer is authorized to disburse funds from the State Lottery Fund to replenish the Lottery Department's account. See Ill. Const. Art. V, §§17-18. Because the lottery operates under the financial constraints of the State generally, the extent of state funding factor cuts in favor of finding that the lottery and its director are arms of the State.

14

*Second*, the State maintains significant oversight and control over the lottery's fiscal affairs. As mentioned above, the State Lottery Fund is controlled by the Treasurer, not the lottery. The lottery's separate account, 20 ILCS 1605/20.1(a), is dependent upon a State appropriation for adequate funding. Additionally, the lottery's director must "report monthly to the State Treasurer and the Lottery Control Board a full and complete statement of lottery revenues, prize disbursements and other expenses for each month . . . ." 20 ILCS 1605/9(j). The Lottery also "shall be accountable to the General Assembly and the people of the State through a comprehensive system of regulation, audits, reports, and enduring operational oversight." 20 ILCS 1605/2. The Lottery Director must also report this information annually to the Governor. *Id.* The Speaker, Senate President, and minority leaders of both houses of the General Assembly also receive these reports. *Id.* And as far as funding is concerned, "[m]oneys may not be transferred from the State Lottery Fund to the Lottery Department's account for payment of prizes [up to $25,000] until procedures are implemented to comply with the Comptroller's Offset System and sufficient internal controls are in place to validate prizes." 20 ILCS 1605/20.1(b). Without a doubt, the State maintains significant control over the lottery's fiscal affairs.

*Third*, the State does not tax the lottery.

*Fourth*, a court judgment against the Department of the Lottery would be identical to a judgment against the State of Illinois. We are not aware of any statutory provision of the Illinois Lottery Law, or other statute for that matter, that authorizes payment of court judgments from the State Lottery Fund. Presumably, if there is a judgment against the lottery, payment will be made by the State Treasury. The Illinois Constitution requires that expenditures of public funds, which would include payments to satisfy court judgments, shall be appropriated by the legislature. See ILL. CONST. art. VIII, § 2(b); 30 ILCS 230/2(a)(4); see *Bd. of Trustees* v. *Burris,* 118 Il1.2d

465,481 (1987) (appropriations do not mandate expenditure of state funds, but provide for ability to do so). Accordingly, a monetary judgment against the lottery would likely require an increase in appropriation to the Lottery Department, or a separate payment from the state treasury.

Finally, we recognize that under the *fifth* factor, the lottery has the ability to raise funds independently through its operations and administration of lottery games. But this is not a totally autonomous authority to raise revenue. Rather, the lottery is constrained by the mandates of the Illinois Lottery Law. So even to the extent the lottery has some discretion to raise revenue, when balanced against the remaining factors, it is clear that the lottery and its director in her official capacity are arms of the State. This is especially true given the lottery's significant fiscal reliance upon the State. See *Burrus*, 546 F.3d at 420.

### 2. The Lottery's general legal status is that of an arm of the State.

The second factor that courts consider in determining whether an entity is an arm of the State is its "general legal status." *Id.* Plaintiffs principally rely on *Burrus v. State Lottery Comm'n of Ind.*, 546 F.3d 417 (7th Cir. 2008), to argue that the Illinois Department of the Lottery and its director should not be considered arms of the State. *Burrus* does not apply here for multiple reasons.

The *Burrus* court held that the Indiana Lottery was not an arm of the state. But that case is quite distinguishable. For starters, the Indiana General Assembly created Indiana's lottery "as a separate body politic and corporate from state government." *Id.* at 418 (quoting Ind. Code §4-30-1-2(1)). The court found that the Indiana legislature intended that its Lottery "function 'as much as possible as an entrepreneurial business enterprise," and mandated "[t]hat the lottery games as a self-supporting revenue raising operation.'" *Burrus*, 546 F.3d at 418 (quoting Ind. Code §§4-30-1-2(1), (3)). The Indiana legislature authorized the Indiana Lottery to sue and be

16

sued in its own name. *Burrus*, 546 F.3d at 418 (citing Ind. Code §4-30-3-1). When the Indiana Lottery is sued, it makes its own decision about whether it will agree to a settlement. *Burrus*, 546 F.3d at 418. Moreover, the court highlighted that the Indiana Lottery's revenue is maintained in an administrative trust fund that is completely controlled by the Indiana Lottery. *Id.* Additionally, the Indiana Lottery establishes its own annual budget and is not required to seek approval of that budget from the state's legislature. *Id.* at 419. And as the court noted, "[m]ost importantly, the [Indiana] Lottery pays any legal obligation from its own administrative trust fund. The Indiana Attorney General has expressly disclaimed liability for any of the Lottery's monetary obligations." *Id.* at 420 (citing 1991 Ind. OAG No. 10). Thus, under these bases, Indiana's State Treasury "is not exposed should there be a monetary judgment against the Indiana Lottery." *Burrus*, 546 F.3d at 420.

Illinois's lottery is vastly different as it relates to financial dependency on the State. For example, the Illinois legislature created the lottery to be conducted specifically by the State through its Department of the Lottery, 20 ILCS 1605/2, an agency the legislature deemed to be an official department of the State, like other agencies such as the State Police, the Department of Revenue, or the Department of Corrections, 20 ILCS 5/5-15. The Illinois legislature did not intend for the lottery to operate as an entrepreneurial business. Importantly, the lottery cannot operate without a budget approved by the legislature and the Governor. It cannot control its own revenue. Ex. C, Froelich Dec., ¶¶4,7,8,30. That money is paid into the state treasury. 20 ILCS 1605/21. Once deposited into the treasury, the Treasurer, and not the lottery, controls the money. Ex. C, Froelich Dec., ¶8,30; see *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 99 (1st Cir. 2002) (holding Massachusetts Lottery is arm of state where, among other factors, the lottery's budget must be approved and appropriated by the legislature annually).

Also, unlike the Indiana Lottery at issue in *Burrus*, the Illinois legislature authorized the Illinois Lottery to sue and be sued in its own name. If the Illinois Lottery Department is sued, the Illinois Attorney General provides representation.as it routinely represents other state agencies. See 15 ILCS 205/4. The lottery does not act autonomously. And if there is a judgment against the lottery that exceeds funds appropriated to it to pay legal liabilities, the state treasury is exposed. See *Wojcik*, 300 F.3d at 99 (holding that potential for additional appropriations to satisfy adverse judgment is indicator that entity is arm of state). Undoubtedly, the lottery is financially dependent on the State. It operates just like any other state agency as far as financial dependence is concerned. It is not like a private business as in the case of the Indiana Lottery. Simply put, it is an arm of the State.

The Director of the Lottery is a cabinet-level position, appointed by the Governor, by and with the advice and consent of the state senate. 20 ILCS 1605/5(a). Ex. D. As discussed above, the State maintains significant oversight over the lottery's fiscal affairs. The lottery is authorized to promulgate administrative rules and regulations governing its operations like all other agencies of the State. 20 ILCS 1605/7.1. Its rules and regulations are subject to the Illinois Administrative Procedures Act, like the rules and regulations of other state agencies. *Id.* The Lottery's records and data are subject to public inspection and copying under the Illinois Freedom of Information Act. 20 ILCS 1605/12. All income arising out of the lottery's activity is paid into the state treasury, and not into a private account held solely by the lottery. 20 ILCS 1605/21; Ex. C, Froelich Dec., ¶6. And all final administrative decisions of the lottery are subject to the Illinois Administrative Review Law, 20 ILCS 1605/25, as is the case with many other state agencies' final administrative decisions. These are all strong indicators that the lottery's general legal status is one of being an arm of the State.

In sum, the Illinois Lottery and its director are neither financially autonomous from the State nor considered legally to be an independent entity operating outside of the context of State government. As such, Illinois Defendants are protected by Eleventh Amendment immunity and, therefore, all of Plaintiffs' claims which seek an order compelling Illinois Defendants to pay outstanding lottery winnings must be barred. See *Hess*, 513 U.S. at 48 (noting that at heart of Eleventh Amendment is protection of the state's treasury); see *Edelman v. Jordan*, 415 U.S. 651, 678 (1974) (holding that Eleventh Amendment barred order compelling State to reimburse plaintiffs for wrongfully withheld public aid benefits).

3. **Only the Comptroller and Treasurer are able to disburse the funds in the State Lottery Fund, and both are unquestionably protected the Eleventh Amendment.**

Finally, we pause to note one additional problem facing Plaintiffs that they do not address. The majority of Plaintiffs are unpaid lottery winners who have won amounts in excess of $25,000. Neither the Illinois Lottery nor its director would be authorized to make payments of that size even if there were a budget and effective appropriations measure for FY16. Ex. C, Froelich Dec., ¶¶17-18; 20 ILCS 1605/20, 20.1(a); Ill. Const. art. V, §§17-18. The Illinois Comptroller and the Illinois Treasurer are the state officials who are responsible for payment from the State's treasury of lottery prizes in excess of $25,000. Ill. Const. art. V, §§17-18. Plaintiffs do not claim that these constitutional officers lack Eleventh Amendment immunity in their official capacities. Nor could they. Thus, any relief sought here would have to be against the Illinois Comptroller and the Treasurer, who both are undoubtedly protected by Eleventh Amendment immunity for many of the same reasons discussed above.

D. **The Eleventh Amendment bars state law claims against state officials in their official capacities.**

19

As we noted earlier, the amended complaint contains numerous state law claims: Counts V, VI, VII, VIII, and IX, alleging civil conspiracy, conversion, and unjust enrichment. [4] These state law claims against state officials in their official capacities are also barred by the Eleventh Amendment. *Pennhurst* addressed the point explicitly:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.

465 U.S. at 106. See also *Moore v. Watson,* 838 F.Supp.2d 735, 753 (N. D. Ill. 2012).

## IV.     THERE IS NO LIKELIHOOD OF SUCCESS ON THE PLAINTIFFS' DUE PROCESS CLAIMS.

The plaintiffs' main federal claim is that they have been denied due process of law because there has been a delay in receiving their lottery prizes. Their vehicle for asserting this claim is 42 U.S. C. § 1983. To the extent they make this claim against the Department of the Lottery itself, it is barred on Eleventh Amendment grounds, *Quern v. Jordan,* 440 U.S. 332 (1979), and because the State and its agencies and departments are not as "persons" subject to suit under 42 U.S.C. § 1983. *Will v. Mich. Dep't of State Police,* 491 U.S. 58 (1989).

But even if one moved beyond those threshold defects, plaintiffs have no likelihood of success on the merits of a due process claim. We have already shown that lottery games are matters of state contract law, and the mere delay in paying prizes hardly constitutes a "breach" of contract. While it is true that property interests are defined by state law, and that legitimate claims of entitlement can rise to the level of a protected property interest, see *Board of Regents v.*

---

[4] Besides the state law claims noted above, Count I is titled "Declaratory Judgment" and Counts XII and XIII are labeled "Mandatory Injunction." These counts do not assert independent theories of recovery but rather remedies, and as labels for counts of a complaint are improper on that basis. See J*ones v. ABN AMRO Mort. Group,* 551 F.Supp.2d 400, 406 (E.D. Pa. 2008). They are redundant to theories put forward in other counts and need not be separately addressed.  We would also note that the Declaratory Judgment Act, 28 U.S.C §§ 2201-2202, does not abrogate the Eleventh Amendment. *Ameritech Corp. v. McCann,* 176 F.Supp.2d 870, 877-78 (E.D. Wis. 2001).

*Roth,* 408 U.S. 564 (1972), lottery winners whose payments have been delayed would have no likelihood of success on the merits of a claim that they have been deprived of property in a constitutional sense without due process of law.

*First*, the Fourteenth Amendment protects those *deprived* of property without due process of law. There has been a regrettable delay in the pay out of lottery prizes because of the lack of a budget, but as we have noted, the legislature appears to be in the process of passing a bill to remedy this, so it is not correct to conclude there has been some sort of final "deprivation" of any legitimate winner's prize. See *Brown v. Brienen,* 722 F.2d 360, 366 (7th Cir. 1983)("the deprivation was merely a postponement," and "it may even be doubted whether any deprivation in the constitutional sense has yet occurred or will occur unless and until the state courts turn down a meritorious contract claim.") There is no question the state will pay lottery winners their prizes—it has every reason to do so given the amount of money the lottery generates for public education, and it has every interest in fulfilling its role as a reliable partner to those who buy lottery tickets.

*Second*, the Fourteenth Amendment does not protect against all property deprivations absolutely, but only those that occur without *due process of law*. In general, that means a hearing before the property is taken away. But this is subject to significant exception. If the State cannot feasibly anticipate the property loss, then a post-deprivation hearing is adequate. *Ellis v. Sheahan,* 412 F.3d 754, 758 (7th Cir. 2005). That is clearly the case here—how could anybody feasibly get a hearing *before* they won the lottery? In such circumstances, due process after the "deprivation," if there is one, is adequate.

*Third,* the Seventh Circuit has repeatedly held that the federal courts, applying the Fourteenth Amendment, are not meant to be the forum for every breach of contract claim

involving a government body. If that were true, whole areas of state law would be displaced. *Brown,* 722 F.2d at 364 ("we must bear in mind that the Fourteenth Amendment was not intended to shift the whole of the public law of the states into the federal courts."); *Taake v. County of Monroe,* 530 F.3d 538, 541 (7th Cir. 2008) ("the Constitution does not require states to keep all promises made in their contracts and regulations….[A] unit of state or local government does not violate the federal Constitution just because it violates a state or local law, including the law of contracts."); *Mid-American Waste Systems v. City of Gary, Ind.,* 49 F.3d 286, 289 (7th Cir. 1995) ("Courts have resisted the implication that every government-contract case belongs in federal court."); *Horwitz-Mathews, Inc. v. City of Chicago,* 78 F.3d 1248, 1250 (7th Cir. 1996)("It would be absurd to turn every breach of contract by a state or municipality into a violation of the federal Constitution.")

*Fourth*, even if one were to conclude there was a property interest involved here worthy of constitutional protection, a state law contract action would provide all the process that is due. *Brown,* 722 F.2d at 366; *Sorrentino v. Godinez,* 777 F.3d 410, 415 (7th Cir. 2015) ("A person with a claim against Illinois based on a contract with the state must bring suit in the Illinois Court of Claims, rather than in the relevant Illinois circuit court or federal district court."); *Khan v. Bland,* 630 F.3d 519, 531-32 (7th Cir. 2010). In reality, "due process of law" will be afforded the lottery winners when the legislature passes an appropriation. If there is a dispute or problem after that regarding someone's prize money, the Court of Claims will be the available forum, and this will provide all the process that is due.

Plaintiffs also alleging a Takings Clause claim. The analysis is the same. *Casey v. Depetrillo,* 697 F.2d 22, 23 (1st Cir. 1983) (breach of contract claim brought under Takings Clause dismissed, otherwise every breach of contract case would be a federal case). There has

22

been no "taking" of prizes won in the lottery. And a plaintiff may not bring a Takings Clause claim in federal court without having exhausted state remedies. *Peters v.Village of Clifton,* 498 F.3d 727, 732 (7th Cir. 2007); *Daniels v. Area Plan Comm'n of Allen County*, 306 F.3d 445, 453 (7th Cir. 2002).

## CONCLUSION

Plaintiffs have failed to establish the essential elements required to obtain preliminary injunctive relief, and the Eleventh Amendment prevents a federal court from awarding retroactive monetary relief against a State. In any event, plaintiffs' claims are at best not federal, but rooted in state law. The State of Illinois Defendants request that the motion for temporary restraining order and preliminary injunction be denied.

Respectfully submitted,

LISA MADIGAN
Attorney General of Illinois

s/*Thomas A. Ioppolo*
THOMAS A. IOPPOLO
SUNIL BHAVE
Assistant Attorneys General
General Law Bureau
100 W. Randolph Street, 13th Floor
Chicago, Illinois 60601
(312) 814-7198

**EXHIBIT INDEX**

Exhibit A: Sample Illinois Lottery ticket

Exhibit B: Illinois Department of the Lottery Game Rules

Exhibit C: Declaration of Christian Froelich, Chief Financial Officer of the Department of the Lottery

Exhibit D: Press release from Governor's Office appointing B. R. Lane as Director of the Lottery

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the aforementioned document was filed on November 17, 2015 through the Court's CM/ECF system. Parties of record may obtain a copy of the paper through the Court's CM/ECF system.

/s/ *Thomas Ioppolo*
Thomas Ioppolo
Assistant Attorney General

24